DAN RAYFIELD
Attorney General
BRIAN SIMMONDS MARSHALL #196129
LEANNE HARTMANN #T25070201, Mass. BBO #667852
Senior Assistant Attorneys General
CARTER BRACE #243828
Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Brian.S.Marshall@doj.oregon.gov
        Leanne.Hartmann@doj.oregon.gov
        Carter.Brace@doj.oregon.gov

*Attorneys for the State of Oregon*

[Additional counsel to appear on signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF OREGON; STATE OF MINNESOTA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF WISCONSIN, | Case No. 6:25-cv-01748 COMPLAINT |
| *Plaintiffs*, | |
| v. | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his Official Capacity as Secretary of U.S. Department of Health and Human Services; UNITED STATES HEALTH AND HUMAN SERVICES ADMINISTRATION FOR CHILDREN AND FAMILIES; and ANDREW GRADISON, in his Official Capacity as Acting Assistant Secretary of U.S. Health and Human Services Administration for Children and Families, | |
| *Defendants*. | |

## INTRODUCTION

1.    Through threatening letters and coercive terms and conditions, the Department of Health and Human Services (HHS) is attempting to force Plaintiff States to rewrite sexual health curricula to erase entire categories of students. Specifically, HHS seeks to forbid even a passing mention of inclusive gender identity in the Personal Responsibility Education Program (PREP) and the Title V Sexual Risk Avoidance Education program (SRAE). This is the latest attempt from the current administration to target and harm transgender and gender-diverse youth as well as youth with differences in sex development (DSD) in the Plaintiff States.

2.    HHS's actions directly contradict the statutes creating these programs. For the past four decades, the federal government has recognized a significant public health need for adolescent sexual health education. Along with other comprehensive sexual health education programs, Congress passed PREP and SRAE's enabling statutes in response to rising teen pregnancy rates and the transmission of HIV/AIDS and other sexually transmitted infections (STIs). In furtherance of these goals, PREP and SRAE require federally funded sexual health education content be "medically accurate and complete," "culturally appropriate" or provided in the appropriate "cultural context." 42 U.S.C. § 713(b)(2)(B)(ii), (v), (vi) (PREP); *id.* § 710(b)(2)(E) (SRAE).

3.    HHS's actions are also a radical departure from how PREP and SRAE have historically been implemented. Consistent with the enabling statutes' requirements, Plaintiff States have implemented medically accurate, complete, and culturally appropriate sexual health education curricula that recognize and affirm gender identity. Each year, HHS has approved the States' PREP and SRAE applications. And as recently as last year, HHS mandated that PREP and SRAE programs and projects be inclusive of LGBTQIA+ youth. Now HHS commands that States remove all references to "gender ideology"—an ill-defined term that appears sweeping in scope.

4.    Suddenly forcing Plaintiff States to remove medically supported, complete, and culturally appropriate content in the materials for PREP and SRAE is contrary to the laws that Congress adopted and is arbitrary and capricious under the Administrative Procedure Act. Congress created PREP and SRAE with clear requirements that are at odds with the Trump

Administration's insistence that sex is absolute, fixed, and binary, and that any reference to transgender or gender-diverse identity must be erased altogether, including in curriculum materials for adolescents funded by PREP and SRAE.

5.      Unilaterally requiring States to remove all references to "gender ideology"—a vague, undefined, and nonsensical term—also usurps Congress' spending power and violates the separation of powers. The Constitution makes clear that it is Congress, not the executive branch, who controls the federal government's spending authority. Furthermore, an executive agency cannot reject crucial components of a validly enacted statute that Congress passed.

6.      Defendants' unlawful actions irreparably harm Plaintiff States by forcing them, and their subgrantees, into an impossible position: lose critical funding for sexual health education programs, or violate federal and state laws requiring medically accurate, non-discriminatory information within those programs. Either course will harm the very at-risk adolescents and public health goals these programs are designed to protect.

## JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202. Jurisdiction is also proper under the judicial review provisions of the APA. 5 U.S.C. §§ 702, 704, 705.

8.      An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–02, and 5 U.S.C. §§ 705–06.

9.      Venue is proper in the District of Oregon under 28 U.S.C. §§ 1391(b)(2) and (e)(1) This is an action against an officer, employee, and/or agency of the United States. The capitol of Oregon and the principal offices of the Oregon Health Authority and Oregon Department of Human Services are in Marion County, and a substantial part of the events giving rise to this Complaint occurred and continue to occur within Marion County and the District of Oregon.

## PARTIES

A.    **Plaintiffs**

10.    Plaintiff State of Washington, represented by and through the Attorney General, is a sovereign state of the United States of America. Attorney General Nick Brown is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030 to pursue this action.

11.    Plaintiff State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

12.    Plaintiff State of Minnesota is a sovereign state of the United States. Minnesota is represented by and through its chief legal officer, Minnesota Attorney General Keith Ellison, who has common law and statutory authority to sue on Minnesota's behalf. Minnesota, through its instrumentalities, including the Department of Health (MDH) administers grants (including but not limited to PREP and SRAE grants) and oversees programming related to teen health aimed at decreasing risk factors and increasing protective factors associated with teen pregnancy and sexually transmitted infections among the state's most vulnerable youth populations.

13.    Plaintiff State of Colorado is a sovereign state in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

14.    Plaintiff State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

15.    Plaintiff State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941).

Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

16.     Plaintiff District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

17.     Plaintiff State of Hawaiʻi is a sovereign state of the United States of America. Hawaiʻi is represented by Attorney General Anne E. Lopez, Hawaiʻi's chief legal officer and chief law enforcement officer, who is authorized by Hawaiʻi Revised Statutes § 28-1 to pursue this action.

18.     Plaintiff State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign state of the United States of America. Attorney General Raoul is the chief legal officer for the State of Illinois and is authorized to pursue this action under Illinois law. *See* 15 ILCS 205/4.

19.     Plaintiff State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

20.     Plaintiff State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown who is the chief legal officer of Maryland.

21.     Plaintiff the Commonwealth of Massachusetts, represented by and through its Attorney General Andrea Joy Campbell, is a sovereign state of the United States of America. Attorney General Campbell is authorized to pursue this action under Mass. Gen. Laws ch. 12, §§ 3, 10.

22.    Plaintiff State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

23.    Plaintiff State of New Jersey, represented by and through its Attorney General, Matthew J. Platkin, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

24.    Plaintiff State of New York represented by and through its Attorney General Letitia James, is a sovereign state of the United States of America. The Attorney General is New York State's chief law enforcement officer and is authorized to pursue this action pursuant to N.Y. Executive Law § 63. New York, through its instrumentalities, including the New York State Department of Health (NYSDOH) administers grants (including but not limited to PREP and SRAE grants) and oversees programming related to teen health aimed at decreasing risk factors and increasing protective factors associated with teen pregnancy and sexually transmitted infections among the state's most vulnerable youth populations.

25.    Plaintiff State of Rhode Island is a sovereign state of the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

26.    Plaintiff State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

27.    All Plaintiff States are current participants in PREP. Many have successfully participated in the program since its inception, partnering with public schools, community organizations, and curriculum designers since 2012 to create and provide information necessary to keep youth safe.

28.    Oregon, Minnesota, New York, and New Jersey, are current participants in SRAE, partnering with schools and community organizations to provide risk-reducing education to youth.

Oregon has been awarded SRAE grants since 2018, and Minnesota has received SRAE funds since 2022. All have successfully met the requirements of the program in the years since.

**B.    Defendants**

29.    Defendant United States Department of Health and Human Services (HHS) is a federal cabinet agency that Congress created and is a part of the executive branch of the United States government. HHS provides grant funding to Plaintiff States. HHS includes subagencies and components, including the Administration for Children and Families.

30.    Defendant Robert F. Kennedy is the Secretary of the United States Department of Health and Human Services and that agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of the agency. He is sued in his official capacity.

31.    Defendant Administration for Children and Families (ACF) is a division of HHS that administers grant programs and provides grant funding to Plaintiff States.

32.    Defendant Andrew Gradison is the Acting Assistant Secretary within HHS in charge of ACF. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

**A.    Congress Created and Funded Adolescent Sexual Health Education Programs to Reduce Teen Pregnancy and Sexually Transmitted Infections**

33.    Teen pregnancy and sexually transmitted infections (STIs) are major public health issues. While the teen birth rate has decreased steadily over time, teen birth rates remain higher in the United States than other high-income countries, with 13.1 births per 1,000 females aged 15-19 in 2023.[1] Babies born to teenagers are more likely to have lower birth weights, increased infant mortality, an increased risk of hospital admission in early childhood, and poorer cognitive

---

[1] Alexandria K. Mickler and Jessica Tollestrup, *Teen Births in the United States: Overview and Recent Trends*, Congressional Research Service (Apr. 17, 2025), https://www.congress.gov/crs-product/R45184#_Toc198647801; U.S. Centers for Disease Control and Prevention, Reproductive Health: About Teen Pregnancy (May 15, 2024), https://www.cdc.gov/reproductive-health/teen-pregnancy/index.html.

development.[2] Teenage parents are less likely to receive a high school diploma and more likely to need public assistance and have low income as adults.[3] In turn, teen mothers are more likely than other teenagers to be socially isolated, confront mental health issues, and have fewer educational and employment opportunities.[4] Youths aged 15 to 24 contract half of new STIs, despite representing only one quarter of the sexually active population.[5] Untreated STIs can lead to severe health complications, including pelvic inflammatory disease and increased risk of HIV and certain cancers.[6]

34.    In addition to the public health impacts, teen pregnancy and sexually transmitted infections (STIs) lead to major financial costs. In 2010, teen childbearing in the United States cost taxpayers $2.1 billion in public sector health care expenses and $3.1 billion in child welfare benefits.[7] STIs cost the U.S. healthcare system billions per year, with 26% of those costs stemming from STIs in youth aged 15 to 24.[8]

---

[2] Donald B. Langille, *Teenage Pregnancy: trends, contributing factors and the physician's role*, Canadian Medical Association Journal (May 22, 2007) https://pmc.ncbi.nlm.nih.gov/articles/PMC1867841/.

[3] Alexandria K. Mickler & Jessica Tollestrup, *Teen Births in the United States: Overview and Recent Trends*, Congressional Research Service (Apr. 17, 2025), https://www.congress.gov/crs-product/R45184

[4] Langille, *supra* note 2 (reviewing and comparing data from Canada, the United States, England, and Wales).

[5] U.S. Dep't of Health & Human Servs., *Sexually Transmitted Infections: National Strategic Plan for the United States 2021-2025* (2020), https://www.hhs.gov/sites/default/files/STI-National-Strategic-Plan-2021-2025.pdf

[6] U.S. Dep't of Health and Human Services, Sexually Transmitted Infections (STIs) (content last reviewed May 12, 2025), https://www.hhs.gov/programs/topic-sites/sexually-transmitted-infections/index.html.

[7] Carmen Solomon-Fears, U.S. Congressional Research Serv., *Teenage Pregnancy Prevention: Statistics and Programs* 4-5 (Jan. 15, 2016), https://sgp.fas.org/crs/misc/RS20301.pdf.

[8] U.S. Centers for Disease Control and Prevention, Sexually Transmitted Infections Prevalence, Incidence, and Cost Estimates in the United States (Apr. 3, 2024), https://www.cdc.gov/sti/php/communication-resources/prevalence-incidence-and-cost-estimates.html; U.S. Centers for Disease Control and Prevention, Sexually Transmitted Infections Prevalence, Incidence, and Cost Estimates in the United States (Apr. 3, 2024), Additional graphic – Cost Estimates, https://www.cdc.gov/sti/media/images/SPICE-cost-estimates.png.

35.    To combat these public health issues, Congress has exercised its spending authority to authorize federal funding for sexual health education programs for over forty years, starting in 1981, with funding intended to reduce teen pregnancy. P.L. 97-35 (enacting the Adolescent Family Life Act). In the decades that followed, this longstanding priority led Congress to enact several sexual health education grant programs, including PREP and SRAE.

36.    Congress established PREP in 2010 as part of the Patient Protection and Affordable Care Act (ACA). 124 Stat. 347-352, Pub. L. No. 111-148 § 2953 *codified as amended at* 42 U.S.C. § 713. The program expanded on the abstinence-only programming supported by prior federal grants and proved very popular among states. In the first year, 43 States and the District of Columbia applied for PREP grants.

37.    While now known as the Title V SRAE program, Congress initially passed Title V, Section 510B of the Social Security Act in 1996 after a decade of growing concern about the transmission of HIV/AIDS. The 1996 legislation provided block grants to states for sexual health education programs that counsel students on matters related to teen pregnancy and avoidance of STIs.[9] In 2018, Congress amended section 510 of the Social Security Act to restructure and rename it as the Title V SRAE program.

**B.    PREP and SRAE Overview and Requirements**

    **1.    <u>PREP</u>**

38.    PREP is designed to educate adolescents on both abstinence and contraception for the prevention of pregnancy and STIs, including HIV/AIDS. PREP's enabling statute sets forth requirements for curricula funded by PREP grants, including that the programs be "medically[]accurate and complete[,]" that they replicate or substantially incorporate elements of

---

[9] Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105, https://www.govinfo.gov/content/pkg/PLAW-104publ193/pdf/PLAW-104publ193.pdf.

"evidence-based effective programs" shown to change youths' sexual behavior, that they be age-appropriate, and that they be "provided in the cultural context that is most appropriate for individuals in the particular population group to which they are directed." 42 U.S.C. § 713(b)(2)(B).

39.　　The PREP enabling statute defines "medically accurate and complete" as "verified or supported by the weight of research conducted in compliance with accepted scientific methods" and either "published in peer-reviewed journals, where applicable" or "comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete." 42 U.S.C. § 713 (e)(2).

40.　　Programs funded with PREP grants must educate adolescents on both abstinence and contraception for the prevention of pregnancy and STIs and on at least three of six "adulthood preparation subjects." 42 U.S.C. § 713(b)(2)(A). These subjects include adolescent development, healthy relationships, and parent-child communication, among other topics. 42 U.S.C. § 713 (b)(2)(C).

41.　　PREP includes four funding streams, one of which is a formula grant to states that apply. All fifty states are eligible to receive a portion of $75 million allotted to implement PREP.[10] Additionally, PREP also provides competitive grants to localities, organizations, and tribes in states and territories that did not apply for formula grants. Plaintiff States applied for and were granted formula State PREP grants. Because PREP grants allow each state and territory to develop its programs and use its funds in the way that is most useful, PREP funding operates differently from state to state.

42.　　Washington, for example, provides PREP funds to a third party who assists school districts with adopting legally-required curriculum, trains educators, and provides ongoing

---

[10] Dep't of Health & Human Servs., *Justification of Estimates for Appropriations Committees* (2026), https://www.hhs.gov/sites/default/files/fy-2026-acfc-cj.pdf.

technical support and assistance. Washington targets students most at risk, serving more than 2,000 youth annually in 15 school districts across the state.[11]

43.     Oregon uses PREP grant funding to work with Oregon state agencies and service providers to support educational programming for Oregon youth ages 14-22 with intellectual and developmental disabilities, because that group is less likely to receive age-appropriate sexual health education instruction that is adapted for their needs as compared to their neurotypical peers.

44.     In New York, NYSDOH primarily uses PREP funding to support comprehensive, evidence-based educational programming to reduce pregnancy, HIV and other STIs, and birth rates for youth. NYSDOH has contracts with seven community-based organizations, chosen via a competitive procurement mechanism, that provide evidence-based sex education and personal responsibility curricula in local communities across our state. Approximately 2,000 youth are served each year by the programs NYSDOH implements with PREP funding.

45.     PREP grantees certify their compliance with PREP requirements—including the requirements that the program be medically accurate, age-appropriate, and culturally appropriate—each year with their grant applications. PREP grantees also understand they must "[p]articipate in a medical accuracy review of selected curricula" sponsored by HHS's Family and Youth Services Bureau (FYSB) when directed.[12] The Plaintiff States have certified their compliance through the application process.

46.     As recently as 2024, HHS prioritized programming related to gender identity. For example, the Terms and Conditions of Washington's 2024 grant state that states using PREP funding must provide programs to youth who are the most high-risk or vulnerable for pregnancies and sexually transmitted infections, which HHS explicitly noted includes transgender and/or questioning youth.

---

[11] Admin. for Children & Families, Family & Youth Servs. Bureau, *State Personal Responsibility Education Program (PREP) Grantee Profiles* (as of Mar. 25, 2025), https://acf.gov/fysb/grant-funding/state-personal-responsibility-education-program-prep-grantee-profiles.
[12] Admin. for Children & Families, Family & Youth Servs. Bureau, *FY 2024 Competitive Personal Responsibility Education Program (PREP)* 51 (2024), https://apply07.grants.gov/apply/opportunities/instructions/PKG00286006-instructions.pdf.

2.    **SRAE**

47.    In 2018 Congress authorized SRAE, which emphasizes sexual risk avoidance, to replace the Title V Abstinence Education grant program, and thus allowing SRAE grant recipients to provide students with education beyond abstinence, including education regarding contraception subject to certain limits. The purpose of SRAE is to fund projects to implement sexual risk avoidance education that teaches participants how to voluntarily refrain from non-marital sexual activity. SRAE also teaches the benefits associated with self-regulation, success sequencing for poverty prevention, healthy relationships, goal setting, and resisting sexual coercion, dating violence, and other youth risk behaviors.

48.    SRAE funding contains two components, with the first component sometimes referred to as "state," "block," or "formula awards" and the second component referred to as "competitive awards."

49.    All fifty states are eligible to receive a portion of $60 million allotted to implement SRAE. Pursuant to 42 U.S.C. § 710(a)(1)(B), State SRAE awards are based on a formula that considers the proportion of low-income children in the applying state compared to the total number of low-income children in the United States. Since fiscal year 2018, 37 to 39 states and territories have accepted annual Title V State allocations. In fiscal year 2025, HHS anticipates awarding approximately $49.2 million for 35 grant awards.[13]

50.    States that choose to apply for and accept SRAE formula funds are responsible for using the funds or distributing them to subgrantees such as community-based organizations, schools, clinics, or other organizations providing programming that complies with SRAE requirements.

51.    In states or territories that have not applied for Title V State SRAE funding, localities and organizations from those states can apply for competitive SRAE awards directly

---

[13] Dep't of Health & Human Servs. Admin. for Children & Families, Family & Youth Servs. Bureau, *State Personal Responsibility Education Program (PREP) Grantee Profiles* (as of Mar. 25, 2025), https://www.hhs.gov/sites/default/files/fy-2026-acfc-cj.pdf.

from the federal government. In FY 2025, HHS anticipates awarding $10.1 million to fund 21 grants.[14]

52.    The statutory requirements governing SRAE closely track those governing PREP. For example, 42 U.S.C. § 710(b)(2)(B) requires educational content provided under SRAE grants to "be medically accurate and complete." The SRAE authorizing statute defines "medically accurate and complete" to mean "verified or supported by the weight of research conducted in compliance with accepted scientific methods" and either "published in peer-reviewed journals, where applicable" or "comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete." 42 U.S.C. § 710(e)(2).

53.    As with PREP grants, SRAE grant content is also required by law to "be age-appropriate." *Id.* § 710(b)(2)(A). And similar to the PREP enabling statute, the SRAE enabling statute requires the program to be "culturally appropriate, recognizing the experiences of youth from diverse communities, backgrounds, and experiences." *Id.* § 710(b)(2)(E).

54.    42 U.S.C. § 708 prohibits the exclusion, denial of benefits, or discrimination on the basis of sex under programs funded by PREP and SRAE grants. An HHS rule expressly interprets sex discrimination under section 708 to include discrimination on the basis of sexual orientation and gender identity. 45 C.F.R. § 75.300(e)(8).

## C.    The Success of PREP and SRAE

55.    By all objective measures, PREP and SRAE are working. For PREP, the most recent data demonstrates that during the 2020-21 reporting period, PREP providers operated 457 programs and served 73,081 youth.[15] At the conclusion of the program, more than half of high-school-age and older youth planned to abstain from sex for at least three months as a result of

---

[14] Dep't of Health & Human Servs., *supra* note 13, at 128.
[15] Diletta Mittone, Lara Hulsey & Lauren Murphy, *PREP Performance Measures Fact Sheet: 2020–2021*, OPRE Report #2023-029 Off. of Planning, Research & Evaluation, Admin. for Children & Families, U.S. Dep't of Health & Human Servs. (Feb. 2023) https://acf.gov/sites/default/files/documents/opre/PMAPS-2020-2021-Fact-Sheet_508.pdf

participating in PREP.[16] Among those who did not plan to abstain, 41% said being in the program made them less likely to have sex in the next three months, 65% said they were more likely to use condoms if having sex, and 59% said they were more likely to use other birth control methods.[17]

56.    Additionally, many participants reported that curriculum supported with PREP funding made them more likely to engage in behaviors reflecting preparation for adulthood. More than three quarters of youth said they were more likely to better understand what makes a relationship healthy (77%), and almost three quarters were more likely to be respectful of others (73%), to resist or say no to pressure to participate in sexual acts (72%), and to make plans to reach their goals (72%).[18] Most youth reported positive perceptions of PREP-funded education, with 88% of youth reporting that they "felt respected as people."[19]

57.    PREP funding has a particularly strong impact in highly vulnerable populations, including youth in foster care, youth in adjudication systems, homeless or runaway youth, pregnant or parenting youth, and LGBTQIA+ youth.[20] In Minnesota, for example, three in four participants were part of an underserved target group.[21]

---

[16] Mittone, *supra* note 15.
[17] Mittone, *supra* note 15; *see also* Sandra Anti Eyiah & Adrienne Duke-Marks, *Evaluating Associations of the Personal Responsibility and Education Program (PREP) with Adolescents' Sexual Health and Relationship Advocacy*, 20 Am. J. Sexuality Educ. 1 (2025).
[18] Mittone, *supra* note 15
[19] Mittone, *supra* note 15
[20] Lara Hulsey, Susan Zief & Lauren Murphy, *Personal Responsibility Education Program (PREP) Snapshot –Input and Outcomes: PREP Programs Serving Runaway and Homeless Youth*, OPRE Report # 2018-44, Off. of Planning, Research & Evaluation, Admin. for Children & Families, U.S. Dep't of Health & Human Servs., (Apr. 2018) https://acf.gov/sites/default/files/documents/opre/prep_snapshot_runawayhomeless_508.pdf; *see also* Lara Hulsey, Susan Zief & Lauren Murphy, *Personal Responsibility Education Program (PREP) Performance Indicators: Youth Participants' Characteristics and Outcomes*, OPRE Report # 2018-22, Off. of Planning, Research & Evaluation, Admin. for Children & Families, U.S. Dep't of Health & Human Servs., (Apr. 2018) https://acf.gov/sites/default/files/documents/opre/prep_performanceindicator_youth_2018_22_508.pdf
[21] MN Dep't of Health, *Personal Responsibility Education Program Grantee Success Stories – Minnesota*, (last visited Sep. 25, 2025) https://www.health.state.mn.us/people/adolescent/prep/success.html

58.     PREP funding also benefits educators and caregivers. In Washington, for instance, PREP funding is used to provide school districts with training and ongoing support from subject matter experts throughout the school year. Educators find these services valuable and empowering.

59.     Parents and caregivers similarly report positive effects from PREP. Polling shows that parents and caregivers in all communities want professional sexual health education. And professional sexual health educators report that there is a strong demand for training about gender identity. Many parents participate in professional sexual health education workshops funded with PREP grant money and find them helpful and informative.

60.     SRAE is also highly successful. Studies show that States providing SRAE have lower teen birth rates. *Id.* at 5. One study in Oregon found that students who attended SRAE programming were more likely to delay sexual activity. *Id.* at 40. Moreover, facilitators report that their SRAE programming meets the needs of most youth, and youth participants report that SRAE curricular content is relevant and engaging.[22]

**D.     State Laws and Policies Promote Comprehensive, Medically Accurate, and Inclusive Sexual Health Education**

61.     Plaintiff States have promulgated a number of state laws and policies aimed at promoting comprehensive, medically-accurate sexual health education and ensuring that sexual health education be inclusive of all students.

62.     Washington law requires comprehensive sexual health education to be "medically and scientifically accurate, age-appropriate, and inclusive of all students, regardless of their protected class status…" Wash. Rev. § 28A.300.475. Washington's sexual health education must also be consistent with the Washington state health and physical education K-12 learning standards, which include teaching about topics such as self-identity (including understanding there

---

[22] Theresa Neelan, et al., *The Sexual Risk Avoidance Education Grant Program: Understanding Implementation Experiences*, viii, OPRE Report #2023-307, Off. of Planning, Research & Evaluation, Admin. for Children & Families, U.S. Dep't of Health & Human Servs. (Dec. 2023) https://acf.gov/sites/default/files/documents/opre/SRAENE-NWS-Implementation-2023.pdf.

are many ways to express gender), puberty and development, anatomy, reproduction, and pregnancy.

63.     Oregon also has a law mandating comprehensive human sexuality education. It provides, among other things, that "[c]ourse instruction shall . . . [v]alidate through course material and instruction the importance of honesty with oneself and others, respect for each person's dignity and well-being, and responsibility for one's actions." Or. Rev. Stat. § 336.455 (2)(j) (2020). The regulation requires, among other things: "[t]he comprehensive plan of instruction shall include information that . . . [u]ses inclusive materials, language, and strategies that recognizes different sexual orientations, gender identities and gender expression . . . and . . . [i]s culturally inclusive." Or. Admin. R 581-022-2050(6)(q), (s).

64.     Maryland state law requiring inclusive health education states that Maryland family life and human sexuality instruction "shall represent all students regardless of ability, sexual orientation, gender identity, and gender expression." Md. Code Regs. 13A.04.18.01(D)(2)(a).

65.     New Jersey's law requires each school district to incorporate "instruction on diversity and inclusion" into their instruction, including diversity of "gender and sexual orientation." N.J. Stat. Ann. § 18A:35-4.36a. That law also requires schools to "encourage safe, welcoming, and inclusive environments for all students regardless of . . . sexual and gender identities." *Id.*

66.     In Colorado, when sexual health education is provided, it must include "resources, references, and information that are meaningful to the experiences and needs of . . . lesbian, gay, bisexual, and transgender communities." Colo. Rev. Stat. § 22-1-128(2)(c) (2025). Further, it may not "exclude the health needs of . . . lesbian, gay, bisexual, and transgender communities." Colo. Rev. Stat. § 22-1-128(7)(b)(III) (2025).

67.    Even in Plaintiff States where sexual health education statutes do not expressly refer to inclusivity or gender identity, many of Plaintiff States use PREP funds for school programming and to the extent school districts use the curricula, sexual health education minimum standards that require comprehensiveness and accuracy will apply.

68.    Minnesota law requires school districts to have programs aimed at preventing and reducing the risk of STIs, and specifies that programs must, at a minimum, include comprehensive and technically accurate curriculum designed to target adolescents, "especially those who may be at high risk" for prevention efforts. Minn. Stat. § 121A.23 (2024).

69.    Wisconsin law requires sexual health education to provide "medically accurate information," Wis. Stat. § 118.019(2)(a), which is defined as "information that is scientifically-based and published, where appropriate, in peer-reviewed journals and textbooks," Wis. Stat. § 118.019(1m)(b).

70.    Maine's state law requiring comprehensive family life education provides for "education on family planning and sexually transmitted diseases, that is medically accurate and age appropriate…that contributes to healthy relationships…that promotes individual responsibility and involvement regarding sexuality; and that teaches skills for responsible decision making regarding sexuality." Me. Stat. tit. 22 § 1902(1-A).

71.    Hawaiʻi has a similar requirement for sexuality health education programs funded by the State. Haw. Rev. Stat. § 321-11.1 (a) requires that sexuality health education programs funded by the State provide "medically accurate and factual information that is age appropriate." "Medically accurate" is defined as "verified or supported by research conducted in compliance with accepted scientific methods and recognized as accurate and objective by professional organizations and agencies with expertise in the relevant field, such as the federal Centers for

Disease Control and Prevention, the American Public Health Association, the American Academy of Pediatrics, and the American College of Obstetricians and Gynecologists." Haw. Rev. Stat. § 321-11.1 (b).

72.    Rhode Island's health and family life courses law requires "age-appropriate and developmentally appropriate elements of effective and evidence-based programs on the prevention of pregnancy, sexually transmitted diseases, and sexual violence." 16 R.I. Gen. Laws §§ 22-17, 22-18.

73.    Plaintiff States have also established successful methods for providing sexual health and personal responsibility education, including opt-out options for families.

74.    In Washington, "any parent or legal guardian who wishes to have his or her child excused from any planned instruction in comprehensive sexual health education may do so upon filing a written request[.]" Wash. Rev. Code § 28A.300.475(7)(a).

75.    Likewise, in Wisconsin, "[n]o pupil may be required to take instruction in human growth and development or in the specific subjects…if the pupil's parent or guardian files with the teacher or school principal a written request that the pupil be exempted." Wis. Stat. § 118.02(4).

76.    Similarly, Colorado law permits parents or guardians to excuse their children from school based sexual health education programs, "without penalty or additional assignment." Colo. Rev. Stat § 22-1-128(3)(a) (2025).

77.    Maryland law directs local school systems to "establish policies, guidelines, and/or procedures for student opt-out regarding instruction related to family life and human sexuality objectives." Md. Code Regs. 13A.04.18.01(D)(2)(e).

78.    Rhode Island's laws regarding health and family life courses and HIV/AIDS education programs allow a parent or legal guardian to "exempt his or her child from the program by written directive to the principal of the school." 16 R.I. Gen. Laws §§ 22-17, 22-18.

79.    Plaintiff States also have robust antidiscrimination laws that prohibit discrimination on the basis of sex or sexual orientation, including gender identity, in places of public accommodation, which generally include public schools.

80.    Washington's Law Against Discrimination, Wash. Rev. Code § 49.60.030(1), provides "[t]he right to be free from discrimination because of . . . sexual orientation[.]" This right includes any place of public accommodation. Wash. Rev. Code § 49.60.030(1)(c). "Sexual orientation" means "heterosexuality, homosexuality, bisexuality, and gender expression or identity." Wash. Rev. Code § 49.60.040(29).

81.    In Oregon, Or. Rev. Stat. § 659A.403 provides that "all persons within the jurisdiction of this state are entitled to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation, without any distinction, discrimination or restriction on account of . . . sex, sexual orientation, [or] gender identity . . . ."

82.    Minnesota's Human Rights Act, Minn. Stat. §§ 363A.13, states that "it is an unfair discriminatory practice to discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because of . . .", among other things, "sex," "gender identity," and "sexual orientation[.]"

83.    Colorado law, CO Rev Stat § 24-34-601 (2024), states that "It is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of . . . sexual orientation, gender identity, gender expression, . . .

the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation . . . ."

84.    The Delaware Equal Accommodations Law provides that "[a]ll persons within the jurisdiction of this State are entitled to the full and equal accommodations, facilities, advantages and privileges of any place of public accommodation regardless of the race, age, marital status, creed, religion, color, sex, disability, sexual orientation, gender identity, military status, or national origin of such persons." Del. Code Ann. tit. 6, § 4503.

85.    Hawai'i law, Haw. Rev. Stat. § 368D-1, prohibits discrimination in covered educational programs and activities. It states, "[n]o person in the State, on the basis of sex, including gender identity or expression as defined in section 489-2, or sexual orientation as defined in section 489-2, shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any covered educational program or activity." Haw. Rev. Stat. § 489-2, in turn, states that "'Gender identity or expression' includes a person's actual or perceived gender, as well as a person's gender identity, gender-related self-image, gender-related appearance, or gender-related expression, regardless of whether that gender identity, gender-related self-image, gender-related appearance, or gender-related expression is different from that traditionally associated with the person's sex at birth." And "'Sexual orientation" means having a preference for heterosexuality, homosexuality, or bisexuality, having a history of any one or more of these preferences, or being identified with any one or more of these preferences.'"

86.    The Illinois Civil Rights Act bars unlawful discrimination in many settings, including places of public accommodation. *See, e.g.*, 775 Ill. Comp. Stat. 5/5-102. "Unlawful discrimination" includes discrimination "against a person because of his or her actual or perceived . . . sex . . . [or] sexual orientation. . . ." Ill. Comp. Stat. 5/1-103. It further provides

"'Sexual orientation' means actual or perceived heterosexuality, homosexuality, bisexuality, or gender-related identity, whether or not traditionally associated with the person's designated sex at birth." *Id.*

87.    Maine's unlawful educational discrimination law, Me. Stat. tit. 5 § 4602, states that "it is unlawful educational discrimination in violation of this Act, on the basis of sex, sexual orientation or gender identity . . . to: (A) Exclude a person from participation in, deny a person the benefits of, or subject a person to, discrimination in any academic, extracurricular, research, occupational training or other program or activity" and "(C) Apply any rule concerning the actual or potential familial status or marital status of a person or to exclude any person from any program or activity because of pregnancy or related conditions or because of sex or sexual orientation or gender identity."

88.    In the Commonwealth of Massachusetts, Mass. Gen. Laws ch. 151B, § 4 prohibits discrimination in employment, housing, public accommodation, and lending on the basis of sex, gender identity, sexual orientation, and other protected classes. And Mass. Gen. Laws ch. 272, §§ 92A, 98 prohibit discrimination in admission to, or treatment in, places of public accommodation.

89.    Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2302, provides that a person shall not "[d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of . . . sex, sexual orientation, [or] gender identity or expression . . . ."

90.    The Delaware Equal Accommodations Law provides that "[a]ll persons within the jurisdiction of this State are entitled to the full and equal accommodations, facilities, advantages and privileges of any place of public accommodation regardless of the race, age, marital status,

creed, religion, color, sex, disability, sexual orientation, gender identity, military status, or national origin of such persons." Del. Code Ann. tit. 6, § 4503).

91.     The New Jersey Law Against Discrimination ("NJLAD") forbids discrimination on the basis of gender identity or sexual orientation in schools. Specifically, the NJLAD defines "place of public accommodation" to include primary schools, secondary schools, and high schools, N.J. Stat. Ann. 10:5-5(l), and the law forbids any agent or employee of a place of public accommodation to "refuse, withhold from or deny to any person any of the accommodations, advantages, facilities, or privileges thereof [. . .] on account of the [. . .] gender identity or expression [or] affectional or sexual orientation" of that person. N.J. Stat. Ann. 10:5-12(f)(1).

92.     New York's Constitution states that "[n]o person shall be denied the equal protection of the laws of this state" and prohibits discrimination because of "sex, including sexual orientation, gender identity, [or] gender expression." N.Y. Const. art. I, § 11(a). Sex, sexual orientation, gender identity, or gender expression are protected categories in employment, education, places of public accommodation, and other contexts. N.Y. Exec. Law §§ 291, 296-296(D). "Gender identity or expression" is defined as "a person's actual or perceived gender-related identity, appearance, behavior, expression, or other gender-related characteristic regardless of the sex assigned to that person at birth, including, but not limited to, the status of being transgender." N.Y. Exec. Law §§ 292(35). Similar statutes in New York prohibit discrimination in "places of public accommodation, resort or amusement" based on "sex, sexual orientation, gender identity or expression." N.Y. Civil Rts. Law §§ 40, 40-c. And in education, New York prohibits discrimination or harassment against students on the basis of sexual orientation or gender, where gender means "actual or perceived sex and shall include a person's gender identity or expression." N.Y. Educ. Law §§ 11-12. Schools must include a curricula component for K-12

youth on discouraging discrimination, harassment, and bullying, and schools are also prohibited from refusing admission on the basis of sex. *Id.* at 801-a, 3201-a. New York Regulations similarly require schools to implement a written code of conduct prohibiting harassment, bullying, or discrimination against students, including for sex, sexual orientation, or gender. 8 N.Y.C.R.R. § 100.2(l)(2). New York regulations also generally prohibit discrimination on the basis of gender identity or expression, which is defined as a "person's actual or perceived gender-related identity, appearance, behavior, expression or other gender-related characteristic regardless of the sex assigned to that person at birth, including, but not limited to, the status of being transgender." 9 N.Y.C.R.R. § 466.13

**E.    Plaintiff States Are Home to Many Transgender Youth, Gender-Diverse Youth, and Youth with Differences in Sexual Development and Inclusive Education is Critically Important to These Students' Health and Well-Being**

93.    Plaintiff States are home to many transgender youth, gender-diverse[23] youth, and youth with differences in sex development ("DSD[24]"). In the United States, approximately 2.8 million people aged 13 and older identify as transgender.[25] While these populations may be underreported, this number includes about 724,000 youth ages 13 to 17, representing 3.3% of all youth. *Id.*

94.    Educators throughout Plaintiff States recognize the importance of gender-inclusive, medically accurate sexual health education by acknowledging and including all genders and

---

[23] Plaintiffs use the term "transgender and gender-diverse" to refer to youth who are nonbinary, two-spirit, genderqueer, and genderfluid, among others.

[24] DSD individuals are people who have conditions that result in an atypical combination of the factors that make up one's sex. David E. Sandberg and Melissa Gardner, *Differences/Disorders of Sex Development: Medical Conditions at the Intersection of Sex and Gender*, Annual Review of Clinical Psychology, Vol. 18 (Feb. 25, 2022), https://www.annualreviews.org/content/journals/10.1146/annurev-clinpsy-081219-101412. The term "intersex" is sometimes used to describe individuals with DSD.

[25] Jody Herman & Andrew R. Flores, *How Many Adults and Youth Identify as Transgender in the United States*? UCLA School of Law Williams Institute, (Aug. 2025), https://williamsinstitute.law.ucla.edu/publications/trans-adults-united-states/.

gender identities in a way that is supportive of transgender, gender-diverse, and DSD youth. Plaintiff States strive to provide safe and inclusive spaces for all students.

95.    Experts also recognize the importance of gender-inclusive, medically accurate sexual health education. Experts recognize that gender and sexual minority youth tend to experience "increased sexual risk behaviors and adverse health outcomes" compared to their heterosexual and cisgender peers.[26] These risk behaviors include the use of alcohol or drugs before sex, decreased condom and contraceptive use, higher incidences of forced sex, dating violence, suicidal thoughts, attempted suicide, bullying, alcohol and drug use, earlier initiation into sex, more sexual partners, and two to seven times higher incidents of teen pregnancy. *Id.* Gender-inclusive sexual health education is essential to providing these vulnerable youth accurate and relevant information to make informed and healthy sexual decisions. *See generally*, *id.* The American Academy of Pediatrics and the American College of Obstetricians and Gynecologists support and recommend including gender identity in comprehensive sexual health education.

96.    Adolescence is a time of great developmental change, and many adolescents begin to understand their gender identity during this time. Thus, an understanding of gender identity is important in education regarding adolescent development, as well as regarding healthy relationships and parent-child communication.

97.    Lack of gender-inclusive medically accurate information increases adolescents' experiences with bullying, non-consensual sex, unprotected sex, failed rates of condoms and birth control utilization, and sex while intoxicated, as well as increasing the rates of sexual experiences, number of partners, sexually transmitted infections, and teen pregnancies. Numerous studies have noted a decrease in bullying with the provision of gender-inclusive health education.

98.    Transgender, non-binary, and DSD adolescents are in just as much need, if not more, for sexual education as any other adolescents.[27] Lack of gender-inclusive medically-accurate

---

[26] Maureen Rabbitte, Sex Education in School, are Gender and Sexual Minority Youth Included? A Decade in Review, Am. J. Sex. Educ. 15(4) 530-42 (Oct 13, 2020). https://pmc.ncbi.nlm.nih.gov/articles/PMC7986966/
[27]    *Evidence-Based Sex Education: The Case for Sustained Federal Support*, Guttmacher, (Apr. 2025) (last visited Sep. 24,2025), https://www.guttmacher.org/fact-sheet/sex-education.

information increases bullying, non-consensual sex, unprotected sex, and sex while intoxicated, as well as increases the number of partners, sexually transmitted infections, and teen pregnancies.[28] Lack of gender-inclusive medically-accurate information leads to catastrophic consequences for such youth, making them feel like they do not exist and increasing depression, anxiety, and self-loathing. *Id.* Numerous studies have noted a decrease in bullying with the provision of gender-inclusive health education. *Id.* When inclusive sexual health information is not provided to gender expansive youth, rates of suicidal ideation and suicide are higher, making provision of this information potentially life-saving. As the Trevor Project found, "[r]oughly half of transgender and nonbinary young people found their school to be gender-affirming, and those who did reported lower rates of attempting suicide."[29]

99.    Stigma and discrimination, including failing to acknowledge gender identity and students' chosen pronouns and names, against LGBTQIA+ students increase their risk of HIV infection, substance use disorder, suicide, and experiencing violence.[30]

100.    Research shows a strong link between transgender and non-binary students' wellbeing and the acknowledgment of gender diversity in educational settings.[31] In addition, research indicates that comprehensive sex education programs can reduce homophobia, expand students' understanding of gender and gender norms, decrease intimate partner violence and improve communication skills.[32] Analysis of sexual health education programming over a period

---

[28] Maureen Rabbitte, Sex Education in School, are Gender and Sexual Minority Youth Included? A Decade in Review, Am. J. Sex. Educ. 15(4) 530-42 (Oct 13, 2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7986966/.

[29] 2023 U.S. National Survey on the Mental Health of LGBTQ Young People, The Trevor Project, at 4, https://www.thetrevorproject.org/survey-2023/assets/static/05_TREVOR05_2023survey.pdf

[30] *Abstinence- Only – Until – Marriage Policies and Programs: An Updated Position Paper of the Society for Adolescent Health and Medicine*, 61 J. of Adolescent Health, 401 -403 (2017), https://www.jahonline.org/article/S1054-139X(17)30297-5/fulltext.

[31] Janie Kelley, et al., *School Factors Strongly Impact Transgender and Non-Binary Youths' Well-Being*, Children (Basel) 9(10):1520 (Oct. 4, 2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9599998/.

[32] Eva S. Goldfarb, et al., *Three Decades of Research: The Case for Comprehensive Sex Education*, 68 J. of Adolescent Health, (Issue) 1, 13-27 (Jan. 2021) https://www.jahonline.org/article/S1054-139X(20)30456-0/fulltext.

of three decades indicates strong support for comprehensive sexual health education that is positive, affirming and inclusive.[33]

101.    The teaching environment established by sex educators (one in which students' identities are met with dignity and acknowledgment) itself acts as a form of educating young teens and pre-teens how to engage with others' differences. This has obvious implications for LGBTQIA+ students, whose well-being and mental health outcomes have close ties to sex inclusive sex education environments and laws.[34]

102.    Inclusive learning environments that show respect and tolerance for gender diversity also have significant implications for heterosexual cisgender boys and girls. Researchers have identified a clear pathway between bullying and homophobic peer-to-peer teasing in childhood, and later sexual harassment or sexual violence by boys and men against girls and women.[35] The CDC itself has previously issued a fact sheet noting the impact of a "climate where adolescent peer groups make fun of students who express behaviors that are not consistent with their gender," warning that peer bullying that includes homophobic bullying, if not addressed or redirected, may escalate and serve as a precursor for sexual harassment or sexual violence.[36] In short: serving the public health goal of reducing sexual harassment and other forms of sexual

---

[33] Eva S. Goldfarb & Lisa D. Lieberman, *Three Decades of Research: The Case for Comprehensive Sex Education*, 68 J. of Adolescent Health https://www.sciencedirect.com/science/article/pii/S1054139X20304560.

[34] Chelsea N. Proulx, et at., *Associations of Lesbian, Gay , Bisexual, Transgender, and Questioning – Inclusive Sex Education With Mental Health Outcomes and School-Based Victimization in U.S. High School Students*, 64 J. Adolescent Health 608-614 (2019) https://www.jahonline.org/article/S1054-139X(18)30797-3/pdf; Jennifer T. Tran, et al., *Anti-LGBTQ+ sex education laws: The effects on students and implications for schools and school practitioners*, Psychology in the Schools (July 6, 2023) https://onlinelibrary.wiley.com/doi/abs/10.1002/pits.23013; *The Trevor Project  2023 U.S. National Survey on the Mental Health of LGBTQ+ Young People* (last visited Sep. 25, 2025) https://www.thetrevorproject.org/survey-2023/#suicide-by-gender.

[35] Dorothy L. Espelage, et al., *Longitudinal Associations Among Bullying, Homophobic Teasing and Sexual Violence Perpetration Among Middle School Students*, J. Interpersonal Violence 30(14):2541-61, (Sep. 30, 2015), https://pubmed.ncbi.nlm.nih.gov/25315484/.

[36] Ctr. For Disease Control Nat'l Ctr. For Injury Prevention and Control, *The Bully-Sexual Violence Pathway in Early Adolescence*, https://cdpsdocs.state.co.us/safeschools/Resources/CDC Centers for Disease Control Prevention/CDC Bully-Sexual Violence Pathway.pdf.

violence against women requires that schools prioritize environments where gender expression is met with dignity rather than bullying.

**F.     The Medical and Scientific Consensus Regarding Gender Identity**

103.    Gender identity is distinct from sex assigned at birth. This is widely accepted by the medical and scientific community and supported by numerous professional medical organizations including the American Academy of Pediatrics, Endocrine Society, Pediatric Endocrine Society, World Health Organization, American Medical Association, and American College of Obstetricians and Gynecologists. The medical and scientific community also recognize that neither sex assigned at birth nor gender is binary.

104.    Sex assigned at birth is defined through a combination of several factors, including chromosomes, gonadal identity (e.g. testes, ovaries, or some combination of these), and external genitalia. Although most people have a male or female sex, sex is not completely binary and there are individuals who have conditions, such as DSD, that result in an atypical combination of the factors that make up one's sex.

105.    In contrast, *gender identity* refers to one's innate sense of being male, female, neither, or both. Most people have a gender identity that conforms with the sex they were assigned at birth. These people are considered *cisgender*, because their internal sense of gender and sex assigned at birth align. However, some individuals have a gender identity that does not conform with their sex assigned at birth. The umbrella term *transgender* is used to describe those individuals with a gender identity that is different than the sex designated at birth.

**G.     Benefits of Providing Gender-Inclusive Sexual Health Education**

106.    Teaching adolescents about gender identity is age-appropriate. The vast majority of transgender and gender-diverse individuals recognized their gender incongruence in childhood or adolescence. Recent data from the CDC's Behavior Risk Factor Surveillance System (BRFSS) and Youth Risk Behavior Survey (YRBS) found that in the United States 1.4% of youth ages 13 to 17 years identify as transgender or gender-diverse compared to 0.3% of people 65 and older.

107.    Education about gender identity is integral to teaching about sexual health including abstinence and contraception. Including gender identity in comprehensive sexuality education is supported and recommended by the American Academy of Pediatrics and the American College of Obstetricians and Gynecologists.

108.    If sexual health education does not include a discussion of gender identity, adolescents may not adequately understand their risk for pregnancy. For example, if a cisgender male who is sexually and romantically interested in other men were to become sexually active with a transgender man, pregnancy could result.

## H.    The "Gender Ideology" Executive Order

109.    On January 20, 2025, President Trump issued Executive Order 14,168 titled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." E.O. 14,168 (Gender Ideology Order).

110.    The Gender Ideology Order declares that "[i]t is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2.

111.    The Gender Ideology Order directs that several new definitions in the Order "shall govern all Executive interpretation of and application of Federal law and administration policy." *Id.*

112.    Section 2(a) defines "sex" to mean "an individual's immutable biological classification as either male or female," which is "not a synonym for and does not include the concept of 'gender identity.'" *Id.* Section 2(d) defines "female" as "a person belonging, at conception, to the sex that produces the large reproductive cell," and Section 2(e) defines "male" as "a person belonging, at conception, to the sex that produces the small reproductive cell." *Id.*

113.    At conception, zygotes do not produce any reproductive cells, neither large nor small.

114.    Section 2(f) claims that "'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males

can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id.* It further asserts that "[g]ender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id.*

115.    Section 2(g) states that "'[g]ender identity' reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." *Id.*

116.    As described above, gender-identity is a person's internal sense of the gender to which they belong, and is neither false nor internally inconsistent. Rather, the existence of gender-identity, and of transgender and gender-diverse identities, is widely accepted by both sexual health educators and human sexual development experts.

117.    The Gender Ideology Order forces agencies to refuse to recognize transgender, DSD, and gender-expansive people by restricting funding that promotes "gender ideology."

**I.    The Administration's Medical Accuracy Review Letter**

118.    On April 14, 2025, FYSB's Division of Positive Youth Development sent PREP grantees from Plaintiff States a letter indicating ACF was performing a "medical accuracy review" pursuant to the PREP enabling statute's requirement that all programs provide "medically accurate and complete" and "age appropriate" information. In its letter, ACF requested grantees submit curricula and programmatic materials currently in use and approved for future use.

119.    Grantees from Plaintiff States timely submitted their curricula and materials in compliance with ACF's medical accuracy review.

**J.    The Notices of Award Prohibit PREP and SRAE Recipients from Including "Gender Ideology" In Any Program or Service**

120.    On August 6, 2025, HHS issued a series of Notices of Award (NOAs) for its fiscal year 2024-2027 PREP grant awards and its SRAE grant awards. These NOAs are virtually identical, stating "[r]ecipients are prohibited from including gender ideology in any program or

service that is funded with this award." The NOA's terms and conditions repeat this prohibition, stating:

> The statutory authority for the . . . program under which this grant has been awarded . . . does not authorize teaching students that gender identity is distinct from biological sex or boys can identify as girls and vice versa, or that there is a vast spectrum of genders that are disconnected from one's sex. Therefore, gender ideology is outside of the scope of the statutory authority for this award. In addition, any costs associated with gender ideology are not allowable expenditures of federal grant funds or maintenance-of-effort funds for this grant because they are not necessary, reasonable, or allocable for the performance of this award. *See* 45 C.F.R. §§ 75.403-405.

121.    The NOAs cite 42 U.S.C. § 713 as statutory authority for PREP and 42 U.S.C. § 710 for SRAE. They also state that "the use of Federal funds from this award constitutes the grantee's acceptance of the listed terms and conditions." For some Plaintiff States, PREP programs draw down funds on a regular but unpredictable basis, often based on payroll or grant reimbursement requests. For these states, it would be impossible to come into compliance with the PREP NOA before drawing down funds without putting a freeze on all reimbursement requests and/or stopping payroll. In this type of situation, these states may be deemed to have accepted the NOA terms without having time to implement them.

**K.    The Supplemental Terms and Conditions Prohibit PREP and SRAE Grant Recipients from Including "Gender Ideology" In Any Program or Service**

122.    On August 7, HHS issued Supplemental Terms and Conditions (Supplemental T&Cs) for PREP awards and SRAE awards expressly prohibiting grant recipients "from including gender ideology in any program or service that is funded with this award" and claiming that "gender ideology is outside the scope of the statutory authority for this award [under the authorizing statutes]." The Supplemental T&Cs are "effective immediately" and "supersede all previous similar T&Cs and will remain in effect until updated for subsequent awards."

**L.    The Termination of California's PREP Grant**

123.    On March 27, 2025, ACF sent California's PREP grantees a Medically Accurate Review Letter. California submitted its PREP curriculum and programmatic materials three days later.

124.    ACF reviewed California's PREP materials and identified "multiple examples of gender ideology content, including lessons teaching students that gender identity is distinct from biological sex and that boys can identify as girls and vice versa."

125.    Later, on June 20, 2025, ACF sent California another letter imposing additional grant conditions and instructing California to remove all "gender ideology" content from its PREP curricula within 60 days, by August 19, 2025.

126.    California declined to make the demanded modifications, and on August 21, 2025, HHS sent California an "official notification" terminating all PREP awards and suspending all PREP funding in the state.

127.    Among other reasons, California declined to make the demanded modifications because HHS previously reviewed and approved the materials and also because the materials are medically accurate and directly relevant to the purposes of PREP's authorizing statute. Additionally, California noted that the PREP materials fully comply with state law, and the requested modifications may prevent PREP materials from being used by California school districts.

128.    HHS thereafter terminated California's PREP grant, claiming termination was part of HHS's "efforts to ensure federally funded programs adhere to statutory requirements and remain free of radical gender ideology."[37]

M.    **Threatened Enforcement Action in Plaintiff States**

129.    On August 26, 2025, PREP grantees in the Plaintiff States received a letter from HHS (the "PREP Directive") with a subject line indicating it concerned PREP grants for fiscal years 2023, 2024, and 2025. The PREP Directive stated that the "current PREP curricula and program materials are out of compliance with the PREP statute and HHS regulations and must be modified" because the curriculum and materials include content about "gender ideology." HHS claimed that "gender ideology is outside of the scope of the authorizing statute." It demanded that

---

[37] Press Release, U.S. Dep't of Health and Hum. Services, HHS Defunds California's Attempt to Indoctrinate Children with Gender Ideology (Aug. 24, 2025), https://www.hhs.gov/press-room/hhs-defunds-californias-attempt-indoctrinate-children-gender-ideology.html.

grantees "remove all content concerning gender ideology from its curricula, program materials and any other aspects of its program delivery within 60 days of receipt of this letter," on or before October 27, 2025. And it threatened "additional enforcement action" should States fail to make these modifications. As possible enforcement actions, it noted that HHS could "withhold, disallow, suspend, or terminate Federal awards." Since the PREP Directive concerns grants for fiscal years 2023, 2024, and 2025, its threatened enforcement actions could apply to awards at various stages, including funding awarded for previous fiscal years, in addition to the 2025 awards.

130. The PREP Directive identified certain curricula concerning "gender ideology" for each state. For example, HHS directed Delaware to remove information instructing facilitators to "[d]emonstrate acceptance and respect for all participants, regardless of personal characteristics, including race, cultural background, religion, social class, sexual orientation or gender identity." It directed Massachusetts to remove information that "[g]ender refers to the ideas in a culture or society about the appropriate ways for men and women to dress, behave, think and feel. Ideas about what gender behavior is appropriate change in different cultures and at different times in history." It directed Maine to remove several definitions from a glossary of terms from an instructor manual including, "GENDER NONCONFORMING: when a person's gender doesn't fit inside traditional male or female categories (sometimes called the gender binary)." And it directed Washington to remove the following information from a high school curriculum: "People of all sexual orientations and gender identities need to know how to prevent pregnancy and STOs [sic], either for themselves or to help a friend."

131. HHS acknowledged that "these curricula and other program materials were previously approved by ACF," but claimed that the "prior administration erred in allowing PREP grants to be used to teach students gender ideology" because "gender ideology is outside of the scope of the authorizing statue."

132. The Directive PREP directs states to eliminate "gender ideology" from their PREP "curricula, program materials and any other aspects of its program." As such, the requirements of the Directive also appear to apply to live questions asked by students in classrooms while PREP

curriculum is being taught. The PREP Directive appears to prohibit teachers from responding to student questions about their own gender identity or about how gender identity might interact with other sexual health or responsibility educational materials. Indeed, the PREP Directive appears to prohibit a teacher from referring to a student by their chosen name or pronouns while engaging in PREP curriculum.

133.    Following the issuance of these letters, HHS issued a news release stating that the "[t]his action reflects the Trump Administration's ongoing commitment to protecting children from attempts to indoctrinate them with delusional ideology." It further warned, "States and territories receiving these new letters are now on notice: failure to comply will result in similar enforcement actions including the withholding, suspension, or termination of federal PREP funding."

**N.    Impact of Threatened Funding Cuts on Students, Parents/Caregivers, Educators, and Plaintiff States**

134.    The PREP Directive, PREP and SRAE NOAs, and PREP and SRAE Supplemental T&Cs (collectively the "PREP and SRAE Gender Conditions" or "Gender Conditions") have already caused and will continue to cause immediate, lasting, and irreparable harm.

135.    Defendants' actions put Plaintiff States in an untenable situation, forcing them to choose between losing federal funding for essential public health education programs or complying with unlawful funding conditions that undermine the central purpose of these programs and conflict with state and federal laws.

136.    The termination of PREP and SRAE funding will result in a loss of at least $35 million to the Plaintiff States. Without this federal funding, Plaintiff States will not be able to continue providing the same level of critical education and services to youth populations that need them most. This will impact thousands of children, with a particularly strong impact on high-risk and vulnerable youth populations. PREP and SRAE providers in Plaiuntiff States provide programming to homeless youth, youth in foster care, youth in correctional settings, youth with intellectual and developmental disabilities, transgender, gender-diverse and DSD youth, and other

high-risk youth. They also provide programming to youth in remote regions of the states who might not otherwise receive medically accurate, culturally-competent sexual health education.

137.    In some Plaintiff States, PREP providers will lose access to vital training and technical support from subject matter experts. For example, Washington uses its PREP grant funds to provide teachers and evaluators with critical information and services. The school district partners and parents/caregivers who receive these services find them highly valuable, particularly the training programs on how to answer sensitive questions from LGBTQIA+ youth. If Washington loses its federal PREP funding, school districts will lose these critical resources, and health educators will feel immediate impacts.

138.    The loss of vital training and technical support will harm the very populations Congress intended to help. It will also cause an immediate loss of funding to the Plaintiff States as well as both short- and long-term costs through potential increases in unplanned pregnancy, higher birth rates, and higher rates of HIV/AIDS and other STIs among young people in vulnerable populations, including transgender, gender-diverse, and DSD youth.

139.    Additionally, the termination of federal funding will harm state agencies' workforces, budgets, planning, and partnerships. Without PREP and SRAE funding, state agencies and their subgrantees will be forced to consider terminating employees. Several Plaintiff States have employees who are partially or fully funded with PREP and SRAE grants. For example, Oregon PREP funding is used to cover the salary of two full-time employees at Oregon Health Authority. With the uncertainty of the PREP grant's continuation past October 27, 2025, Oregon's agency is being forced to contemplate reducing or terminating these two employees' positions. Without these two positions, the Youth Sexual Health Program would be eliminated within OHA. Likewise, in Washington, three employees at the Department of Health are partially or fully funded with PREP funding. In addition to staffing uncertainties, state agencies report that the Gender Conditions have created immense confusion and have severely negatively impacted their ability to plan for the future.

140.    Complying with the unlawful funding conditions is no less injurious. Compliance with the Gender Conditions appears to require that Plaintiff States censor sexual health education programs to deny the existence of transgender, gender-diverse, or DSD individuals. This directly undermines Congress's intent to implement programs that are "medically[]accurate and complete," and "culturally appropriate," or provided in the appropriate "cultural context" as required by 42 U.S.C. § 713(b)(2)(B)(ii), (vi) and 42 U.S.C § 710(b)(2)(E).

141.    Moreover, denying the existence of transgender, gender-diverse, or DSD individuals will have catastrophic effects for individuals in those populations. Providing medically and scientifically accurate, age-appropriate, and inclusive sexual health information is integral to combatting teen pregnancy and STIs—exactly the outcomes the PREP and SRAE programs were designed to mitigate. Additionally, providing inclusive sexual health information, including information about gender identity, is supported and recommended by numerous professional organizations. In places where inclusive sexual health information is not provided to gender expansive youth, rates of suicidal ideation and suicide are higher. And studies consistently show that transgender youth who are rejected or excluded face significantly higher rates of depression, PTSD, substance misuse, and suicidality in adulthood.

142.    And, those States that have enacted laws prohibiting discrimination against transgender youth, gender expansive youth, and youth with DSD, or laws requiring gender-inclusive educational curricula cannot comply with HHS's demands without violating state law.

143.    Lastly, complying with the unlawful funding conditions severely undermines States' ability to effectuate laws and policies aimed at promoting sexual health education that is comprehensive, medically and scientifically accurate, age-appropriate, and inclusive of all students, regardless of their protected class status.

## CAUSES OF ACTION

### COUNT 1
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)
### Agency Action Contrary to Law
### (PREP and SRAE Gender Conditions)

144.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

145.    HHS is an "agency" under the APA, 5 U.S.C. § 551(1), and the Gender Conditions are "agency action" subject to review under the APA, 5 U.S.C. § 551(13).

146.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C).

147.    The PREP and SRAE Gender Conditions conflict with the statutory requirement to provide culturally appropriate information in educational curricula. The PREP statute requires grantees to present information that is "culturally appropriate, recognizing the experiences of youth from diverse communities, backgrounds, and experiences." 42 U.S.C. § 713(b)(2)(B)(vi). The SRAE statute requires programs to be "carried out . . . in the cultural context that is most appropriate for individuals in the particular population group to which [teaching is] directed." 42 U.S.C. § 710(b)(2)(E). By refusing to allow gender-inclusive language in school curricula, the PREP and SRAE Gender Conditions require states to be culturally insensitive and inappropriate to diverse youth who identify as transgender, gender-diverse, or DSD.

148.    The PREP and SRAE Gender Conditions directly conflict with the purpose of the grants. Congress expressly intended PREP grants to be targeted to "high-risk, vulnerable, and culturally under-represented youth populations," and used to teach subjects such as healthy relationships, adolescent development, and parent-child communication. 42 U.S.C. § 713(a)(1)(C)(ii)(III), (b). Likewise, Congress intended SRAE grants to teach "healthy relationships." 42 U.S.C. § 710(b)(2)(E). Requiring removal of medically accurate, evidence-

based information essential to help high-risk and vulnerable youth populations conflicts with these purposes and is thus contrary to law.

149.    Additionally, the PREP and SRAE Gender Conditions conflict with the statutory requirement that programs using PREP or SRAE grants must be "medically[]accurate and complete." 42 U.S.C. § 713(b)(2)(B)(ii); 42 U.S.C. § 710(b)(2)(B). 42 U.S.C. § 713(b)(2)(B)(ii), (iv); 42 U.S.C. § 713 (e)(2); 42 U.S.C. § 710(b)(2)(B), (C); 42 U.S.C. § 710(e)(2). Including information about gender identity in sexual health education is integral to a complete teaching about abstinence and contraception. And requiring the removal of gender identity from the PREP and SRAE Gender Conditions, without any justification whatsoever, would render them medically unsupported and inaccurate. Accordingly, the PREP and SRAE Gender Conditions directly conflict with these statutory requirements.

150.    HHS's actions exceed statutory authority and are contrary to law under 5 U.S.C. §§ 706(2)(A) and (C). Therefore, the PREP and SRAE Gender Conditions must be held unlawful and set aside.

**COUNT 2**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious Agency Action**
**(PREP and SRAE Gender Conditions)**

151.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

152.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

153.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified). An agency

action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

154.    In making this determination, the Court looks to the "grounds that [HHS] invoked when it issued the directive." *Michigan v. EPA*, 576 U.S. 743, 758 (2015*); see also Motor Vehicle Mfrs. Ass*'n, 463 U.S. at 50. The information an agency should and should not consider necessarily "turns on what the relevant substantive statute makes important," *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 799 (9th Cir. 1996) (internal quotation marks omitted); *see Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 67 F.4th 1027, 1039 (9th Cir. 2023). It is arbitrary and capricious for the agency to neither "look to" nor "discuss" statutory "requirements," *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020), or to "rel[y] on factors which Congress has not intended it to consider" in making its decision, *State Farm*, 463 U.S. at 43; *see Ctr. for Biological Diversity*, 67 F.4th at 1039.

155.    The PREP and SRAE Gender Conditions are neither reasonable nor reasonably explained. HHS has not explained how its new conditions comply with statutory criteria or further the programs' statutory purpose as defined by Congress. The only rationale HHS gave the Plaintiff States for the new PREP and SRAE conditions was that discussion of gender identity is not authorized by 42 U.S.C. §§ 713 or 710. That explanation is not consistent with the plain language of the statutes, or objective medical evidence. If HHS had examined the relevant data, it would have found that the medical and scientific community and numerous professional medical organizations widely accept that gender identity is distinct from sex assigned at birth.

156.    Furthermore, the PREP and SRAE Gender Conditions are an impermissible pretextual justification for a preordained action. *E.g., Dept. Of Com. v. New York*, 588 U.S. 752, 785 (2019) ("The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions[.]"); *Saget v. Trump*, 375 F.Supp.3d 280, 361 (E.D.N.Y. 2019) ("An agency's actions are arbitrary and capricious under the

APA if they are pretextual"). Implicit in the PREP Directive received by Plaintiff States is that HHS intended to erase reference to transgender, gender-diverse, and DSD individuals from PREP programming at the outset of their medical accuracy review in April 2025. Seemingly, when it became clear that HHS could not do so under the veil of a "medical accuracy review," it reverse-engineered a haphazard justification that such programming was not "authorized" by the statute.

157.    The arbitrary and capricious nature of the SRAE and PREP Gender Conditions is particularly evident when one considers the unexplained inconsistency between these actions and prior HHS actions related to gender identity, including past grant awards specifically requiring targeting programs to underserved youth based on factors including gender identity. "Unexplained inconsistency" between agency actions is "a reason for holding an interpretation to be an arbitrary and capricious change." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 981 (2005). Grantees have enjoyed consistent approval of content including LGBTQIA+ inclusive content for years. Indeed, as recently as last year, HHS prioritized programming related to gender identity.

158.    The PREP and SRAE Gender Conditions also contradict HHS' own position on discrimination. Under their authorizing statutes, PREP and SRAE grants are both subject to 42 U.S.C. § 708, which prohibits discrimination on the bases of sex under any grant funded program. 42 U.S.C. § 713(d)(1)(d)(B)(vii) (PREP grants); 42 U.S.C. § 710(d)(B)(vi) (SRAE grants). HHS' own rule expressly interprets sex discrimination under 42 U.S.C. § 708 to include discrimination on the basis of sexual orientation and gender identity. 45 C.F.R. § 75.300(e). By now requiring the discriminatory erasure of any mention of gender identity in curriculum materials, HHS has abruptly reversed its position without regard to legal or medical authorities. This is quintessentially arbitrary and capricious.

159.    HHS also failed to consider the impact of the decision or reliance interests of grantees. "The change-in-position doctrine" prevents agencies from "mislead[ing] regulated entities." *FDA v. Wages & White Lion Invs.*, 145 S. Ct. 898, 917 (2025) (internal quotation omitted). "Under that doctrine, '[a]gencies are free to change their existing policies as long as they

provide a reasoned explanation for the change, 'display awareness that [they are] changing position,' and 'consider serious reliance interests.'" *Id.* (quoting *Encino Motorcars v. Navarro*, 579 U.S. 211, 221-22 2016). "When an agency changes its existing position, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (internal citations and quotation marks omitted). The agency must also consider alternatives to its change in position that are "within the ambit of existing [policy]." *Id.* The PREP and SRAE Gender Conditions abruptly changed HHS's policy, without providing a reasoned explanation for the change in policy. Moreover, HHS neither took reliance interests of the Plaintiff States and the vulnerable youth Congress intended to serve into account, nor considered alternatives within the ambit of existing policy.

160.    HHS's PREP and SRAE Gender Conditions are arbitrary and capricious and must be declared unlawful and set aside. 5 U.S.C. § 706(2)(A).

## COUNT 3
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B)
### Contrary to Constitutional Right
### (PREP and SRAE Gender Conditions)

161.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding and foregoing paragraphs as if fully set forth herein.

162.    The APA requires that a reviewing court "hold unlawful and set aside agency action" found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C.§ 706(2)(B).

163.    As described in Counts 4 and 5, the PREP and SRAE Gender Conditions violate the Spending Clause and the separation of powers.

164.    The PREP and SRAE Gender Conditions must be declared unlawful and set aside as "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

<u>**COUNT 4**</u>
**Violation of the Spending Clause**
**(PREP and SRAE Gender Conditions)**

165.     Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

166.     The Spending Clause of the U.S. Constitution, Article I, Section 8, Clause 1, provides that Congress—not the Executive—"shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ."

167.     The Spending Clause requires that States have clear notice of any conditions on federal funds and that such conditions be imposed "unambiguously" so that States may "voluntarily and knowingly" accept them. Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17, 25 (1981); Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 296 (2006). Congress's power to legislate under the spending power "does not include surprising participating states with post acceptance or 'retroactive' conditions." Pennhurst at 25; Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 584 (2012).

168.     Congress never before restricted PREP funding based on a condition that States change their programming in the way HHS now commands. Such a directive is contrary to the plain language and intent of 42 U.S.C. §713(b) and to HHS's previous approval of the same curricula upon which States relied. Yet, the PREP Directive's subject line indicates that it concerns PREP grants for fiscal years 2023, 2024, and 2025. Thus, by its terms, the PREP Directive is retroactive and applies to preexisting programs. It violates the Spending Clause because the States lacked notice of the PREP Directive's retroactive conditions and could not have knowingly accepted them.

169.     To the extent the PREP and SRAE Gender Conditions are prospective, they fall short of the clear and "unambiguous" language required by the Spending Clause. The PREP and SRAE Gender Conditions do not define "gender ideology." To the extent that the definition comes from the January 2025 Executive Order 14168, it is hopelessly vague and relies on nonsensical

definitions of "male" and "female." See E.O. 14168, § 2(f). The Executive Order defines "male" as "a person belonging, at conception, to the sex that produces the small reproductive cell" and it defines "female" as "a person belonging, at conception, to the sex that produces the large reproductive cell." E.O. 14168, §2(e). But zygotes do not produce reproductive cells "at conception." The Administration's nonsensical definition of "gender ideology" is thus inconsistent with medical science. Additionally, they do not provide States with the type of "unambiguously" clear notice about what can and cannot be included to meet Spending Clause requirements. On the contrary, these new conditions raise numerous questions about what States can and cannot say in their curricula or in their programs. That violates the Spending Clause.

170.    HHS's imposition of the PREP and SRAE Conditions also violates the principle that only Congress may impose conditions under the Spending Clause. See South Dakota v. Dole, 483 U.S. 203, 206–07 (explaining scope of Congress's Spending Clause power). Moreover, Spending Clause conditions must be related "to the federal interest in particular national projects or programs." Id. at 207–08 (internal citation omitted).

171.    HHS's new Gender Conditions – which serve as a blanket prohibition on including "gender ideology" in any program receiving PREP or SRAE funds—directly conflict with the broad language and central purpose of the enabling statutes. The plain statutory language of 42 U.S.C. § 713 and § 710 demonstrates Congress's intent to provide medically accurate and complete information that will help youth reduce risky sexual behavior and to prepare them for adulthood by exploring topics like relationships, adolescent body changes and body image. Yet HHS's funding condition excludes programs and topics that further the statutes' objectives, which fails the Spending Clause's "relatedness" requirement.

172.    Defendants' PREP and SRAE Gender Conditions violate the Spending Clause of the U.S. Constitution.

## COUNT 5
### Violation of the Separation of Powers
### (PREP and SRAE Gender Conditions)

173.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

174.    Congress possesses exclusive power to legislate, and the Constitution vests Congress—not the Executive—with the spending power. U.S. Const. art. I, § 1; U.S. Const. art. I, § 8, cl. 1. The Executive has no legislative or spending power; its authority is limited to those powers specifically conferred by the Constitution and federal statutes. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585 (1952).

175.    There is "no provision in the Constitution" that authorizes the Executive to enact, to amend, or to repeal statutes" or to "decline to follow a statutory mandate or prohibition simply because of policy objections." City and Cnty. of San Francisco v. Trump, 897 F.3d 1225, 1232 (2018) (citing Clinton v. City of New York, 524 U.S. 417, 438 (1998)).

176.    The PREP and SRAE Gender Conditions retroactively rewrite funding conditions on pre-existing programs to impose restrictions that conflict with the enabling statutes and that were not authorized by Congress. See, e.g., Washington v. Trump, 768 F. Supp. 3d 1239, 1261–63(W.D. Wash. 2025) (not even Congress may "surprise[] states with post acceptance . . . conditions" on federal funds and "impose conditions on federal grants that are unrelated to the federal interest in particular national projects or programs."). The Conditions unilaterally impose new restrictions that undermine the central purpose of the enabling statutes by prohibiting programs addressing topics that Congress intended to fund, restrictions that Congress never authorized.

177.    Because HHS's PREP and SRAE Gender Conditions purport to rewrite funding conditions for pre-existing programs and to impose new conditions on PREP and SRAE grant funding, the Conditions usurp Congress's legislative role and violate the separation of powers doctrine.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States pray that the Court:

a.      Declare that Defendants' PREP and SRAE Gender Conditions and actions to effectuate them are unlawful;

b.      Enter an order pursuant to 5 U.S.C. § 705 staying the PREP Directive pending judicial review;

c.      Enter an order pursuant to 5 U.S.C. § 706(2) holding unlawful and vacating the Defendants' PREP and SRAE Gender Conditions and Defendants' actions to effectuate them;

d.      Preliminarily and permanently enjoin Defendants from implementing or enforcing the PREP and SRAE Gender Conditions;

e.      Declare that the PREP and SRAE Gender Conditions and Defendants' actions to effectuate them are unconstitutional;

f.      Award Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

g.      Award such other relief as this Court may deem just and proper.

DATED this 26th day of September 2025.

DAN RAYFIELD
Attorney General
State of Oregon

*s/ Leanne Hartmann*
BRIAN SIMMONDS MARSHALL #196129
LEANNE HARTMANN #T25070201, Mass. BBO #667852
Senior Assistant Attorneys General
CARTER BRACE #243828
Assistant Attorney General
100 SW Market Street
Portland, OR 97201
971-673-1880
Brian.S.Marshall@doj.oregon.gov
Leanne.Hartmann@doj.oregon.gov
Carter.Brace@doj.oregon.gov
*Counsel for Plaintiff State of Oregon*

NICHOLAS W. BROWN
Attorney General
State of Washington

*s/ Lucy Wolf*
LUCY WOLF
MOLLY POWELL
KELLY PARADIS
CYNTHIA ALEXANDER
ALEXIA DIORIO
Assistant Attorneys General
Complex Litigation Division
800 Fifth Avenue, Suite 2000
206-464-7744
lucy.wolf@atg.wa.gov
molly.powell@atg.wa.gov
kelly.paradis@atg.wa.gov
cynthia.alexander@atg.wa.gov
alexia.diorio@atg.wa.gov
*Counsel for Plaintiff State of Washington*

KEITH ELLISON
Attorney General
State of Minnesota

*s/ Lindsey E. Middlecamp*
LINDSEY E. MIDDLECAMP
Special Counsel, Rule of Law
Office of the Minnesota Attorney General
445 Minnesota St., Suite 600
St. Paul, MN 55101
651-300-0711
lindsey.middlecamp@ag.state.mn.us
*Counsel for Plaintiff State of Minnesota*

WILLIAM TONG
Attorney General
State of Connecticut

*s/ Andrew M. Ammirati*
ANDREW M. AMMIRATI
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov
*Counsel for Plaintiff State of Connecticut*

BRIAN L. SCHWALB
Attorney General
District of Columbia

*s/ Jess E. Feinberg*
JESS E. FEINBERG
Assistant Attorney General
400 6th Street, NW, Suite 10100
Washington, D.C. 20001
202-735-6637
jess.feinberg@dc.gov
*Counsel for Plaintiff District of Columbia*

PHILIP J. WEISER
Attorney General
State of Colorado

*s/ Kevin G. Webster*
KEVIN G. WEBSTER
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
720-508-6086
kevin.webster@coag.gov
*Counsel for Plaintiff State of Colorado*

KATHLEEN JENNINGS
Attorney General
State of Delaware

*s/ Ian R. Liston*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
ROSE GIBSON
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
ian.liston@delaware.gov
vanessa.kassab@delaware.gov
rose.gibson@delaware.gov
*Counsel for Plaintiff State of Delaware*

ANNE E. LOPEZ
Attorney General
State of Hawaiʻi

*s/ Kalikoʻonālani D. Fernandes*
DAVID D. DAY
Special Assistant to the Attorney General
KALIKOʻONĀLANI D. FERNANDES
Solicitor General
425 Queen Street
Honolulu, HI 96813
808-586-1360
kaliko.d.fernandes@hawaii.gov
*Counsel for Plaintiff State of Hawaiʻi*

KWAME RAOUL
Attorney General
State of Illinois

*s/ Cara Hendrickson*
CARA HENDRICKSON
Executive Deputy Attorney General
ELIZABETH MORRIS
Deputy Chief, Special Litigation Bureau
115 S. LaSalle Street
Chicago, IL 60603
312-814-3000
cara.hendrickson@ilag.gov
elizabeth.morris@ilag.gov
*Counsel for Plaintiff State of Illinois*

ANTHONY G. BROWN
Attorney General
State of Maryland

*s/ Lauren Gorodetsky*
LAUREN GORODETSKY
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-7057
lgorodetsky@oag.state.md.us
*Counsel for Plaintiff State of Maryland*

DANA NESSEL
Attorney General
Michigan

*s/ Neil Giovanatti*
NEIL GIOVANATTI
DANIEL PING
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov
PingD@michigan.gov
*Counsel for Plaintiff State of Michigan*

AARON M. FREY
Attorney General
State of Maine

*s/ Kevin J. Beal*
KEVIN J. BEAL
Assistant Attorney General
111 Sewall Street, 6th Floor
6 State House Station
Augusta, ME 04333-0006
207-626-8800
kevin.beal@maine.gov
*Counsel for Plaintiff State of Maine*

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts

*s/ Allyson Slater*
ALLYSON SLATER
Director, Reproductive Justice Unit
MORGAN CARMEN
Assistant Attorney General
One Ashburton Place
Boston, MA 02108
617-727-2200
allyson.slater@mass.gov
morgan.carmen@mass.gov
*Counsel for Plaintiff Commonwealth of Massachusetts*

MATTHEW J. PLATKIN
Attorney General
State of New Jersey

*s/ Farng-Yi Foo*
FARNG-YI FOO
GEOFFREY MCGEE
*Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
609-696-5279
Farng-Yi.Foo@law.njoag.gov
Geoffrey.McGee@law.njoag.gov
*Counsel for Plaintiff State of New Jersey*

LETITIA JAMES
Attorney General
State of New York

*s/ Galen Leigh Sherwin*
GALEN LEIGH SHERWIN
Special Counsel for Reproductive Justice
28 Liberty Street
New York, NY 10005
212-426-5667
galen.sherwin@ag.ny.gov
*Counsel for Plaintiff State of New York*

JOSHUA L. KAUL
Attorney General of Wisconsin

*s/ Aaron J. Bibb*
AARON J. BIBB
Assistant Attorney General
Wisconsin Department of Justice
PO Box 7857
Madison, WI 53707-7857
608-266-0810
aaron.bibb@wisdoj.gov
*Counsel for Plaintiff State of Wisconsin*

PETER F. NERONHA
Attorney General
State of Rhode Island

*s/ Riley M. O'Brien*
RILEY M. O'BRIEN
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
401-274-4400
robrien@riag.ri.gov
*Counsel for Plaintiff State of Rhode Island*