DAN RAYFIELD
Attorney General
BRIAN SIMMONDS MARSHALL #196129
LEANNE HARTMANN #T25070201, Mass. BBO #667852
Senior Assistant Attorneys General
CARTER BRACE #243828
Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-188
Fax: (971) 673-5000
Email: Brian.S.Marshall@doj.oregon.gov
        Leanne.Hartmann@doj.oregon.gov
        Carter.Brace@doj.oregon.gov
*Counsel for Plaintiff State of Oregon*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

| | |
|---|---|
| STATE OF WASHINGTON, et al., | Case No. 6:25-cv-01748-AA |
| *Plaintiffs*, | PLAINTIFF STATES' MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | ORAL ARGUMENT REQUESTED |
| *Defendants*. | EXPEDITED CONSIDERATION REQUESTED |

# TABLE OF CONTENTS

L.R. 7-1 CERTIFICATION ..................................................................................... 1

MOTION ................................................................................................................... 1

MEMORANDUM OF LAW ..................................................................................... 1

I.     INTRODUCTION ............................................................................................ 1

II.    FACTS ............................................................................................................... 2

    A.  Congress Created and Funded Adolescent Sexual Health Education Programs to Reduce Teen Pregnancy and Sexually Transmitted Infections ................................ 2

    B.  Congress Intended for PREP and SRAE to Be Medically Accurate and Complete, Age-Appropriate, and Culturally Appropriate ......................................... 4

        1.  The PREP statute ................................................................................. 4

        2.  The SRAE statute ................................................................................. 5

    C.  Plaintiff States Have Complied with PREP and SRAE Requirements ..................... 5

    D.  PREP and SRAE Are Highly Successful .................................................. 6

    E.  Many Plaintiff States' Laws and Policies Require that Sexual Health Education be Inclusive of All Students ........................................................ 8

    F.  Plaintiff States Are Home to Many Transgender Youth, Gender-Diverse Youth, and Youth with Differences in Sexual Development; Inclusive Education is Critically Important to These Students' Health and Well-Being ............................. 9

    G.  The Current Administration's Attacks on PREP and SRAE Furthers its Ideological Campaign to Erase Transgender, Gender-Diverse, and DSD Individuals ........................................................................................ 10

        1.  President Trump issues an executive order denying the existence of transgender, gender diverse, and DSD individuals ........................... 10

        2.  HHS issues notices of award and supplemental terms and conditions prohibiting PREP and SRAE grant recipients from including "gender ideology" in any program or service ............................... 11

        3.  HHS terminates California's PREP awards and suspends funding after the State declined to remove content related to "gender ideology" from its PREP curricula .................................................. 12

        4.  HHS threatens to take enforcement action in Plaintiff States if references to "gender ideology" are not removed from PREP curricula ............................. 13

    H.  The NOAs, Supplemental T&Cs, and PREP Directive Inflict Irreparable Harm on Plaintiff States ......................................................... 14

III.  ARGUMENT ................................................................................................... 15

 A.  Legal Standard ....................................................................................... 15

 B.  The Plaintiff States Are Likely to Succeed on the Merits of their Claims .............. 15

  1.  The NOAs, Supplemental T&Cs, and PREP Directive are final agency actions subject to APA review ....................................................... 15

  2.  HHS's actions purporting to require PREP and SRAE grantees to erase references to, and acknowledgment of, gender identity is contrary to law ...... 18

  3.  HHS's actions requiring grantees to erase references to gender identity from PREP and SRAE programming are arbitrary and capricious ................. 20

  4.  The Gender Conditions violate the Spending Clause ...................................... 24

  5.  The Gender Conditions violate separation of powers ..................................... 27

 C.  Plaintiff States Will Suffer Irreparable Harm Absent Injunctive Relief ................. 28

 D.  The Equities and Public Interest Weigh Strongly in States' Favor ........................ 35

IV.  CONCLUSION ............................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Al Otro Lado v. Wolf*,
  952 F.3d 999 (9th Cir. 2020) ................................................................. 34

*All. for Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ............................................................... 15

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
  548 U.S. 291 (2006) ......................................................................... 24, 25

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................... 18

*City and County of San Francisco v. Trump*,
  897 F.3d 1225 (2018) ............................................................................ 27

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) ............................................................................... 18

*City of Chicago v. Barr*,
  961 F.3d 882 (7th Cir. 2020) ................................................................ 27

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ............................................................................... 27

*Ctr. for Biological Diversity v. Fish & Wildlife Serv.*,
  67 F.4th 1027 (9th Cir. 2023) ............................................................... 21

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ............................................................................... 23

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ............................................................................. 20, 23

*Doe v. San Diego Unified Sch. Dist.*,
  19 F.4th 1173 (9th Cir. 2021) ............................................................... 35

*Drs. for Am. v. Off. of Pers. Mgmt.*,
  No. 25-322 (JDB), 2025 WL 1836009 (D.D.C. July 3, 2025) .............. 18

*E. Bay Sanctuary Covenant v. Trump*,
  932 F.3d 742 (9th Cir. 2018) ................................................................ 34

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
  36 F.4th 850 (9th Cir. 2022) ................................................................. 17

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ............................................................................... 20

*FCC v. Prometheus Radio Project*,

592 U.S. 414 (2021) .................................................................................... 20

*FDA v. Wages & White Lion Invs.*,
145 S. Ct. 898 (2025) ................................................................................ 22

*Gonzales v. Oregon*,
546 U.S. 243 (2006) .................................................................................. 17

*Hosp. Partners, L.P. v. Burwell*,
786 F.3d 46 (D.C. Cir. 2015) .................................................................. 21

*Kalispel Tribe of Indians v. Dep't of Interior*,
999 F.3d 683 (9th Cir. 2021) ................................................................... 20

*Kaweah Delta Health Care Dist. v. Becerra*,
123 F.4th 939 (9th Cir. 2024) .................................................................. 18

*King County v. Turner*,
Case No. 2:25-cv-814, 2025 WL 1582368 (W.D.Wa. June 3, 2025) ................................ 27, 34

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) .................................................................................. 18

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) .................................................................................. 21

*Michigan v. EPA*,
576 U.S. 743 (2015) .................................................................................. 20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................................... 20, 21

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) .................................................................................. 22

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) .................................................................................. 24

*Nat'l Lab. Rels. Bd. v. Siren Retail Corp.*,
99 F.4th 1118 (9th Cir. 2024) .................................................................. 16

*Nw. Env't Advocs. v. EPA*,
537 F.3d 1006 (9th Cir. 2008) ................................................................ 18

*Or. Nat. Res. Council v. Thomas*,
92 F.3d 792 (9th Cir. 1996) ..................................................................... 21

*Or. Nat'l Res. Council v. Harrell*,
52 F.3d 1499 (9th Cir. 1995) ................................................................... 16

*Oregon v. Ashcroft*,
368 F.3d 1118, 1148 (9th Cir. 2004) ....................................................... 17

*Pennhurst State Sch. & Hosp. v. Halderman*,

451 U.S. 1 (1981)........................................................................................ 24, 25, 26

*PFLAG, Inc. v. Trump,*
769 F. Supp. 3d 405 (D. Md. 2025) ......................................................... 27

*Planned Parenthood of Greater Wash. & N. Idaho v. Dep't of Health & Hum. Servs.,*
328 F. Supp. 3d 1133 (E.D. Wash. 2018)................................................. 31

*Planned Parenthood of Greater Wash. & N. Idaho v. Dep't of Health & Hum. Servs.,*
946 F.3d 1100 (9th Cir. 2020) .................................................................. 19

*Prutehi Litekyan: Save Ritidian v. Dep't of Airforce,*
128 F.4th 1089 (9th Cir. 2025) ................................................................. 16

*R.I. Coal. Against Domestic Violence v. Bondi,*
No. CV 25-279 WES, 2025 WL 2271867 (D.R.I. Aug. 8, 2025)............... 16

*Roman v. Wolf,*
977 F.3d 935 (9th Cir. 2020) .................................................................... 15

*Saget v. Trump,*
375 F.Supp.3d 280 (E.D.N.Y. 2019) ........................................................ 23

*Saliba v. Sec. & Exch. Comm'n,*
47 F.4th 961 (9th Cir. 2022) ..................................................................... 16

*San Francisco Herring Ass'n. v. Dep't of Interior,*
946 F.3d 564 (9th Cir. 2019) .................................................................... 15

*San Fransico Unified Sch. Dist. v. AmeriCorps,*
No. 25-CV-02425-EMC, 2025 WL 1713360 (N.D. Cal. June 18, 2025)............... 16

*Sierra Club v. Dep't of Agric., Rural Utils. Serv.,*
841 F. Supp. 2d 349 (D.D.C. 2012) .......................................................... 31

*South Dakota v. Dole,*
483 U.S. 203 (1987)............................................................................ 25, 26

*State v. Bureau of Land Mgmt.,*
286 F. Supp. 3d 1054 (N.D. Cal. 2018) .................................................... 31

*Texas v. Becerra,*
89 F.4th 529 (5th Cir. 2024) ..................................................................... 18

*Thakur v. Trump,*
148 F.4th 1096 (9th Cir. 2025) ................................................................. 23

*Trump v. United States,*
603 U.S. 593 (2024)................................................................................... 27

*United States v. Skrmetti,*
145 S. Ct. 1816 (2025)............................................................................... 19

*Util. Air Reg. Grp. v. EPA,*

573 U.S. 302 (2014) ................................................................................ 27

*Washington v. Trump*,
768 F. Supp. 3d 1239 (W.D. Wash. 2025) .................................... 27, 28, 34

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .............................................................................. 15

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ........................................................................... 27

## <u>Constitutional Provisions</u>

N.Y. Const. art. I, § 11(a) ...................................................................... 8

U.S. Const. art. I, § 1 ............................................................................ 27

U.S. Const. art. I, § 8, cl. 1 .................................................................... 27

## <u>Statutes</u>

16 R.I. Gen. Laws § 22-17 ...................................................................... 8

42 U.S.C. § 300z ..................................................................................... 3

42 U.S.C. § 710 .............................................................................. passim

42 U.S.C. § 713 .............................................................................. passim

5 U.S.C. § 551 ...................................................................................... 16

5 U.S.C. § 704 ...................................................................................... 15

5 U.S.C. § 706 ................................................................................ 18, 20

775 Ill. Comp. Stat. 5/1-103(O-1) ............................................................ 8

775 Ill. Comp. Stat. 5/1-103(Q) ............................................................... 8

8 N.Y.C.R.R. § 100.2 .............................................................................. 8

9 N.Y.C.R.R. § 466.13 ............................................................................ 8

Colo. Rev. Stat. § 22-1-128 ................................................................. 8, 34

Haw. Rev. Stat. § 321-11.1 ..................................................................... 8

Haw. Rev. Stat. § 368D-1(a) .................................................................... 8

Mass. Gen. Laws ch. 151B, § 4 ............................................................... 8

Mass. Gen. Laws ch. 272, § 92A .............................................................. 8

Mass. Gen. Laws ch. 272, § 98 ................................................................ 8

Me. Stat. tit. 22 § 1902 ................................................................ 8

Me. Stat. tit. 5 § 4602 ................................................................ 8

Mich. Comp. Laws § 37.2302(a) ................................................ 8

Minn. Stat. § 121A.23 ................................................................ 8

Minn. Stat. § 24-34-601 ............................................................ 8

Minn. Stat. § 363A.13 ................................................................ 8

N.Y. Civ. Rights Law § 40 .......................................................... 8

N.Y. Civ. Rights Law § 40-c ...................................................... 8

N.Y. Educ. Law § 11 .................................................................. 8

N.Y. Educ. Law § 12 .................................................................. 8

N.Y. Educ. Law § 3201-a .......................................................... 8

N.Y. Educ. Law § 801-a ............................................................ 8

N.Y. Exec. Law § 291 ................................................................ 8

N.Y. Exec. Law § 292(35) .......................................................... 8

N.Y. Exec. Law § 296 ................................................................ 8

N.Y. Exec. Law § 300 ................................................................ 8

Or. Admin. R 581-022-2050 ...................................................... 8

Or. Admin. R. 581-022-2050 .................................................... 34

Or. Rev. Stat. § 336.455 ........................................................ 8, 34

R.I. Gen. Laws § 22-18 .............................................................. 8

Wash. Rev. Code § 28A.300.475 ............................................ 8, 34

Wash. Rev. Code § 49.60.030 .................................................... 8

Wash. Rev. Code § 49.60.040 .................................................... 8

Wis. Stat. § 118.019 .................................................................. 8

## Regulations

45 C.F.R. § 75.300 ...................................................................................................... 21

Exec. Order No. 14,168; 90 Fed. Reg. § 8615 (Jan. 20, 2025) ....................................... 10, 11, 25

## Other Authorities

Affordable Care Act, 124 Stat. 347-352, Pub. L. No. 111-148 § 2953 ......................................... 3

DelGrosso, Schulte, and Zief, *Supporting Statewide Implementation of Evidence-Based Teen Pregnancy Prevention Programs: Findings from Four PREP Grantees*, OPRE Report # 2016-87, (Nov. 2016) ................................................................................. 4

Elliot A. Tebbe & Stephanie L. Budge, *Factors that drive mental health disparities and promote well-being in transgender and nonbinary people*, 1 Nature Revs. Psych., (Sept. 26, 2022) ................................................................................................................ 32

Jody L. Herman & Andrew R. Flores, UCLA School of Law Williams Institute, *How Many Adults and Youth Identify as Transgender in the United States?* ................................. 9

Maureen Rabbitte, *Sex Education in School, are Gender and Sexual Minority Youth Included?* A Decade in Review, Am. J. Sexual Educ. 15(4) 530-42 (Oct 13, 2020). .... 9, 19, 32

Minn. Dep't of Health, Personal Responsibility Education Program Grantee Success Stories – Minnesota ......................................................................................... 28

New York State Dep't. of Educ., *NYSED Assessment Process for Review of Local Education Agencies (LEAs) Condom Availability Plan (CAP) and Approval of the Plan for Training For School Personnel and/or Health Service Personnel Providing Personal Health Guidance to Students* (2017) ............................................................ 8

New York State Education Dep't, *A Guidance Document for Achieving the New York State Standards in Health Education* (2005) ................................................................ 8

Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 110 Stat. 2353-2354, Pub. L. No. 104-193 § 912 ..................................................................... 3

Press Release, U.S. Dep't of Health and Hum. Servs., HHS Defunds California's Attempt to Indoctrinate Children with Gender Ideology (Aug. 24, 2025) ................................. 12

Sandra Anti Eyiah & Adrienne Duke-Marks, *Evaluating Associations of the Personal Responsibility and Education Program (PREP) with Adolescents' Sexual Health and Relationship Advocacy*, 20 Am. J. Sexuality Educ. 1 (2025) ................................. 6, 7

The Trevor Project, 2023 U.S. National Survey on the Mental Health of LGBTQ Young People ........................................................................................................ 10, 33

Theresa Neelan et al., *The Sexual Risk Avoidance Education National Evaluation: Understanding Program Implementation Experiences*, OPRE Report 2023-307 (Dec. 2023) ................................................................................................. 7

Tracy A. Becerra-Culqui, et al., *Mental Health of Transgender and Gender Nonconforming Youth Compared with Their Peers*, Pediatrics (Apr. 16, 2018) .................. 32

## L.R. 7-1 CERTIFICATION

Plaintiffs' counsel certify that the Plaintiff States offered to confer on this motion and its expedited consideration by voicemail and email to the Civil Chief of the U.S. Attorney's Office for the District of Oregon on September 26. Plaintiff States have not received a response to that request. Based on previous conversations with that office, Plaintiff States understand that the U.S. Attorney's Office declines to confer until formal service of the complaint and summons is completed and named defendants have received copies by certified mail.

## MOTION

Plaintiff States move under Rule 65(a) for entry of a preliminary injunction in their favor while their case is pending. This motion is supported by the following memorandum of law and the declarations and exhibits filed simultaneously with this motion.

Plaintiffs also request an expedited hearing of this motion given the immediate effect of the challenged policy, which is already in place, the ongoing nature of the grant programs, and the October 27, 2025 compliance deadline. Plaintiffs request that the Court order that the Federal Defendants' response to the motion is due on October 8, that Plaintiffs' reply is due October 15, and that the Court set a hearing at its earliest availability thereafter. Plaintiffs intend to seek the agency's agreement to voluntarily stay the policy pending resolution of this motion in lieu of expedited consideration.

## MEMORANDUM OF LAW

## I.    INTRODUCTION

For decades, States have successfully administered two sexual health education programs created and funded by Congress—the Personal Responsibility Education Program (PREP) and the Sexual Risk Avoidance Education program (SRAE). But now, the Department of Health and Human Services (HHS) imminently intends to cut all State PREP and SRAE funding unless States remove all references to inclusive gender identity from their programs. This new directive flies in the face of clear statutory requirements that these programs include content that is "medically accurate and complete" and "culturally appropriate," or provided in the appropriate "cultural

context." *See* 42 U.S.C. §§ 713(b)(2)(B)(ii), (vi); *id.* § 710(b)(2)(E). In line with these requirements, Plaintiff States have developed PREP and SRAE-funded programs that recognize transgender and gender-diverse youth as well as youth with differences in sex development (DSD). HHS now threatens to cut funding unless, by October 27, 2025, states remove *any* reference—even a passing one—to inclusive gender identity.

HHS's new conditions violate federal law and the Constitution. Forcing States to use medically unsupported, incomplete PREP and SRAE content is contrary to their enabling statutes and arbitrary and capricious. Unilaterally imposing these grant conditions also usurps Congress' spending power and violates the separation of powers.

Defendants' unlawful actions irreparably harm Plaintiff States by forcing them into an impossible position: lose critical sexual health education funding or violate federal (and in some instances state) law. Either course will harm the very youth and public health goals these programs are designed to protect.

The Trump Administration's attempt to target and harm transgender, gender-diverse, and DSD youth by insisting that state curricula ignore inclusive gender identity cannot stand. This Court should enjoin Defendants from enforcing these conditions on PREP and SRAE funding.

## II.    FACTS

### A.    Congress Created and Funded Adolescent Sexual Health Education Programs to Reduce Teen Pregnancy and Sexually Transmitted Infections

Teen pregnancy and Sexually Transmitted Infections (STIs) are major public health issues. While the teen birth rate has declined, teen birth rates remain higher in the United States than other high-income countries, with 13.1 births per 1,000 females aged 15-19 in 2023. Wolf-WA Decl. Ex. 1 at 2-4, 10-11. In 2010, teen childbearing in the United States cost taxpayers billions of dollars, including $2.1 billion in public sector health care expenses and $3.1 billion in child welfare benefits. *Id.* Ex. 2 at 9. The societal impacts extend far beyond financial costs. Babies born to teenagers are more likely to have lower birth weights, increased infant mortality, an increased risk

of hospital admission in early childhood, and poorer cognitive development.[1] Teenage parents are less likely to graduate high school and more likely to need public assistance and have low income as adults. *Id.* Ex. 1 at 12. And teen mothers are more likely than other teenagers to be socially isolated, experience mental health issues, and have fewer educational and employment opportunities.[2]

STIs among young people also impose significant costs and public health concerns. STI rates in the United States reached an all-time high in 2021. *Id.* Ex. 3 at 3. Youths aged 15 to 24 have one half of new STI infections, despite representing only one quarter of the sexually active population. *Id.* Ex. 4 at 10. This is "a serious public health concern that requires immediate attention," in part because untreated STIs can lead to severe health complications, including pelvic inflammatory disease, infertility, and increased risk of HIV and certain cancers. *Id.* Ex. 3 at 3. Direct medical costs of new STIs cost the American healthcare system $16 billion in 2018 alone, with 26 percent of those costs stemming from STIs in youth aged 15-24.[3]

To combat these public health issues, Congress has long exercised its spending authority to authorize federal funding for sexual health education. *See* 42 U.S.C. § 300z. In 1996, after a decade of growing concern over HIV/AIDS, Congress enacted Title V, Section 510B of the Social Security Act, providing block grants to states for sexual health education programs. Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 110 Stat. 2353-2354, Pub. L. No. 104-193 § 912. This legislation provided the framework for SRAE. In 2010, following a spike in teen birth rates (Wolf-WA Decl. Ex. 6 at 5), Congress authorized PREP as part of the Affordable Care Act. 124 Stat. 347-352, Pub. L. No. 111-148 § 2953 *codified as amended at* 42 U.S.C. § 713. This program is one of the largest federally funded programs designed to address teen pregnancy.[4]

---

[1] Donald B. Langille, *Teenage Pregnancy: trends, contributing factors and the physician's role*, Canadian Med. Ass'n J. (May 22, 2007), https://pmc.ncbi.nlm.nih.gov/articles/PMC1867841/.
[2] *Id.*
[3] Harrell W. Chesson, et al., *The Estimated Direct Lifetime Medical Costs of Sexually Transmitted Infections Acquired in the United States in 2018*, Sexually Transmitted Diseases (Apr. 2021); *see also* Wolf-WA Decl. Ex. 5.
[4] DelGrosso, Schulte, and Zief, *Supporting Statewide Implementation of Evidence-Based Teen Pregnancy Prevention Programs: Findings from Four PREP Grantees*, OPRE Report # 2016-87,

In 2018, Congress substantially revised SRAE into its current form. *See* 132 Stat. 224-227, Pub. L. No. 115-123 § 510.

**B.    Congress Intended for PREP and SRAE to Be Medically Accurate and Complete, Age-Appropriate, and Culturally Appropriate**

**1.    The PREP statute**

PREP grantees have flexibility in designing and implementing programs provided they meet certain criteria specified in 42 U.S.C. § 713. Among other requirements, the program must be "medically-accurate and complete." 42 U.S.C. § 713(b)(2)(B)(ii). The statute defines this term to mean "verified or supported by the weight of research conducted in compliance with accepted scientific methods" and either "published in peer-reviewed journals, where applicable" or "comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete." *Id.* § 713(e)(2).

The program must provide "age-appropriate information and activities." *Id.* § 713(b)(2)(B)(v). The program must also be "provided in the cultural context that is most appropriate for individuals in the particular population group to which they are directed." *Id.* § 713(b)(2)(B)(vi). HHS's website specifically notes that state PREP programs target youth who are homeless, in foster care, living in rural areas or areas with high teen birth rates, and "from minority groups (including sexual minorities)." Wolf-WA Decl. Ex. 7.

Additionally, PREP programs must educate adolescents on both abstinence and contraception for the prevention of pregnancy and STIs and on at least three of six "adulthood preparation subjects", including "[h]ealthy relationships, including marriage and family interactions"; "[a]dolescent development, such as the development of healthy attitudes and values about adolescent growth and development, body image, racial and ethnic diversity, and other related subjects"; and "[p]arent-child communication." 42 U.S.C. §§ 713(b)(2)(A)(i)-(iii), (C).

---

(Nov. 2016), https://acf.gov/sites/default/files/documents/opre/06991_d51_prep_dis_implement ation_report_final_508.pdf.

2.    **The SRAE statute**

The statutory requirements governing SRAE closely track those governing PREP. For example, 42 U.S.C. § 710(b)(2)(B) requires educational content provided under SRAE grants to "be medically accurate and complete[.]" Similarly, the SRAE authorizing statute defines "medically accurate and complete" as "verified or supported by the weight of research conducted in compliance with accepted scientific methods" and either "published in peer-reviewed journals, where applicable" or "comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete." *Id.* § 710(e)(2). As with PREP grants, SRAE grant content is also required by law to "be age-appropriate." *Id.* § 710(b)(2)(C). And, like PREP, the program must be "culturally appropriate, recognizing the experiences of youth from diverse communities, backgrounds, and experiences." *Id.* § 710(b)(2)(E).

C.    **Plaintiff States Have Complied with PREP and SRAE Requirements**

HHS oversees both PREP and SRAE. All Plaintiff States are current participants in PREP. Several Plaintiff States are also participants in SRAE. Plaintiff States have dutifully complied with PREP and SRAE requirements over many years. During that time, HHS has expressly required States to provide programming to LGBTQIA+ youth.

PREP grants to States are "formula grants" based on the youth population percentage in each state. *Id.* § 713(a)(1)(A)(ii). To receive its allotment, a state must formally apply and receive approval from HHS. *Id.* § 713(a)(1)(C)(i). In its application, States must certify their compliance with PREP requirements—including that the program be medically accurate, age-appropriate, and provided in the appropriate cultural context. *Id.* § 713(a)(1)(C)(ii). For the last fifteen years, Plaintiff States have certified their compliance through this application process. *See, e.g,* Roberts-WA Decl. ¶¶ 7, 8; Tran-WI Decl. ¶ 8; Castillo-CO Decl. ¶¶ 6-7; Vigil-CT Decl. ¶7; Blodgett-MA Decl. ¶ 7; Woodrich-MN Decl. ¶ 9; Campagna-RI Decl. ¶ 6; Davis-NY Decl. at 14; Brown-NJ Decl. ¶ 7; Sullivan-MD Decl. ¶ 7. As recently as 2024, HHS prioritized programming related to gender identity. Indeed, HHS expressly required that States provide programs "to youth

populations that are the most high-risk or vulnerable for pregnancies and sexually transmitted infections, including HIV/AIDS, or have other special circumstances including culturally underrepresented youth populations such as . . . youth who identify as lesbian, gay, bisexual, transgender, and /or questioning (LGBTQ+), and other vulnerable or underserved youth populations." Wolf-WA Decl. Ex. 8 at 12.

SRAE funds to States are also formula grants. These awards are calculated based on the State's proportion of low-income children compared to the total number of low-income children in the United States. 42 U.S.C. § 710(a)(1)(B). Since 2018, approximately 39 states and territories have received SRAE awards. As with PREP, as recently as 2024, HHS prioritized programming related to gender identity. In fact, in a 2024 SRAE Notice of Funding Opportunity, HHS stated that "States must ensure that SRAE projects are inclusive of youth who identify as lesbian, gay, bisexual, transgender, and/or questioning, intersex, asexual, and two-spirit (LGBTQIA2S+)." Wolf-WA Decl. Ex. 9 at 7.

### D.    PREP and SRAE Are Highly Successful

By all objective measures, PREP and SRAE are working. The most recent PREP data demonstrates that during the 2020-21 reporting period, PREP providers operated 457 programs and served 73,081 youth. *Id.* Ex. 10 at 3. At the conclusion of the program, just over half of high-school-age and older youth planned to abstain from sex for at least three months as a result of participating in PREP. *Id.* at 5. Among those who did not plan to abstain, 41% said PREP made them less likely to have sex in the next three months, 65% said they were more likely to use condoms if having sex, and 59% said they were more likely to use other forms of birth control. *Id.*; *see also* Sandra Anti Eyiah & Adrienne Duke-Marks, *Evaluating Associations of the Personal Responsibility and Education Program (PREP) with Adolescents' Sexual Health and Relationship Advocacy*, 20 Am. J. Sexuality Educ. 1 (2025) (finding that participation in PREP is associated with positive outcomes in adolescents' sexual health indicators, behavioral intent, and relationship advocacy). The majority of participants reported that PREP helped them better understand what makes a relationship healthy, made them more likely to be respectful of others, and to resist

pressure to participate in sexual acts. *Id.* Most youth reported positive perceptions of PREP, with 88% reporting that they felt "respected as people." *Id.*; *see also* Wolf-WA Decl. Ex. 11 at 34-40 (youth participants consistently reported that PREP programs were helpful and engaging and made them feel safe and supported).

PREP funding also benefits educators and caregivers. States have flexibility in implementing PREP and do so in a variety of ways. In Washington, for instance, PREP funding is used to provide school districts and teachers with training and support from experts throughout the school year. Sharnbroich-WA Decl. ¶¶ 5-6. Educators report that these services are "an invaluable support" and "essential". *E.g.*, Smith-WA Decl. ¶¶ 5, 11; Rossman-WA Decl. ¶ 14. Parents and caregivers similarly report positive effects from PREP-funded programs. Polling shows that parents and caregivers across communities want professional sexual health education, and many want a greater understanding of gender identity. Sharnbroich-WA Decl. ¶14. Parents who have participated in professional sexual health education workshops funded with PREP grants describe them to be "informative, well-grounded, and common sense." Sharnbroich-WA Decl. ¶ 14.

SRAE is also highly successful. Studies show that States providing SRAE have lower teen birth rates. *Id.* at 5. One study in Oregon found that students who attended SRAE were more likely to delay sexual activity. *Id.* at 40. Additionally, as with PREP, program participants—as well as community members—have positive perceptions of the program. Facilitators report that their SRAE programming meets the needs of most youth, and youth participants report that SRAE curricular content is relevant and engaging.[5] And most SRAE grant recipients reported that staff at their organization, parents and guardians, and the broader community were supportive of their SRAE curricular content. *Id.*

---

[5] Theresa Neelan et al., *The Sexual Risk Avoidance Education National Evaluation: Understanding Program Implementation Experiences*, OPRE Report 2023-307, at viii (Dec. 2023), https://acf.gov/sites/default/files/documents/opre/SRAENE-NWS-Implementation-2023.pdf.

**E.      Many Plaintiff States' Laws and Policies Require that Sexual Health Education be Inclusive of All Students**

Plaintiff States deeply value diversity and inclusivity. To that end, many have promulgated laws and policies aimed at promoting comprehensive, medically-accurate sexual health education and ensuring that such education is inclusive of all students. Numerous Plaintiff States require sexual health education programs use gender-inclusive curricula, instruction, and materials and provide sexual health education that is medically and scientifically accurate, age-appropriate, inclusive of all students, and also meets state learning standards.[6] Even in Plaintiff States where sexual health education statutes do not expressly refer to inclusivity or gender identity, many have sexual health education minimum standards that require comprehensiveness and medical and scientific accuracy.[7] Some Plaintiff States include options for families to opt-out of certain curricula.[8] Plaintiff States also have robust antidiscrimination laws that prohibit discrimination on the basis of sex or sexual orientation, including gender identity, in places of public accommodation.[9]

---

[6] *See, e.g.*, Wash. Rev. Code §§ 28A.300.475(1)(a)(i), (c); Wolf-WA Decl. Ex 12 at 37, 40 (Washington State K-12 learning standards requiring students learn there is a range of gender identities and expressions, and that biological sex is distinct from gender identity); Colo. Rev. Stat. § 22-1-128(2)(c), § 22-1-128(7)(b)(III) (2025); New York State Education Dep't, *A Guidance Document for Achieving the New York State Standards in Health Education* (2005); New York State Dep't. of Educ., *NYSED Assessment Process for Review of Local Education Agencies (LEAs) Condom Availability Plan (CAP) and Approval of the Plan for Training For School Personnel and/or Health Service Personnel Providing Personal Health Guidance to Students* (2017); Or. Admin. R 581-022-2050(6)(q), (s); Or. Rev. Stat. § 336.455 (2)(j) (2020).

[7] *See, e.g.*, Haw. Rev. Stat. § 321-11.1; Me. Stat. tit. 22 § 1902(1-A); Minn. Stat. § 121A.23 (2024); 16 R.I. Gen. Laws §§ 22-17, 22-18; Wis. Stat. §§ 118.019(2)(a), 118.019(1m)(b).

[8] *See, e.g.,* Wash. Rev. Code § 28A.300.475(7)(a); Wis. Stat. § 118.019(4).

[9] *See* Wash. Rev. Code §§ 49.60.030(1), .040(29); Me. Stat. tit. 5 § 4602; Minn. Stat. §§ 363A.13, 24-34-601(2)(a), Colo. Rev. Stat. § 22-1-128 (2025); Haw. Rev. Stat. § 368D-1(a); N.Y. Const. art. I, § 11(a); N.Y. Exec. Law §§ 291, 292(35), 296, 300 *et seq.*; N.Y. Civ. Rights Law §§ 40, 40-c; N.Y. Educ. Law §§ 11-12, 801-a, 3201-a; 9 N.Y.C.R.R. § 466.13; 8 N.Y.C.R.R. § 100.2(l)(2); Mass. Gen. Laws ch. 272, §§ 92A, 98 (prohibiting discrimination in admission to, or treatment in, places of public accommodation); Mass. Gen. Laws ch. 151B, § 4 (prohibiting discrimination in employment, housing, public accommodation, lending on basis of sex, gender identity, sexual orientation, other protected classes); Mich. Comp. Laws § 37.2302(a); 775 Ill. Comp. Stat. 5/1-103(O-1), (Q).

**F.     Plaintiff States Are Home to Many Transgender Youth, Gender-Diverse Youth, and Youth with Differences in Sexual Development; Inclusive Education is Critically Important to These Students' Health and Well-Being**

Plaintiff States are home to many transgender youth, gender-diverse[10] youth, and youth with differences in sex development (DSD[11]). In the United States, approximately 2.8 million people aged 13 and older identify as transgender.[12] While these populations can be underreported, this number includes about 724,000 youth ages 13 to 17, representing 3.3% of all youth. *Id.*

Educators throughout the Plaintiff States recognize the importance of inclusive education for all students. Rossman-WA Decl. ¶¶15-16; Smith-WA Decl. ¶¶14-15. Teachers "are committed to creating a safe and inclusive space for every kid . . . including gender diverse kids." *Id.* ¶20.

Inclusive education extends to gender-inclusive, medically accurate sexual health education. Experts recognize that gender and sexual minority youth tend to experience "increased sexual risk behaviors and adverse health outcomes" compared to their heterosexual and cisgender peers.[13] These risk behaviors include "the use of alcohol or drugs before sex, decreased condom and contraceptive use, higher incidences of forced sex, dating violence, suicidal thoughts, attempted suicide, bullying, alcohol and drug use, earlier initiation into sex, more sexual partners, and two to seven times higher incidents of teen pregnancy. *Id.* Gender-inclusive sexual health education is essential to providing these vulnerable youth accurate and relevant information to make informed and healthy sexual decisions. *See generally*, *id.*

---

[10] Plaintiffs use the term "transgender and gender-diverse" to refer inclusively to youth who are nonbinary, two-spirit, genderqueer, and genderfluid, among others.
[11] DSD individuals are people who have conditions that result in an atypical combination of the factors that make up one's sex. Millington-WA Decl. ¶ 25. They do not fit cleanly into a male or female binary definition. *Id.* ¶ 34. The term "intersex" is sometimes used to describe individuals with DSD. *Id.* ¶ 25.
[12] Jody L. Herman & Andrew R. Flores, UCLA School of Law Williams Institute, *How Many Adults and Youth Identify as Transgender in the United States?* https://williamsinstitute.law.ucla.edu/publications/trans-adults-united-states/ (last visited Sept. 25, 2025).
[13] Maureen Rabbitte, *Sex Education in School, are Gender and Sexual Minority Youth Included? A Decade in Review*, Am. J. Sexual Educ. 15(4) 530-42 (Oct 13, 2020). https://pmc.ncbi.nlm.nih.gov/articles/PMC7986966/

Failing to provide gender-inclusive medically-accurate information to such youth has catastrophic consequences. It increases their traumatic experiences with bullying, non-consensual sex, unprotected sex, and sex while intoxicated, as well as the number of partners, STIs, and teen pregnancies. *Id.* It makes them feel like they do not exist and increases depression, anxiety, and self-loathing. *Id.* Numerous studies have noted a decrease in bullying with the provision of gender-inclusive health education. *Id.* When inclusive sexual health information is not provided to transgender, gender-diverse, and DSD youth, "rates of suicidal ideation and suicide are higher," making provision of this information potentially "life-saving[.]" Sharnbroich-WA Decl., ¶27; *see also* 2023 U.S. National Survey on the Mental Health of LGBTQ Young People (finding that "[r]oughly half of transgender and nonbinary young people found their school to be gender-affirming, and those who did reported lower rates of attempting suicide.").[14]

Given these terrible consequences, it is no surprise that including gender identity in comprehensive sexual health education is supported and recommended by the American Academy of Pediatrics and the American College of Obstetricians and Gynecologists. Millington-WA Decl., ¶39. Experts and educators agree that youth in the Plaintiff States benefit tremendously from an understanding of gender identity as a facet of adolescent development, and such education helps engender healthy relationships of all kinds, including parent-child communication.

## G. The Current Administration's Attacks on PREP and SRAE Furthers its Ideological Campaign to Erase Transgender, Gender-Diverse, and DSD Individuals

### 1. President Trump issues an executive order denying the existence of transgender, gender diverse, and DSD individuals

On January 20, 2025, President Trump issued Executive Order 14,168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Exec. Order No. 14,168; 90 Fed. Reg. § 8615 (Jan. 20, 2025) (cited as E.O. 14,168). This order establishes a federal policy of recognizing only two sexes, male and female. It defines "sex" to mean "an individual's immutable biological classification as either male or female,"

---

[14] The Trevor Project, 2023 U.S. National Survey on the Mental Health of LGBTQ Young People at 4, https://www.thetrevorproject.org/survey-2023/assets/static/05_TREVOR05_2023survey.pdf

which is "not a synonym for and does not include the concept of 'gender identity.'" *Id*. § 2(a). And it seeks to eradicate "gender ideology," which it characterizes as "permitting the false claim that males can identify as and thus become women and vice versa." *Id*. § 2(f). The order dictates that the definitions for terms like "sex," "gender ideology," and "gender identity" "govern all Executive interpretation of and application of Federal law and administration policy. *Id.* § 2. To achieve this objective, among other things, the order commands that federal funds "shall not be used to promote gender ideology." *Id.* § 3(g). It directs all federal agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology" and "take all necessary steps" to "end the Federal funding of gender ideology." *Id.* §§ 3(e), (g).

2.    **HHS issues notices of award and supplemental terms and conditions prohibiting PREP and SRAE grant recipients from including "gender ideology" in any program or service**

On August 6, 2025, HHS issued a series of Notices of Award (NOAs) for the 10/1/2024-9/30/2027 PREP grant award period (*see, e.g.*, Wolf-WA Decl. Ex. 13) and the 10/1/2024-9/30/2026 SRAE grant award period (*see, e.g.*, *id.* Ex. 14). These NOAs contain language restricting inclusion of "gender ideology" in terms that are virtually identical. *See* Roberts-WA Decl. Ex. 2 at 3; Va-ME Decl. Ex. B at 3; Blessing-DE Decl. Ex. C at 3; Castillo-CO Decl. Ex. 3 at 3; Liu-OR Decl. Ex. 3 at 4 (PREP); Baney-OR Decl. Ex. 3 at 3 (SRAE); Blodgett-MA Decl. Ex. 3 at 3; Woodrich-MN Decl. Ex. E at 3 (PREP), Ex. L at 3 (SRAE); Suzuki-HI Decl. Ex. B at 3; Vigil-CT Decl. Ex. B at 3; Tran-WI Decl. Ex. B at 3. In relevant part, these NOAs state that "[r]ecipients are prohibited from including gender ideology in any program or service that is funded with this award." *See, e.g.*, Wolf-WA Ex. 13 at 3, Ex. 14 at 3. Their terms and conditions repeat this prohibition, stating:

> The statutory authority for the . . . program under which this grant has been awarded . . . does not authorize teaching students that gender identity is distinct from biological sex or boys can identify as girls and vice versa, or that there is a vast spectrum of genders that are disconnected from one's sex. Therefore, gender ideology is outside of the scope of the statutory authority for this award. In addition, any costs associated with gender ideology are not allowable expenditures of federal grant funds or maintenance-of-effort funds for this grant because they are not necessary, reasonable, or allocable for the performance of this award. *See* 45 C.F.R. §§ 75.403-405.

*See, e.g.*, Wolf-WA Decl. Ex. 13 at 3, Ex. 14 at 3. The NOAs cite 42 U.S.C. § 713 as statutory authority for PREP and 42 U.S.C. § 710 for SRAE. *See, e.g.*, *id.* Ex. 13 at 3, Ex. 14 at 3.

The next day, HHS issued Supplemental Terms and Conditions (Supplemental T&Cs) for PREP and SRAE awards expressly prohibiting grant recipients "from including gender ideology in any program or service that is funded with this award," claiming that "gender ideology is outside the scope of the statutory authority for this award [under the authorizing statutes]." *Id.* Ex. 15 at 2 (PREP); *Id.* Ex. 16 at 3 (SRAE). The Supplemental T&Cs are "effective immediately" and "supersede all previous similar T&Cs and will remain in effect until updated for subsequent awards." *Id.* Ex. 15 at 2, Ex. 16 at 2.

### 3. HHS terminates California's PREP awards and suspends funding after the State declined to remove content related to "gender ideology" from its PREP curricula

On August 21, 2025, HHS sent California an "official notification" terminating all PREP awards and suspending all PREP funding in the state. *Id.* Ex. 17 at 2. This was two days after California sent HHS a letter indicating that it would not make modifications to its curricula to remove "gender ideology" as requested by HHS in a letter sent on June 20, 2025. *Id.* Ex. 18 at 2, Ex. 19. California noted that HHS had previously approved the materials and that the materials are medically accurate and directly relevant to the purposes of PREP as set out in the authorizing statute. *Id*. Additionally, California noted that the PREP materials fully comply with state law, and the requested modifications may prevent California school districts from using PREP materials. *Id*. After terminating California's PREP grants, HHS claimed termination was part of its "efforts to ensure federally funded programs adhere to statutory requirements and remain free of radical gender ideology."[15]

---

[15] Press Release, U.S. Dep't of Health and Hum. Servs., HHS Defunds California's Attempt to Indoctrinate Children with Gender Ideology (Aug. 24, 2025), https://www.hhs.gov/press-room/hhs-defunds-californias-attempt-indoctrinate-children-gender-ideology.html

4.    **HHS threatens to take enforcement action in Plaintiff States if references to "gender ideology" are not removed from PREP curricula**

Five days after it terminated California's PREP funding, PREP grantees in Plaintiff States received a letter from HHS (the "PREP Directive"). Wolf-WA Decl. Ex. 20 (all states), Ex. 21 (Washington State). The subject line of the PREP Directive indicated that it concerned PREP grants for fiscal years 2023, 2024, and 2025. *See, e.g.*, *id.* Ex. 21 at 2. The PREP Directive then stated that the "current PREP curricula and program materials are out of compliance with the PREP statute and HHS regulations and must be modified" because they include content about "gender ideology." *See, e.g.*, *id* at 6. HHS acknowledged that "these curricula and other program materials were previously approved by ACF," but claimed that the "prior administration erred in allowing PREP grants to be used to teach students gender ideology" because "gender ideology is outside of the scope of the authorizing statue." *See, e.g.*, *id*. It demanded that grantees "remove all content concerning gender ideology from its curricula, program materials and any other aspects of its program delivery within 60 days of receipt of this letter." *See, e.g.*, *id* at 6-7.

For example, HHS directed Delaware to remove information instructing facilitators to "[d]emonstrate acceptance and respect for all participants, regardless of personal characteristics, including race, cultural background, religion, social class, sexual orientation or gender identity." Blessing-DE Decl. Ex. D. It directed Massachusetts to remove information that "[g]ender refers to the ideas in a culture or society about the appropriate ways for men and women to dress, behave, think and feel. Ideas about what gender behavior is appropriate change in different cultures and at different times in history." Blodgett-MA Decl. Ex. 4 at 3. And it directed Washington to remove information from a high school curriculum stating that "[p]eople of all sexual orientations and gender identities need to know how to prevent pregnancy and STOs [sic], either for themselves or to help a friend." Wolf-WA Decl. Ex. 21 at 5.

HHS threatened "additional enforcement action" should States fail to comply within 60 days—by October 27, 2025. *See, e.g.*, *id.* Ex. 21 at 7. The PREP Directive set forth a variety of enforcement mechanisms at its disposal, including that HHS could "withhold, disallow, suspend,

or terminate Federal awards." *Id.* Following the issuance of these letters, HHS issued a news release stating that "[t]his action reflects the Trump Administration's ongoing commitment to protecting children from attempts to indoctrinate them with delusional ideology." *Id.* Ex. 22 at 3. It further stated, "[s]tates and territories receiving these new letters are now on notice: failure to comply will result in similar enforcement actions including the withholding, suspension, or termination of federal PREP funding." *Id.*

## H.    The NOAs, Supplemental T&Cs, and PREP Directive Inflict Irreparable Harm on Plaintiff States

The NOAs, the Supplemental T&Cs, and the PREP Directive (collectively the "PREP and SRAE Gender Conditions" or "Gender Conditions") have already caused and will continue to cause immediate and lasting harm. Defendants' actions put Plaintiff States in an untenable situation, forcing them to choose between losing federal funding for essential public health education programs or complying with unlawful funding conditions that undermine the central purpose of the programs and conflict with state and federal laws and policies.

Many States have enacted laws and policies prohibiting discrimination against transgender, gender-diverse, and DSD youth or requiring gender-inclusive educational curricula. *See supra,* note 7. The PREP and SRAE Gender Conditions are already creating widespread confusion about whether they can even be implemented in accordance with these laws and policies. *See, e.g.*, Castillo-CO Decl. ¶ 17; Vigil-CT Decl. ¶ 16; Blessing-DE Decl. ¶ 18; Suzuki-HI Decl. ¶ 16; Va-ME Decl. ¶ 17; Blodgett-MA Decl. ¶ 17; Liu-OR Decl. ¶ 18; Baney-OR Decl. ¶ 12; Tran-WI Decl. ¶ 18. And should States lose their federal PREP and SRAE funding, they may be forced to lay off sexual health education professionals and sharply reduce health education programs. *See, e.g.*, Castillo-CO Decl. ¶ 17 (seven PREP-funded employees in Colorado are at risk). As a result, many schools and community programs will no longer be able to reliably provide sexual health education services to the youth populations that need them most, including youth in juvenile detention centers, youth in foster care, homeless youth, pregnant or parenting youth, and transgender, gender-diverse, and DSD youth. *See, e.g.*, Vigil-CT Decl. ¶ 18 (Connecticut serves youth who are aging out of foster care, homeless youth, youth with HIV/AIDS, victims of human trafficking,

pregnant or parenting youth who are under age 21, and youth who live in rural areas or areas with high teen birth rates; without PREP funding, Connecticut's state agency and its partners will not be as effective in administering and providing sexual health education); *see also* Castillo-CO Decl. ¶¶ 17, 19; Blessing-DE Decl. ¶ 20; Suzuki-HI Decl. ¶ 18; Va-ME Decl. ¶ 19; Blodgett-MA Decl. ¶ 19; Woodrich-MN Decl. ¶ 30; Liu-OR Decl. ¶ 21; Baney-OR Decl. ¶ 13; Hermann-WI Decl. ¶ 20; Tran-WI Decl.¶ 20. This will harm public health and safety and lead to long-term costs for the Plaintiff States through inevitable rise in unplanned pregnancy, higher birth rates, and higher rates of HIV and other STIs among youth populations. *See supra,* Section II.A.

### III.    ARGUMENT

#### A.    Legal Standard

A preliminary injunction is warranted where Plaintiffs establish that (1) they are likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the Ninth Circuit's sliding-scale approach to preliminary relief, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (citation modified). "Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940-41 (9th Cir. 2020).

#### B.    The Plaintiff States Are Likely to Succeed on the Merits of their Claims

##### 1.    The NOAs, Supplemental T&Cs, and PREP Directive are final agency actions subject to APA review

The NOAs, and Supplemental T&Cs, and PREP Directive are all "final agency actions" subject to review under the APA, 5 U.S.C. § 704. *San Francisco Herring Ass'n. v. Dep't of Interior*, 946 F.3d 564, 576 (9th Cir. 2019). The APA defines "agency action" broadly to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial

thereof, or failure to act[.]" 5 U.S.C. § 551(13). The definition "is meant to cover comprehensively every manner in which an agency may exercise its power." *Id*. In determining whether an agency action is final, courts consider "factors such as whether the action amounts to a definitive statement of the agency's position, whether it has a direct and immediate effect on the day-to-day operations of the subject party, and if immediate compliance . . . is expected." *Prutehi Litekyan: Save Ritidian v. Dep't of Airforce*, 128 F.4th 1089, 1108 (9th Cir. 2025) (quoting *Nat'l Lab. Rels. Bd. v. Siren Retail Corp.*, 99 F.4th 1118, 1123 (9th Cir. 2024)). Finality is "interpreted in a pragmatic and flexible manner[,]" "focus[ing] on the practical and legal effects of the agency action." *Saliba v. Sec. & Exch. Comm'n*, 47 F.4th 961, 967 (9th Cir. 2022) (quoting *Or. Nat'l Res. Council v. Harrell*, 52 F.3d 1499, 1504 (9th Cir. 1995)).

Each one of the agency's actions identified above meets this standard. Each presents a definitive statement of the agency's position and interpretation of law and states that it has legal effect on grantees effective immediately. These actions present grantees with imminent and significant legal and practical consequences: grantees must choose either to forego significant federal funding and accept the irreparable harm to sexual health education programs and public health that follows, or accept funding and comply with terms and conditions requiring grantees to violate federal and state laws and policies.

Courts agree that adoption of federal funding conditions, like the Gender Conditions, constitutes final agency action. This is because the conditions constitute "discrete agency action" that is the culmination of agency decision making, and because legal consequences flow from the decision, such as whether grantees receive the funds they are legally entitled to seek, and whether the lawful scope of activities permitted with grant funds will change or the grants will terminate. *R.I. Coal. Against Domestic Violence v. Bondi*, No. CV 25-279 WES, 2025 WL 2271867, at *6 (D.R.I. Aug. 8, 2025); *San Fransico Unified Sch. Dist. v. AmeriCorps*, No. 25-CV-02425-EMC, 2025 WL 1713360, at *13 (N.D. Cal. June 18, 2025) (holding that AmeriCorps Directive to "certify that grant recipients' programs do not 'promote DEI'" constitute final agency action).

Here, the NOAs and Supplemental T&Cs are final agency actions that determine rights and obligations and produce legal consequences. Grantees are prohibited from including "gender ideology" in programs and services funded with the PREP and SRAE awards or else will risk termination of the funding. The NOAs inform grantees that "use of Federal funds from this award constitutes the grantee's acceptance of the [supplemental] terms and conditions." *See, e.g.*, Wolf-WA Decl. Ex. 13 at 3; Ex. 14 at 3.

Similarly, the PREP Directive is a final agency action that commands the States to remove discussion of gender identity from educational curricula funded by PREP grants within 60 days, under threat of termination of PREP grant funding if States do not comply. Nothing about these actions is tentative or interlocutory,[16] and legal consequences will flow from them. The PREP Directive references 45 C.F.R § 75.371, which permits HHS to withhold, disallow, suspend or terminate federal awards if imposing conditions on a grantee does not cure "noncompliance." *See, e.g.*, *id.* Decl. Ex. 21 at 7.

HHS's press release and termination of California's PREP funding demonstrate the PREP Directive's finality and the legal consequences flowing from it. The press release crows that HHS "demanded that 46 states and territories remove all references to gender ideology in their federally-funded [PREP] materials within 60 days." *Id.* Ex 22 at 2-3. It trumpets that HHS terminated California's PREP grant for failure to meet HHS's demand and puts "[s]tates and territories receiving these new letters . . . on notice: failure to comply will result in similar enforcement actions including the withholding, suspension, or termination of federal PREP funding." *Id.* at 3. Because Defendants' actions are neither tentative nor interlocutory and because they determine rights or obligations from which legal consequences will flow, they are final agency actions subject

---

[16] Final agency action is the programmatic decision, even where further steps are necessary to implement the program and comply with the directives. *E.g.*, *Oregon v. Ashcroft*, 368 F.3d 1118, 1148 (9th Cir. 2004) (Wallace, J. dissenting), *aff'd sub nom. Gonzales v. Oregon*, 546 U.S. 243 (2006) ("An agency action can be final even if its concrete legal effects are contingent upon a future event."); *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 869 (9th Cir. 2022) ("programmatic review" is final agency action regardless of whether "reviewing and approving individual, site-specific permits" remains).

to review under the APA. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *Texas v. Becerra*, 89 F.4th 529, 538-41 (5th Cir. 2024).

> **2.** **HHS's actions purporting to require PREP and SRAE grantees to erase references to, and acknowledgment of, gender identity is contrary to law**

The APA prohibits agency action that exceeds statutory or constitutional authority or is otherwise contrary to law. 5 U.S.C. §§ 706(2)(A), (C); *Kaweah Delta Health Care Dist. v. Becerra*, 123 F.4th 939, 944 (9th Cir. 2024) ("[U]nder our system of separation of powers, neither good intentions nor pressing policy problems can substitute for an agency's lack of statutory authority to act."); *Nw. Env't Advocs. v. EPA*, 537 F.3d 1006, 1025-27 (9th Cir. 2008).

For agencies charged with administering statutes, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). An agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). And "if an agency acts without statutory authority, then a court must set that action aside" under the APA. *Drs. for Am. v. Off. of Pers. Mgmt.*, No. 25-322 (JDB), 2025 WL 1836009, at *17 (D.D.C. July 3, 2025). Here, the Gender Conditions are contrary to law because they conflict with specific PREP and SRAE statutory requirements and the programs' purpose.

First, the Gender Conditions are directly contrary to the statutory requirement to provide culturally appropriate information in educational curricula. The PREP statute requires grantees to present information that is "culturally appropriate, recognizing the experiences of youth from diverse communities, backgrounds, and experiences." 42 U.S.C. § 713(b)(2)(B)(vi). The SRAE statute similarly requires that programs be "carried out . . . in the cultural context that is most appropriate for individuals in the particular population group to which [teaching is] directed." *Id.* § 710(b)(2)(E)). Yet the PREP Directive suggests that merely allowing transgender students to attend sex education classes with their preferred name, pronouns, or physical presentation, or allowing educators to respond in an affirming manner to a student's questions about their transgender family members, classmates, or community members, may violate the Gender

Conditions. This would require program providers to be culturally *insensitive* to the experience and existence of transgender, gender-diverse, or DSD youth.

Second, the Gender Conditions are unlawful because they directly conflict with the purpose of the grants. *Planned Parenthood of Greater Wash. & N. Idaho v. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1113 (9th Cir. 2020) (holding that an agency's grant criterion was contrary to law because it deviated from the purpose of the authorizing statute, to "replicat[e] programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy). Congress expressly intended PREP grants to be targeted to "high-risk, vulnerable, and culturally under-represented youth populations," and used to teach subjects such as healthy relationships, adolescent development, and parent-child communication. 42 U.S.C. §§ 713(a)(1)(C)(ii)(III), (b). Congress further intended to reduce adolescent pregnancy and STIs.[17] State programs that include evidence-based references to transgender identity comport with this purpose, because excluding such information is associated with harms such as higher rates of STIs and pregnancy and greater risk of high-risk sexual behavior.[18] Requiring removal of essential health information thus conflicts with these purposes and is contrary to law.

Third, Congress expressly required that programs utilizing PREP and SRAE grants must be "medically[]accurate and complete," which means supported by the weight of evidence-based scientific research. 42 U.S.C. § 713(b)(2)(B)(ii), (iv); *id.* § 713 (e)(2); *id.* § 710(b)(2)(B), (C); *id.* § 710(e)(2). The Gender Conditions directly conflict with these statutory requirements by requiring that PREP and SRAE curricula ignore the very existence of transgender individuals. HHS offers no evidence whatsoever that the Gender Conditions are medically accurate, and they are clearly incomplete. Indeed, the Supreme Court itself just acknowledged that "1.6 million Americans over the age of 13 identify as transgender, meaning that their gender identity does not align with their biological sex." *United States v. Skrmetti*, 145 S. Ct. 1816, 1824 (2025). What's more, the near

---

[17] Rabbitte, Am. J. Sex. Educ. 15(4) at 530-42.
[18] *Id.*

unanimous consensus of the medical and scientific community is that gender identity is distinct from sex. Millington-WA Decl. ¶ 29.

In short, the States' inclusion of gender identity material in their PREP and SRAE curricula is consistent with the statutory requirements governing those programs. HHS's directives to ignore gender identity stand in direct opposition to statutory requirements. Because the Gender Conditions are contrary to the enabling statutes, they are invalid and must be set aside under the APA.

Finally, for the reasons discussed Sections III.B.4 and III.B.5, *infra*, HHS acted "contrary to constitutional right [or] power," and therefore its actions are unlawful and must be set aside on that independent basis as well. 5 U.S.C. § 706(2)(B).

### 3. HHS's actions requiring grantees to erase references to gender identity from PREP and SRAE programming are arbitrary and capricious

The APA prohibits arbitrary and capricious action. *Id.* § 706(2)(A); *Kalispel Tribe of Indians v. Dep't of Interior*, 999 F.3d 683, 688 (9th Cir. 2021). It requires federal agencies to engage in "reasoned decisionmaking," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020), meaning an agency must offer "'a satisfactory explanation for its action'" and can neither "rel[y] on factors which Congress has not intended it to consider" nor ignore "an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified). While agencies can change their existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have taken account of "reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The APA requires a court to "hold unlawful and set aside agency action" that is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

In making this determination, the Court looks to the "grounds that [HHS] invoked when it [issued the directive]." *Michigan v. EPA*, 576 U.S. 743, 758 (2015); *see also Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 50. The information an agency should consider necessarily "turns on what a relevant substantive statute makes important[.]" *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792,

798 (9th Cir. 1996) (internal quotation marks omitted); *see also Ctr. for Biological Diversity v. Fish & Wildlife Serv.*, 67 F.4th 1027, 1039 (9th Cir. 2023). It is arbitrary and capricious for the agency to neither "look to" nor "discuss" statutory "requirements," *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020), or to "rel[y] on factors which Congress has not intended it to consider" in making its decision, *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. S*ee also Ctr. for Biological Diversity*, 67 F.4th at 1039.

The Gender Conditions are neither reasonable nor reasonably explained. HHS does not and cannot explain how its new conditions comply with the statutory criteria discussed above or further the programs' statutory purpose as defined by Congress. The conditions fly in the face of medical evidence and the needs of vulnerable youth. HHS did not consider or explain how the new conditions meet any of the objectives or statutory requirements of PREP or SRAE, such as how the conditions: (1) help reach "high-risk, vulnerable, and culturally under-represented youth populations;" (2) provide "medically-accurate and complete" information; (3) provide information "in the cultural context that is most appropriate for individuals in the particular population group to which they are directed;" (4) and develop "healthy attitudes and values about adolescent growth and development, [and] body image." 42 U.S.C. § 713; *id.* § 710. Because HHS cites no relevant data and has provided no reasonable explanation for its Gender Conditions, they violate 5 U.S.C. § 706(2)(A) and must be set aside. *See Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) ("An agency contravenes the APA when it "fails to examine the relevant data.").

The arbitrary and capricious nature of the Gender Conditions is also evident from the fact that HHS itself recognizes that gender identity discrimination is discrimination based on sex. Under their authorizing statutes, PREP and SRAE grants are both subject to 42 U.S.C. § 708 which prohibits discrimination on the basis of sex under any grant funded program. 42 U.S.C. § 713(d)(2)(B)(vi) (PREP); *id.* § 710(d)(1) (SRAE). In its own rule, HHS has interpreted sex discrimination to include gender identity. 45 C.F.R. § 75.300(e)(8). As such, the Gender Conditions contradict HHS' own position on discrimination. This is quintessentially arbitrary and capricious.

Moreover, HHS fails to explain the inconsistency between the Gender Conditions and prior HHS actions. "Unexplained inconsistency" between agency actions is "a reason for holding an interpretation to be an arbitrary and capricious change." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). As recently as 2024, HHS required PREP and SRAE grantees to provide programming to LGBTQIA+ youth. Indeed, the 2024 PREP NOA received by States required them to "[p]rovide PREP programming to . . . culturally underrepresented youth populations such as . . . youth who identify as lesbian, gay, bisexual, transgender, and/or questioning." Wolf-WA Decl. Ex. 8 at 12. Similarly, in a 2024 SRAE Notice of Funding Opportunity, HHS stated that "States must ensure that SRAE projects are inclusive of youth who identify as lesbian, gay, bisexual, transgender, and/or questioning, intersex, asexual, and two-spirit (LGBTQIA2S+)." *Id.* Ex. 9 at 7.

HHS's abrupt reversal also violates "[t]he change-in-position doctrine," which prevents agencies from "mislead[ing] regulated entities." *FDA v. Wages & White Lion Invs.*, 145 S. Ct. 898, 917 (2025) (citation modified). "Under that doctrine, '[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change, 'display awareness that [they are] changing position,' and 'consider serious reliance interests.'" *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016)).

Here, HHS not only failed to provide a reasoned explanation for its change in position, it also ignored the impact of its decision on reliance interests of grantees. Many of these programs have been in place for over fifteen years and have become an embedded part of school districts' efforts to provide sexual health education services and reduce teen pregnancy and STIs. *See, supra* Section II.C. Moreover, schools, grantees, and sub-grantees typically develop their curricula far ahead of time, and do not have the option of changing their curricula in the middle of a school year as HHS has demanded. Davis-NY Decl. ¶ 19. Many school districts, especially smaller ones, lack the expertise to fill the gap created by a loss of federal funding. Sharnbroich-WA Decl. ¶ 24; *see also* Baney-OR ¶14 (explaining that if new curriculum is required, Oregon would need to hire an external contractor to produce the updated curriculum); Blessing-DE Decl. ¶ 21 ("Discontinuation

represents a substantial gap in preventative education and community engagement efforts."); Johnson-ME Decl. ¶ 19 ("If Maine Family Planning loses PREP funding, [it] would be unable to meet its obligations to provide age-appropriate and medically accurate education to youth."); Hermann-WA Decl. ¶ 18 ("The absence of this funding leaves Wisconsin School districts without a specifically funded position to ensure Human Growth and Development statute compliance."); Davis-NY Decl. ¶ 48 ("termination of these awards and loss of staff would haphazardly interrupt student education and engagement."). There is no evidence HHS took these reliance interests into account when it abruptly changed its policy. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) ("When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.") (citation modified); *Thakur v. Trump*, 148 F.4th 1096, 1106-07 (9th Cir. 2025) (holding termination of federal funding for state researchers was arbitrary and capricious where there was "no evidence" the agency considered "reliance interests" including that the impact of the funds would be lost if revoked partway through the project.).

HHS also failed to consider that many States have laws preventing the types of discrimination required by the Gender Conditions. *See, infra* III.C. States thus may not even have the option of accepting HHS's discriminatory conditions. Nor did HHS display any awareness of the consequences to vulnerable youth if States lose this funding. HHS simply ignored the "devastating" impacts on transgender and gender-diverse youth in having transgender identity erased from their curricula. Sharnbroich-WA Decl. ¶ 27.

Last but not least, the Gender Conditions are an impermissible pretextual justification for a preordained action. *E.g.*, *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) ("The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions[.]"); *Saget v. Trump*, 375 F.Supp.3d 280, 361 (E.D.N.Y. 2019) ("An agency's actions are arbitrary and capricious under the APA if they are pretextual"). Implicit in the PREP Directive is that HHS intended to erase reference to transgender, gender-diverse, and DSD individuals from PREP programming when it initiated a medical

accuracy review in April 2025. Seemingly, when it became clear that HHS could not do so under the veil of a "medical accuracy review," it reverse-engineered a haphazard justification that such programming was not "authorized" by the statute. *See, e.g.*, Wolf-WA Decl. Ex. 21 at 2. For all of these reasons, Defendants' actions violate the APA.

### 4. The Gender Conditions violate the Spending Clause

Defendants' conditioning of PREP and SRAE funding also violates the Spending Clause. The Spending Clause requires that States have clear notice of any conditions on federal funds and that such conditions be imposed "unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981); *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). These requirements flow from the principle that States must "voluntarily and knowingly" accept conditions attached to federal spending. *Pennhurst State Sch.*, 451 U.S. at 17. States "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Id.* Congress's power to legislate under the spending power "does not include surprising participating states with post acceptance or 'retroactive' conditions." *Id.* at 25; *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012).

The Gender Conditions directly violate these principles. Congress never restricted PREP or SRAE funding based on a condition that States change their programming in the way HHS now commands. On the contrary, as discussed *supra* Section III.B.2, the broad language of the enabling statutes, particularly their requirements that programs be "medically-accurate and complete," and "culturally appropriate" or "provided in the cultural context that is most appropriate for individuals in the particular population group to which they are directed," compels the conclusion that programs containing medically accurate information about sex and gender fall squarely within the scope of the statutes. 42 U.S.C. §§ 713(b)(2)(B)(ii), (v), (vi); *id.* § 710(b)(2)(E); *see also*, *Murphy*, 548 U.S. at 296, 297 ("courts must presume that a legislature says in a statute what it means" and must "enforce it according to its terms").

Consistent with this statutory language, Plaintiff States have received PREP and SRAE funding for years without any indication that programs containing such information would be

excluded from grant eligibility. In fact, HHS admits it "previously approved" the very same curricula now at issue. *See, e.g.*, Wolf-WA Decl. Ex. 21 at 6. And HHS's 2024 PREP funding conditions expressly required that PREP programs be provided to high-risk and vulnerable youth including LGBTQIA+ youth, *see, e.g.*, *id.* Ex. 8 at 12, as did HHS's 2024 Notice of Funding Opportunity States for SRAE. *Id.* Ex. 9 at 7. Yet HHS has now abruptly declared that it views these same curricula as beyond the authority of the authorizing statutes while at the same time declaring without warning that using funds constitutes acceptance of these conditions. *See, e.g.*, *id.* Ex. 13 at 3, Ex. 14 at 3.

Importantly, the subject line of the PREP Directive indicates that it concerns PREP grants for fiscal years 2023, 2024, and 2025. *See, e.g.*, *id.* Ex. 21 at 2. Accordingly, HHS's threatened enforcement actions could apply to awards at various stages, including funding awarded for previous fiscal years. HHS has thus effectively imposed a retroactive funding condition on the States' preexisting programs that Congress never enacted. This violates the Spending Clause because the States lacked notice of this retroactive condition and could not have knowingly accepted it. *See Pennhurst State Sch.*, 451 U.S. at 17; *Murphy*, 548 U.S. at 296.

Additionally, to the extent the Gender Conditions are prospective rather than retroactive, they likewise violate the Spending Clause for three reasons. First, the restrictions fall far short of the type of clear and "unambiguous" language required under the Spending Clause. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987); *Pennhurst State Sch.*, 451 U.S. at 25 (Congress must provide "clear notice" of the obligations a spending law entails). While the Gender Conditions prohibit content concerning "gender ideology" in States' PREP and SRAE programs, they do not attempt to define that term. To the extent that the definition comes from the January 2025 Executive Order, it is hopelessly vague and relies on unscientific definitions of "male" and "female." *See* E.O. 14168, § 2(f). The Executive Order defines "male" as "a person belonging, at conception, to the sex that produces the small reproductive cell" and it defines "female" as "a person belonging, at conception, to the sex that produces the large reproductive cell." *Id.* § 2(e). But zygotes do not

produce reproductive cells "at conception." Millington Decl. ¶ 47. The Administration's nonsensical definition of "gender ideology" is thus inconsistent with biological reality.

What is more, the Gender Conditions do not provide States with the type of "unambiguously" clear notice about what can and cannot be included to meet Spending Clause requirements. *Pennhurst State Sch.*, 451 U.S. at 17. On the contrary, they raise numerous questions about what States can and cannot say in their curricula or in their programs. Is the word "transgender" banned? Must gender diverse instructors or program administrators conceal their identities when performing grant-related activities? Are States banned from allowing students to speak about their own experiences? The States cannot reasonably determine which of their programs comply with the conditions, making it impossible for States to "voluntarily and knowingly" accept the conditions attached to federal spending. *Id.*

Second, only Congress may impose conditions under the Spending Clause, and HHS's attempt to impose new restrictions on PREP and SRAE grant funding violates this core principle. *See Dole*, 483 U.S. at 206–07 (explaining scope of Congress's Spending Clause power). And finally, Spending Clause conditions must be related "to the federal interest in particular national projects or programs." *Id.* at 207–08 (citation modified). But the new Gender Conditions HHS attempts to impose here—a blanket prohibition on including "gender ideology" in any program receiving PREP or SRAE funds—is found nowhere in the authorizing statutes, and to the contrary, directly conflicts with the broad language and central purpose of the enabling statutes. The plain language of 42 U.S.C. § 713 and 42 U.S.C. § 710 demonstrates Congress's intent to provide medically accurate and complete information that will help youth reduce risky sexual behavior and to prepare them for adulthood by exploring topics like relationships, adolescent body changes and body image. Yet HHS's funding condition *excludes* topics that further the statute's objectives, which fails the Spending Clause's "relatedness" requirement. The States are thus likely to succeed on the merits of their Spending Clause claim.

5.      **The Gender Conditions violate separation of powers**

As noted above, Congress possesses exclusive power to legislate, and the Constitution vests Congress—not the Executive—with the spending power. U.S. Const. art. I, § 1; *id.* § 8, cl. 1. The Executive authority is limited to those powers specifically conferred by the Constitution and federal statutes. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Thus, any instance where the Executive directs an agency to take an action that runs afoul of a statute violates the Separation of Powers doctrine. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637-38 (2024); *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014). There is "no provision in the Constitution" that authorizes the Executive to enact, to amend, or to repeal statutes," or to "decline to follow a statutory mandate or prohibition simply because of policy objections." *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1232 (2018) (citing *Clinton v. City of New York*, 524 U.S. 417, 438, 118 (1998)).

Courts around the country agree that federal agencies have no power to unilaterally impose conditions on federal funding without Congressional authorization. *See, e.g.*, *id.* at 1231, 1234–35 ("withhold[ing] all federal grants from so-called 'sanctuary' cities and counties" without congressional authorization violated separation of powers); *City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020) (imposing "extra-statutory conditions on federal grant awards as a tool to obtain compliance with [the executive's] policy objectives strikes at the heart of . . . the separation of powers."). Courts have held that funding conditions requiring compliance with the executive definitions of "gender ideology" violate the separation of powers. *Washington v. Trump*, 768 F. Supp. 3d 1239, 1261–63 (W.D. Wash. 2025) (finding that Congress never conditioned federal funding on compliance with "gender ideology" funding conditions, which violated separation of powers); *King County v. Turner*, Case No. 2:25-cv-814, 2025 WL 1582368, at *6, 15–17 (W.D.Wa. June 3, 2025) ("gender ideology" and anti-DEI funding conditions violated separation of powers); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 431–43 (D. Md. 2025) (conditioning funding on recipients' denying gender-affirming care violated separation of powers).

For the same reasons the Gender Conditions violate the Spending Clause, they also violate the Separation of Powers doctrine. They retroactively rewrite funding conditions on pre-existing programs to impose restrictions that conflict with the enabling statutes and were not authorized by Congress. *See, e.g.*, *Washington*, 768 F. Supp. 3d at 1261–63 (not even Congress may "surprise[] states with post acceptance . . . conditions" on federal funds and "impose conditions on federal grants that are unrelated to the federal interest in particular national projects or programs."). And they unilaterally impose new restrictions that undermine the central purpose of the enabling statutes by prohibiting programs addressing topics that Congress intended to fund. Congress never authorized such restrictions to PREP or SRAE funding. Because HHS's attempts to rewrite funding conditions for pre-existing programs and to impose new conditions on PREP and SRAE funding usurps Congress's legislative role, the States are likely to succeed on their Separation of Powers claim.

## C.    Plaintiff States Will Suffer Irreparable Harm Absent Injunctive Relief

Defendants' actions have forced Plaintiff States into an untenable dilemma—they must choose between losing federal funding for essential public health education programs or complying with unlawful funding conditions that undermine the central purpose of these programs and conflict with state and federal laws and policies. Both options inflict irreparable harm.

PREP and SRAE are designed to educate youth on abstinence and contraception for the prevention of pregnancy and sexually transmitted infections, including HIV/AIDS. 42 U.S.C. § 713 (b)(2)(A)(i); *id.* § 710. They are highly successful and have a particularly strong impact in vulnerable populations, including youth in foster care; youth in adjudication systems; homeless or runaway youth; pregnant or parenting youth; and transgender, gender-diverse, and DSD youth. Wolf-WA Decl. Ex. 23 at 2; Ex. 24 at 2. In Minnesota, for example, three in four participants were part of an underserved target population. *See also* Sullivan-MD Decl. ¶ 20 (Maryland uses PREP

to hold session in a local public library in a majority-minority county with one of the highest rates of HIV in the United States).[19]

The termination of PREP and SRAE funding will cause an immediate loss of at least $35 million to the Plaintiff States. Without federal funding to implement these programs, Plaintiff States will not be able to provide critical education and services to the youth populations that need them most. For example, one Minnesota SRAE subrecipient teaches the HHS-approved "It's That Easy" curriculum to hundreds of families each year within several of Minnesota's federally-recognized tribal communities. Woodrich-MN Decl. ¶35(b). The subrecipient employs instructors who incorporate Ojibwe language and culture into the programming. *Id.* In some of those more remote regions of Minnesota, that subrecipient is one of few, if not the only, source of medically accurate, culturally-competent sexual education. *Id.* Programming in those communities may be eliminated and staff positions may be unsustainable if this subrecipient is required to choose between accepting SRAE funds or maintaining their mission of providing medically accurate, culturally appropriate content. *Id.* ¶ 35(b). Delaware's subgrantee states that vulnerable middle and high school-aged youth, including homeless youth, those in foster care, and youth in correctional settings, would lose access to vital curriculum and programming that PREP funds. Thomas-Jones-DE Decl. ¶¶ 19-20; *see also* Liu-OR Decl. ¶¶ 5, 23 (loss of PREP funding would directly impact almost 1,300 youth with Intellectual and Developmental Disabilities).

In other States, PREP providers will lose access to vital training and technical support from subject matter experts. For example, Washington contracts with Cardea Services to train educators and uses its PREP grant funds to provide teachers and evaluators with critical information and services. Sharnbroich-WA Decl. ¶¶ 5-6; *see also* Rossman-WA Decl. ¶ 5; Smith-WA Decl. ¶¶ 5, 20. Cardea's services include assisting school districts with planning curricula, performing needs assessments, answering questions about district-specific issues, holding parent/caregiver workshops, and providing ongoing support throughout the school year. Sharnbroich-WA Decl.

---

[19] Minn. Dep't of Health, Personal Responsibility Education Program Grantee Success Stories – Minnesota, https://www.health.state.mn.us/people/adolescent/prep/success.html (last accessed Sept. 25, 2025).

¶¶8-9, 14; *see also* Rossman-WA Decl. ¶¶ 7, 9, 10; Smith-WA Decl. ¶¶ 6, 7, 8. The school district partners and parents/caregivers who receive these services find them highly valuable, particularly the training programs on how to answer sensitive questions from LGBTQIA+ youth. Sharnbroich-WA Decl. ¶¶ 11-12; *see also* Rossman-WA Decl. ¶ 11; Smith-WA Decl. ¶¶ 8, 9. School districts have noted that Cardea is an "invaluable support", an "extremely knowledgeable and effective partner[]", and "essential". Rossman-WA Decl. ¶¶ 5, 8; Smith-WA Decl. ¶¶ 5, 11. If Washington loses its PREP funding, school districts will lose these critical resources, and health educators will feel immediate impacts. Roberts-WA Decl. ¶ 33 (Cardea's training and technical assistance is "a crucially important part of fulfilling PREP program goals"); *see also* Davis-NY Decl. ¶ 52 (loss of funding would put New York in the "untenable position of terminating the eleven existing SRAE sub-grantee contracts and the funds already awarded therewith."). Some schools may even have to stop providing sexual health education entirely. Johnson-IL Decl. ¶ 27 (explaining that if school districts are forced to remove gender from curricula, "school districts may just opt to no longer teach sex education at all"). Additionally, the quality of the students' education will suffer, as Cardea's training helps "sexual health education be more inclusive" and a "richer experience for students." Rossman-WA Decl. ¶ 15; Smith-WA Decl. ¶ 8.

The inability to fund PREP and SRAE programming will also result in long term costs through inevitable increase in unplanned pregnancy, higher birth rates, and higher rates of HIV and other STIs among young people in vulnerable populations. Wolf-WA Decl. Ex. 11 at 12 ("Pregnancies and STIs pose negative consequences for both the teenagers who experience them and society, including billions of dollars in health care and taxpayer costs"); *Id.* Ex. 5 (noting that STIs cost the American healthcare system nearly $16 billion in healthcare costs); Roberts-WA Decl. ¶ 35 ("without the continued and uninterrupted funding of the PREP grant, DOH and its partners will not be as effective in administering and providing age-appropriate and medically accurate education to youth who are at particular risk of becoming pregnant or contracting HIV and other STIs."); Lyon-Callo-MI Decl. ¶ 22 ("[l]oss of PREP funding would threaten Michigan's historic reductions in teen pregnancy, as the program is central to the state's prevention strategy").

It will also have a devastating impact on the very populations Congress intended to help, especially high-risk youth. *See* Rossman-WA Decl. ¶ 16 (services provided by PREP funding is "vital" and without them "youth in our school district, especially high-risk youth, will suffer"); Smith-WA Decl. ¶ 20 (same); Campagna-RI Decl. ¶ 18 (same); Brown-NJ Decl. ¶ 26 (same); Davis-NY Decl. ¶ 42 (same); Bell-MA Decl. ¶ 13 (same).

Given the goals of PREP and SRAE, their overwhelming success, and the vital information and services they provide, this court can easily conclude that termination of these programs and supportive services will cause irreparable harm to public health in the Plaintiff States. *See State v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1074 (N.D. Cal. 2018) (finding irreparable harm from agency rule that "will have irreparable consequences for public health") (citation omitted); *Sierra Club v. Dep't of Agric., Rural Utils. Serv.*, 841 F. Supp. 2d 349, 358 (D.D.C. 2012) (threats to public health establish irreparable harm).

Additionally, the termination of federal funding will harm state agencies' workforce, planning, and partnerships. Many states have employees funded with PREP and SRAE funds, and state agencies may be forced to consider terminating these positions should funding be cut. *See* Roberts-WA Decl. ¶ 25 (three employees at risk); *see also* Castillo-CO Decl. ¶ 17 (7 employees); Vigil-CT Decl. ¶ 16 (1.25 employees); Suzuki-HI Decl. ¶ 16 (1.5 employees); Johnson-ME Decl. ¶ 17 (1.6 FTEs); Blodgett-MA Decl. ¶ 17 (1.3 FTEs); Woodrich-MN Decl. ¶ 28 (3 agency employees and 48 positions); Liu-OR Decl. ¶ 19 (2 employees); Baney-OR Decl. ¶ 12 (4.75 FTEs); Hermann-WI ¶ Decl. 17 (.5 FTE); Tran-WI Decl. ¶ 19 ("The PREP grant also contributes substantially to the salary of two employees [of the Wisconsin Department of Health Services] . . . as well as parts of the salaries of three other individuals"); Davis-NY Decl. ¶ 45 (2 employees); Campagna-RI Decl. ¶ 16 (3 employees); Brown-NJ Decl. ¶ 23 ("PREP grant covers the full salary of one [FTE] as well as a portion of the salaries of two further employees."); Lyon-Callo-MI Decl. ¶ 19 (1.38 FTEs as well as 22 program staff at partner organizations). In addition to possible staffing cuts, state agencies also report that the Gender Conditions have created "immense confusion" and have "severely negatively impacted" their ability to plan for the future.

*See, e.g.*, Dils-WA Decl. ¶15; Roberts-WA Decl. ¶ 25; Sullivan-MD Decl. ¶ 17. These, too, are irreparable harms. *See Planned Parenthood of Greater Wash. & N. Idaho v. Dep't of Health & Hum. Servs.,* 328 F. Supp. 3d 1133, 1150 (E.D. Wash. 2018) (finding irreparable harm three months before grant termination became effective because "Plaintiffs based their programs, budgeting, staffing, and partnerships with communities on th[e] understanding" of grant's five-year term).

On the other hand, complying with the unlawful funding conditions is no less injurious. Compliance appears to require that Plaintiff States censor their sexual health education programs to deny the existence of transgender, gender-diverse, and DSD individuals. This will have catastrophic effects for individuals in those populations. Providing medically and scientifically accurate, age-appropriate, and inclusive sexual health information is integral to combatting teen pregnancy and STIs—exactly the outcomes the PREP and SRAE programs were designed to mitigate. Rabbitte, Am. J. Sex. Educ. 15(4) at 530-42. And providing inclusive sexual health information, including information about gender identity, is "lifesaving work." Sharnbroich-WA Decl. ¶ 27; *see also* Millington-WA Decl. ¶ 39 (including gender identity in comprehensive sexual health education is supported and recommended by numerous professional organizations). Indeed, in places "where inclusive sexual health information isn't provided to gender expansive youth, rates of suicidal ideation and suicide are higher." Sharnbroich-WA Decl. ¶ 27; *see also* Elliot A. Tebbe & Stephanie L. Budge, *Factors that drive mental health disparities and promote well-being in transgender and nonbinary people*, 1 Nature Revs. Psych., (Sept. 26, 2022), 694–707. https://doi.org/10.1038/s44159-022-00109-0 (Studies consistently show that transgender youth who are rejected or excluded face significantly higher rates of depression, PTSD, substance misuse, and suicidality in adulthood); Tracy A. Becerra-Culqui, et al., *Mental Health of Transgender and Gender Nonconforming Youth Compared with Their Peers*, Pediatrics, 141(5) (Apr. 16, 2018), https://pubmed.ncbi.nlm.nih.gov/29661941/. (Finding significantly elevated rates of depression, anxiety, and suicidality among gender-diverse youth, directly linked to minority stress and a lack of affirmation).

As one sub-grantee put it, "providing a non-judgmental and affirming environment for youth—including for youth who may be dealing with mental health issues, including gender dysphoria, or developing a sense of their own gender identity and sexual orientation—is both necessary to the programming's effectiveness and central to our values and our organizational mission." Spicer-NY Decl. ¶¶ 20, 29; *id.* ("Denying or refusing to acknowledge the existence of LGBTQ+ youth would … exacerbate inequities and create a stigmatizing environment that encourages other students to disrespect LGBTQ+ students."); Vincheski-NY Decl. ¶ 33 ("Being able to acknowledge and accept students' identifies in a supportive and non-judgmental environment is critical in enabling TOP to achieve its mission to help all children."); Trevor Project 2023 U.S. National Survey on the Mental Health of LGBTQ Young People, The Trevor Project, at 4, (affirming gender identity among transgender and nonbinary young people is consistently associated with lower rates of attempting suicide).

This sentiment is endorsed by grantees throughout the Plaintiff States. *See, e.g.*, Castillo-CO Decl. ¶ 18 (describing how Colorado's PREP grants support sexual health education for underserved communities, including LGBTQ+ youth, who often suffer from trauma, may be more prone to high-risk behaviors, and are in environments where quality sexual health education is not otherwise available); Johnson-ME Decl. ¶ 20 ("Removing any mention of gender diversity throughout the curriculum not only erases and harms vulnerable transgender and non-binary youth, but leaves out general information so that all young people, regardless of how they identify, can learn about the many ways young people in Maine and in the world identify"); Woodrich-MN Decl. ¶ 34 (describing research articles emphasizing the importance of sex education that is culturally appropriate and that is inclusive of LGBTQ+ youth); Hermann-MI Decl. ¶ 21 ("specific harms to transgender youth as a result of erasure and rejection are documented in national, state, and local data"); Campagna-RI Decl. ¶ 19 ("Elimination of this programming and revisions to language inclusive of gender identity would contribute harm to LGBTQ+ youth."); Davis-NY Decl. ¶ 56 ("censoring the curricula by removing all references to gender identity and gender roles

would drastically decrease these programs' efficacy [and] harm the very communities the programs were designed to serve.").

Moreover, censorship in sexual health education effectively prohibits Plaintiff States from effectuating state laws and policies promoting sexual health education that is comprehensive, medically and scientifically accurate, age-appropriate, and inclusive of all students, regardless of their protected class status. *See, e.g.*, Wash. Rev. Code § 28A.300.475; Or. Rev. Stat. § 336.455(2)(j) (2020); Or. Admin. R. 581-022-2050(6)(q), (s); Colo. Rev. Stat. § 22-1-128 (2025); Sullivan-MD Decl. ¶ 21 (noting that to comply with Gender Conditions requires Maryland to violate state law). This undermines the States' sovereign interests in carrying out their own laws and policies that protect against discrimination, aim to foster an inclusive environment for all students, and strive to target underrepresented and at-risk populations including transgender, gender-diverse, and DSD young people. This is also injurious. *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1015 (9th Cir. 2020) ("'[T]he public also has an interest in ensuring that 'statutes enacted by [their] representatives' are not imperiled by executive fiat.") (quoting *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018)).

Simply put, Plaintiff States will suffer irreparable injuries whether they comply with the Gender Conditions or not. They must either capitulate to unlawful conditions or lose federal funding necessary to support important health programs protecting vulnerable youth. This "Hobson's choice" plainly demonstrates the need for injunctive relief. *See Turner*, 2025 WL 1582368, at *7, *18-19 (finding irreparable harm where imposition of new funding conditions imposed a "Hobson's choice of accepting illegal conditions that are without authority [and] contrary to the Constitution . . . or forgoing the benefit of grant funds…that are necessary for crucial local services"); *Washington*, 768 F. Supp. 3d at 1256 (plaintiff states established irreparable harm where they faced the loss of millions in federal funding and dire harms to transgender youth).

**D.**     **The Equities and Public Interest Weigh Strongly in States' Favor**

The final two *Winter* factors, which merge when the government is a party, both tip sharply in the Plaintiff States' favor. The States are in danger of losing funding for common-sense and effective programs providing age-appropriate and medically accurate education to youth who are at particular risk for becoming pregnant or for contracting HIV or other STIs. *See Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1181 (9th Cir. 2021) (promoting the health and safety of students constitutes a public interest). And the threat to these programs far outweighs the Federal Government's interest in censoring or terminating sexual health education. Whatever interest the federal government may have in cutting off sexual health education services to youth during the pendency of this case is negligible compared to the irreparable harms faced by Plaintiffs States and youth who will abruptly lose access to ongoing programming providing essential information necessary to keep them safe. The balance of equities supports a preliminary injunction, and the Court should preserve the status quo until the case can be decided on the merits.

## IV.     CONCLUSION

For the foregoing reasons, this Court should grant the Plaintiffs' motion and immediately enjoin the implementation and enforcement of the PREP Directive, the PREP and SRAE NOAs, and the PREP and SRAE Supplemental T&Cs.

DATED this 26th day of September 2025.

Respectfully submitted,

<table>
<tr><td>

DAN RAYFIELD
Attorney General
State of Oregon

*s/ Leanne Hartmann*
BRIAN SIMMONDS MARSHALL #196129
LEANNE HARTMANN #T25070201, Mass.
BBO #667852
Senior Assistant Attorneys General
CARTER BRACE #243828
Assistant Attorney General
100 SW Market Street
Portland, OR 97201
971-673-1880
Brian.S.Marshall@doj.oregon.gov
Leanne.Hartmann@doj.oregon.gov
Carter.Brace@doj.oregon.gov
*Counsel for Plaintiff State of Oregon*

</td><td>

NICHOLAS W. BROWN
Attorney General
State of Washington

*s/ Lucy Wolf*
LUCY WOLF
MOLLY POWELL
KELLY PARADIS
CYNTHIA ALEXANDER
ALEXIA DIORIO
Assistant Attorneys General
Complex Litigation Division
800 Fifth Avenue, Suite 2000
206-464-7744
lucy.wolf@atg.wa.gov
molly.powell@atg.wa.gov
kelly.paradis@atg.wa.gov
cynthia.alexander@atg.wa.gov
alexia.diorio@atg.wa.gov
*Counsel for Plaintiff State of Washington*

</td></tr>
<tr><td>

KEITH ELLISON
Attorney General
State of Minnesota

*s/ Lindsey E. Middlecamp*
LINDSEY E. MIDDLECAMP
Special Counsel, Rule of Law
Office of the Minnesota Attorney General
445 Minnesota St., Suite 600
St. Paul, MN 55101
651-300-0711
lindsey.middlecamp@ag.state.mn.us
*Counsel for Plaintiff State of Minnesota*

</td><td>

PHILIP J. WEISER
Attorney General
State of Colorado

*s/ Kevin G. Webster*
KEVIN G. WEBSTER
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
720-508-6086
kevin.webster@coag.gov
*Counsel for Plaintiff State of Colorado*

</td></tr>
</table>

WILLIAM TONG
Attorney General
State of Connecticut

*s/ Andrew M. Ammirati*
ANDREW M. AMMIRATI
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov
*Counsel for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General
State of Delaware

*s/ Ian R. Liston*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
ROSE GIBSON
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
ian.liston@delaware.gov
vanessa.kassab@delaware.gov
rose.gibson@delaware.gov
*Counsel for Plaintiff State of Delaware*

BRIAN L. SCHWALB
Attorney General
District of Columbia

*s/ Jess E. Feinberg*
JESS E. FEINBERG
Assistant Attorney General
400 6th Street, NW, Suite 10100
Washington, D.C. 20001
202-735-6637
jess.feinberg@dc.gov
*Counsel for Plaintiff District of Columbia*

ANNE E. LOPEZ
Attorney General
State of Hawai'i

*s/ Kaliko'onālani D. Fernandes*
DAVID D. DAY
Special Assistant to the Attorney General
KALIKO'ONĀLANI D. FERNANDES
Solicitor General
425 Queen Street
Honolulu, HI 96813
808-586-1360
kaliko.d.fernandes@hawaii.gov
*Counsel for Plaintiff State of Hawai'i*

KWAME RAOUL
Attorney General
State of Illinois

*s/ Cara Hendrickson*
CARA HENDRICKSON
Executive Deputy Attorney General
ELIZABETH MORRIS
Deputy Chief, Special Litigation Bureau
115 S. LaSalle Street
Chicago, IL 60603
312-814-3000
cara.hendrickson@ilag.gov
elizabeth.morris@ilag.gov
*Counsel for Plaintiff State of Illinois*

AARON M. FREY
Attorney General
State of Maine

*s/ Kevin J. Beal*
KEVIN J. BEAL
Assistant Attorney General
111 Sewall Street, 6th Floor
6 State House Station
Augusta, ME 04333-0006
207-626-8800
kevin.beal@maine.gov
*Counsel for Plaintiff State of Maine*

ANTHONY G. BROWN
Attorney General
State of Maryland

*s/ Lauren Gorodetsky*
LAUREN GORODETSKY
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-7057
lgorodetsky@oag.state.md.us
*Counsel for Plaintiff State of Maryland*

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts

*s/ Allyson Slater*
ALLYSON SLATER
Director, Reproductive Justice Unit
MORGAN CARMEN
Assistant Attorney General
One Ashburton Place
Boston, MA 02108
617-727-2200
allyson.slater@mass.gov
morgan.carmen@mass.gov
*Counsel for Plaintiff Commonwealth of Massachusetts*

DANA NESSEL
Attorney General
Michigan

*s/ Neil Giovanatti*
NEIL GIOVANATTI
DANIEL PING
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov
PingD@michigan.gov
*Counsel for Plaintiff State of Michigan*

MATTHEW J. PLATKIN
Attorney General
State of New Jersey

*s/ Farng-Yi Foo*
FARNG-YI FOO
GEOFFREY MCGEE
*Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
609-696-5279
Farng-Yi.Foo@law.njoag.gov
Geoffrey.McGee@law.njoag.gov
*Counsel for Plaintiff State of New Jersey*

LETITIA JAMES
Attorney General
State of New York

*s/ Galen Leigh Sherwin*
GALEN LEIGH SHERWIN
Special Counsel for Reproductive Justice
28 Liberty Street
New York, NY 10005
212-426-5667
galen.sherwin@ag.ny.gov
*Counsel for Plaintiff State of New York*

PETER F. NERONHA
Attorney General
State of Rhode Island

*s/ Riley M. O'Brien*
RILEY M. O'BRIEN
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
401-274-4400
robrien@riag.ri.gov
*Counsel for Plaintiff State of Rhode Island*

JOSHUA L. KAUL
Attorney General of Wisconsin

*s/ Aaron J. Bibb*
AARON J. BIBB
Assistant Attorney General
Wisconsin Department of Justice
PO Box 7857
Madison, WI 53707-7857
608-266-0810
aaron.bibb@wisdoj.gov
*Counsel for Plaintiff State of Wisconsin*