**SCOTT E. BRADFORD, OSB #062824**
United States Attorney
District of Oregon
**SUSANNE LUSE, OSB #142489**
Assistant United States Attorney
Susanne.Luse@usdoj.gov
**SARAH E. FELDMAN, OSB #141458**
Assistant United States Attorney
Sarah.Feldman@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204-2936
Telephone: 503.727.1000
*Counsel for Defendants*


# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON


| | |
|---|---|
| **STATE OF WASHINGTON, et al.,** | Case No.: 6:25-cv-01748-AA |
| Plaintiffs, | |
| v. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,** | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................3

I.    Factual Background ...................................................................................................3

II.    Procedural Background...............................................................................................7

LEGAL STANDARDS ........................................................................................................8

ARGUMENT .......................................................................................................................9

I.    Plaintiffs are unlikely to succeed on the merits of their claims. ............................9

        A.    Plaintiffs have no likelihood of success on the merits of their APA claims because this Court lacks subject matter jurisdiction over them.............................................9

                1.    This Court lacks jurisdiction over all of Plaintiffs' claims because they are barred by the Tucker Act. ..........................................................................10

                2.    APA review is unavailable because the challenged actions are committed to agency discretion by law....................................................................12

                3.    APA review is unavailable because HHS's actions are not discrete, final agency actions .......................................................................................14

        B.    Plaintiffs have no likelihood of success on the merits of their APA claim ...........18

                1.    Defendants' actions were not "contrary to law." .......................................18

                2.    Defendants' actions were not "arbitrary and capricious." .........................21

        C.    Plaintiffs have no likelihood of success on the merits of their Spending Clause Claim.....................................................................................................................25

        D.    Plaintiffs have no likelihood of success on the merits of their Separation of Powers Claim ........................................................................................................29

II.    Plaintiffs fail to demonstrate a likelihood of irreparable harm that favors a preliminary injunction .............................................................................................................32

III.    Neither the balance of the equities nor the public interest supports a preliminary injunction. ...............................................................................................................35

IV.    Any injunction should be narrowly tailored to the harms to the named Plaintiffs ...........37

V.    If the Court issues injunctive relief, it should be stayed pending appeal and should accompany a bond............................................................................................38

CONCLUSION...............................................................................................................38

WORD COUNT CERTIFICATE ....................................................................................39

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ACLU of Ky. V. McCreary Cnty.*, 607 F.3d 439 (6th Cir. 2010) ................................. 11

*Agency for Int'l Dev. V. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ......................... 33

*Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006) ...................................................... 9

*Arlington Central School District Bd. Of Ed. V. Murphy*, 548 U.S. 291 (2006) ........................ 26

*Ass'n of Am. Med. Colls. V. United States*, 217 F.3d 770 (9th Cir. 2000) ................................. 14

*Bennett v. Spear*, 520 U.S. 154 (1997) .............................................................. 15

*Boaz Housing Auth. V. United States*, 994 F.3d 1359 (Fed. Cir. 2021) ...................................... 10

*Cal. Cmtys. Against Toxics v. Envtl. Prot. Agency*, 934 F.3d 627 (D.C. Cir. 2019) ................... 15

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ........................................................... 37

*Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988) ..................... 32

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ........................................................ 29

*Cobell v. Kempthorne*, 455 F.3d 301 (D.C. Cir. 2006) ................................................. 17

*Ctr. For Food Safety v. Perdue*, 320 F. Supp. 3d 1101 (N.D. Cal. 2018) .................................. 14

*Dep't of Educ. V. California*, 145 S. Ct. 966 (2025) ................................. 10, 32-33, 36

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) .............................. 24

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) ............................... 35

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ............................................. 21

*FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898 (2025) ................................. 23

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) ................................. 18

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) ................................................ 8

*Gaylor v. United States*, 74 F.3d 214 (10th Cir. 1996) ................................................ 11

*Harris Cnty., Texas v. Kennedy*, 786 F. Supp. 3d 194 (D.D.C. 2025) ........................................ 36

*Heckler v. Chaney*, 470 U.S. 821 (1985) ........................................................ 13, 14

*Inst. For Fisheries Res. V. Hahn*, 424 F. Supp. 3d 740 (N.D. Cal. 2019) ................................. 14

*Jajati v. U.S. Customs & Border Prot.*, 102 F.4th 1011 (9th Cir. 2024) ................................. 9-10

*King County v. Turner*, 2025 WL 1582368 (W.D. Wash. June 3, 2025) ................................... 30

*Lincoln v. Vigil*, 508 U.S. 182 (1993) .......................................................... 13, 14, 31

*Lopez v. Brewer*, 680 F.3d 1068 (9th Cir. 2012) .......................................... 8

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................... 9

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
571 F. 3d 873 (9th Cir. 2009) ............................................... 8, 32

*Massie v. United States*, 166 F.3d 1184 (Fed. Cir. 1999) .......................... 11

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) .......................................................... 9

*McKart v. United States*, 395 U.S. 185 (1969) ........................................ 16

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ......................... 11

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) ............................ 36

*National Cable & Telecommunications Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) .......................................................... 23

*Naturo v. Slater*, 888 F.3d 418 (9th Cir. 2018) ....................................... 9

*Nat'l Fed'n of Indep. Bus. V. Sebelius*, 567 U.S. 519 (2012) ..................... 28

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ............................ 15

*NW Utils. V. Bonneville Power Admin.*, 408 F.3d 638 (9th Cir.2005) ......................................... 15

*Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414 (1990) .............................. 18-19

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977 (9th Cir. 2006) .......................... 10, 15

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) ......................... 25

*Pippenger v. U.S. DOGE Serv.*, No. 25-cv-1090,
2025 WL 1148345 (D.D.C. Apr. 17, 2025) ........................................... 12

*Puga v. Chertoff*, 488 F.3d 812 (9th Cir. 2007) ...................................... 17

*Rust v. Sullivan*, 500 U.S. 173 (1991) ............................................. 26, 27, 29, 31

*Sols. In Hometown Connections v. Noem,* No. 25-cv-885,
2025 WL 1103253 (D. Md. Apr. 14, 2025) ........................................... 12

*South Dakota v. Dole*, 483 U.S. 203–08 (1987) ..................................... 28

*Stanley v. Univ. of S. Cal.*, 13 F.3d 1313 (9th Cir. 1994) ......................... 8

*Steenholdt v. FAA*, 314 F.3d 633 (D.C. Cir. 2003) ................................................ 12-13

*Television Stations, Inc.*, 556 U.S. 502–14 (2009) ........................................... 22

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) ........................................................ 37

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ........................................................ 19

*Tucson Airport Auth. V. Gen. Dynamics Corp.*, 136 F.3d 641 (9th Cir. 1998) ................. 9, 11, 12

*United Aeronautical Corporation v. United States Air Force*,
    80 F.4th 1017 (9th Cir. 2023) ...................................................... 9

*United States v. Chem. Found.*, 272 U.S. 1 (1926) ........................................... 24-25

*United States v. Mitchell*, 463 U.S. 206 (1983) ............................................... 9

*Washington v. Trump*, 768 F. Supp. 3d 1239 (W.D. Wash. 2025) ................................ 30

*Webster v. Doe*, 486 U.S. 592 (1988) .......................................................... 13

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .................................. 8, 32, 36

*Woodford v. Ngo*, 548 U.S. 81 (2006) ......................................................... 16

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ................................. 29

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8 ......................................................................... 29

U.S. Const. art. II, § 3 ........................................................................ 29

## FEDERAL STATUTES

5 U.S.C. § 551 ................................................................................. 9, 14

5 U.S.C. § 701 ................................................................................. 12

5 U.S.C. § 702 ................................................................................. 9, 12

5 U.S.C. § 704 ................................................................................. 14

5 U.S.C. § 706 ................................................................................. 12

28 U.S.C. § 1491 ............................................................................... 10

31 U.S.C. § 1301 ............................................................................... 18

42 U.S.C. § 710 ................................................................................ *passim*

42 U.S.C. § 713 ................................................................................ 4, 19, 27

## STATE STATUTES

Wash. Rev. Code § 28A.300.475 ................................................................. 35

**FEDERAL RULES**

Fed. R. Civ. P. 65 ...................................................................................................... 38

**FEDERAL REGULATIONS**

2 C.F.R. § 200.211 ................................................................................................. 19
42 C.F.R. § 75.300 ................................................................................................. 22
45 C.F.R. § 16.7 .................................................................................................... 17
45 C.F.R. §§ 75.403-405........................................................................................ 6

## INTRODUCTION

Plaintiff States bring this action in an attempt to dictate the terms and conditions on which the Office of the Administration for Children and Families ("ACF") within the United States Department of Health and Human Services ("HHS") awards grants to fund educational programs under two statutes: the Personal Responsibility Education Program and the Sexual Risk Avoidance Education Program. Plaintiffs seek a preliminary injunction to enjoin the federal government from enforcing the terms contained in lawfully issued Notices of Award, supplemental terms and conditions, and directive letters that prohibit grantees from using federal funding for programs that promote gender ideology. The challenged conditions simply clarify that federal funds must support medically accurate sexual risk avoidance education, not ideological concepts outside the statutory scope. The Court should deny Plaintiffs' motion for preliminary injunction for the following reasons.

*First*, Plaintiffs have failed to satisfy their substantial burden of demonstrating that the extraordinary remedy of an injunction is warranted in this case. Rather than preserving the status quo, the requested order would fundamentally alter it by compelling the Defendants to award federal grants and disburse federal funds without the essential terms and conditions that are necessitated by the program statutes.

*Second*, Plaintiffs are unlikely to succeed on the merits of Administrative Procedure Act ("APA") and constitutional claims for several reasons. To begin, the Court lacks subject matter jurisdiction over Plaintiffs' claims because their claims are barred by the Tucker Act. The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims for claims against the United States based on contracts, including grants implemented through contracts. Plaintiffs' suit, challenging the terms and conditions under the grants and seeking to enjoin HHS from enforcing them, is at its essence a contract action and therefore barred by the Tucker Act.

Additionally, the Court lacks jurisdiction over Plaintiff's APA claims because they challenge non-final, non-discrete agency actions that are generally committed to agency discretion by law. The issuance of program administration documents, such as Notices of Awards and directives to remove gender ideology content from the curricula do not constitute final agency actions. Plaintiffs' claims amount to a broad programmatic attack, which is impermissible under the APA.

Furthermore, Plaintiffs' APA claim is unlikely to succeed because HHS's actions were not unlawful. HHS has the authority to impose grant conditions, including those requiring grantees to remove references to gender ideology from federally funded curricula. This directive aligns with Congressional goals of promoting abstinence and sexual risk avoidance and is consistent with the statutory requirements for medically accurate and culturally appropriate information.

ACF's decision to require grantees to omit references to gender ideology in PREP and SRAE programs is not arbitrary and capricious. ACF reasonably explained that teaching gender ideology is outside the statutory authority for these programs, which focus on abstinence, teen pregnancy reduction, and healthy relationships.

Moreover, the exclusion of gender ideology from the federally funded PREP and SRAE programs does not violate the Spending Clause. The exclusion provides clear notice, falls within HHS's delegated authority, and is directly related to the federal interest in promoting medically accurate sexual health education. The exclusion does not impose unconstitutional coercion because the States have the option to decline the funds and design their own programs using their own resources.

Similarly, the exclusion of gender ideology from the programs does not violate the Separation of Powers doctrine. ACF's decision to exclude this content from the curriculum

aligns with Congressional intent and statutory limitations, as the authorizing statutes do not encompass gender ideology. This action reflects ACF's faithful adherence to Congressional directives and lawful exercise of administrative discretion.

*Third*, Plaintiffs fail to establish a likelihood of irreparable harm warranting the injunction. Plaintiffs' alleged economic harm is, by definition, not irreparable. And Plaintiffs fail to make a sufficiently specific showing that they will suffer an actual, immediate harm if they are unable to use federal funds in contravention of the federal government's conditions.

*Fourth*, Plaintiffs fail to establish that the balance of equities and public interest tip in their favor.

To the extent this Court is considering granting injunctive relief, the relief must be narrowly tailored to address the direct harms suffered by the named plaintiffs. Plaintiffs seek broad orders enjoining the implementation and enforcement of gender ideology conditions. However, this request is excessive and encompasses states that are not parties to this action and are not parties to the grant agreements between the federal government and the Plaintiff states.

Finally, any injunctive relief should be secured by an appropriate bond and should be stayed pending a determination by the Solicitor General whether to appeal, and if appeal is authorized, pending any appeal.

## BACKGROUND

### I.    Factual Background

ACF issues federal financial assistance awards like grants and cooperative agreements to promote the economic and social well-being of children, families, and communities. Declaration of Resa Matthew ("Matthew Decl.") ¶ 5. ACF, through the Family and Youth Services Bureau's ("FYSB") Division of Positive Youth Development, administers grants under the Personal

Responsibility Education Program ("PREP") and Title V Sexual Risk Avoidance Education ("SRAE"). Matthew Decl. ¶¶ 9, 18.

PREP was authorized in 2010, and its purpose is to fund states and territories to educate youth and young adults on both abstinence and contraception to prevent pregnancy and sexually transmitted infections ("STIs"), including HIV/AIDS, and on at least three of the six "adult preparation subjects" listed in the statute. Matthew Decl. ¶¶ 18–19; 42 U.S.C. § 713(b).

All content contained in PREP grants must adhere to strict medical accuracy and completeness standards. Matthew Decl. ¶ 20; 42 U.S.C. § 713(b)(2)(B). It must provide age-appropriate information and engage in activities that promote healthy sexual development. *Id.* Furthermore, PREP content must replicate evidence-based effective programs or substantially incorporate elements of proven programs that have demonstrated a track record of successfully changing behavior on the basis of rigorous scientific research. *Id.* This includes delaying sexual activity, increasing condom or contraceptive use for sexually active youth, or reducing pregnancy rates among youth. *Id.* The content must be taught within the cultural context that is most appropriate for individuals in the particular population group to which they are directed. *Id.* In addition to these requirements, PREP content must also include activities that educate youth who engage in sexual activity about responsible sexual behavior, including both abstinence and contraception. Matthew Decl. ¶ 21; 42 U.S.C. § 713(b)(2)(B). It must place substantial emphasis on both abstinence and contraception as means of preventing pregnancy among youth and sexually transmitted infections. *Id.*

The statute includes no mention of gender ideology or gender identity. Matthew Decl. ¶ 25; *see generally* 42 U.S.C. §713.

Formula grants are also available to states under the SRAE statute. 42 U.S.C. § 710. SRAE was authorized in 2018, and the purpose is to provide funding to states and territories for

the implementation of education exclusively focused on sexual risk avoidance. Matthew Decl.

¶¶ 9–10; 42 U.S.C. § 710(b). This education equips youth with the knowledge and skills to

voluntarily refrain from engaging in non-marital sexual activity. *Id.* The program is designed to

instill personal responsibility, self-regulation, goal setting, healthy decision-making, a focus on

the future, and the prevention of youth risk behaviors such as drug and alcohol use. *Id.* Notably,

SRAE does not normalize non-marital teen sexual activity. *Id.*

As with PREP, all content within SRAE programs must adhere to strict medical accuracy

and completeness standards. Matthew Decl. ¶ 11; 42 U.S.C. § 710(b)(2). This entails providing

age-appropriate information, basing it on adolescent learning and developmental theories

relevant to the target age group, and ensuring cultural appropriateness, recognizing the

experiences of youth from diverse communities, backgrounds, and experiences. *Id.* SRAE

programs are mandated to address six distinct topics, each with an unambiguous and primary

emphasis on promoting optimal health behaviors that avoid non-marital sexual activity.

Matthew Decl. ¶ 14; 42 U.S.C. § 710(b).

Like PREP, the SRAE statute contains no mention of gender ideology or gender identity.

Matthew Decl. ¶ 15; *see generally* 42 U.S.C. § 710.

Plaintiffs are 16 states, and the District of Columbia, that have received grant awards

from ACF under the PREP and/or SRAE statutes. On August 6, 2025, ACF issued Plaintiffs

Notices of Award ("NOAs") for the 10/1/2024-9/30/2027 PREP grant award period. Matthew

Decl. ¶ 28; *see, e.g.*, ECF No. 7, Declaration of Lucy Wolf ("Wolf-WA Decl.") Ex. 13. It also

issued NOAs for the 10/1/2024-9/30/2026 SRAE grant award period to some, but not all, of the

PREP grant recipients.[1] Matthew Decl. ¶ 17; *see, e.g.*, Wolf-WA Decl. Ex. 14. The NOAs for

---

[1] According to the ACF website, nine of the Plaintiffs obtained SRAE grants for fiscal year 2024

both PREP and SRAE awards explicitly state that "[t]he award is subject to the requirements listed in the terms and conditions" and "use of Federal funds from this award constitutes the grantee's acceptance of the listed terms and conditions." *See, e.g.*, Wolf-WA Decl. Ex. 13 at 3, Ex. 14 at 3. The NOA terms and conditions state that "[r]ecipients are prohibited from including gender ideology in any program or service that is funded with this award." *Id.*

On August 7, 2025, ACF issued awards with Supplemental Terms and Conditions ("Supplemental T&Cs") for PREP and SRAE grants prohibiting grant recipients from "including gender ideology in any program or service that is funded with this award," and pointing out that "gender ideology is outside the scope of the statutory authority for this award." *Id.* Exs. 15 & 16. The Supplemental T&Cs for both grants contain the following language:

> Recipients are prohibited from including gender ideology in any program or service that is funded with this award. The statutory authority for the [PREP or SRAE] program under which this grant has been awarded . . . does not authorize teaching students that gender identity is distinct from biological sex or boys can identify as girls and vice versa, or that there is a vast spectrum of genders that are disconnected from one's sex. Therefore, gender ideology is outside of the scope of the statutory authority for this award. In addition, any costs associated with gender ideology are not allowable expenditures of federal grant funds or maintenance-of-effort funds for this grant because they are not necessary, reasonable, or allocable for the performance of this award. *See* 45 C.F.R. §§ 75.403-405.

*Id.* Ex. 15 at 2; Ex. 16 at 3. Nothing in the NOAs or Supplemental T&Cs prevents Plaintiffs from using State resources for programs or services that include gender ideology.

---

(October 1, 2024-September 30, 2026 award period) including Colorado, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, Oregon, and Wisconsin. https://acf.gov/fysb/grant-funding/fysb/title-v-state-sexual-risk-avoidance-education-srae-grantees (last visited October 10, 2025). Plaintiffs' Complaint states that Oregon, Minnesota, New York, and New Jersey are current participants in SRAE. Compl. ¶ 28.

In April 2025, ACF issued a letter to State PREP grant recipients requesting all curricula and program materials to facilitate a medical accuracy review.[2]  Matthew Decl. ¶ 41, Ex. E. Upon review, ACF identified gender ideology content in many of the submitted materials that fell outside the scope of PREP's authorizing statute.  *Id.* ¶ 42.  *Id.*

On August 26, 2025, ACF issued a letter to Plaintiffs and other states and territories that contained gender ideology content in their PREP materials ("PREP directive").  *Id.* ¶ 44; Ex. F. The letter informed them that all gender ideology content would need to be removed from PREP curricula and programmatic materials to comply with the authorizing statute.  *Id.*  Each letter included specific examples of the gender ideology content in the recipient's program that ACF had identified for removal.  *Id.*  Recipients were given until October 27, 2025, to remove all content in question.  *Id.*

## II.    Procedural Background

On September 26, 2025, Plaintiff States filed this lawsuit, alleging that ACF's actions to ensure that curricula in federally funded programs are limited to Congressionally authorized subjects violate the APA,  the Spending Clause, and the Separation of Powers doctrine.  Compl., ECF No. 1.  The Complaint seeks orders staying the PREP directives and vacating the PREP and SRAE gender conditions found in the NOAs and Supplemental T&Cs.  *Id.* at 44.

The same day, Plaintiffs filed a motion for preliminary injunction, ECF No. 2, broadly seeking the Court to enjoin the implementation and enforcement of the PREP directive, the

---

[2] Both the SRAE and PREP authorizing statutes require that program materials be "medically accurate and complete."  Consequently, FYSB oversees a medical accuracy review ("MAR") for all content used in PREP and SRAE programs.  PREP and SRAE Supplemental Terms and Conditions, incorporated into Notices of Awards, require grant recipients to provide all program materials to FYSB for medical accuracy reviews upon request.  Matthew Decl. ¶ 29.

PREP and SRAE NOAs, and the PREP and SRAE Supplemental T&Cs.  Plaintiffs'

Memorandum ("Pls.' Mem.") at 35.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 22 (2008).  A plaintiff seeking a preliminary injunction must prove (1) that it is likely

to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary

relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.

*Id.* at 20.

A plaintiff requesting a preliminary injunction must carry its burden to establish a "clear

showing" of the four *Winter* elements.  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

There are two types of preliminary injunctions: (1) a prohibitory injunction that

"preserve[s] the status quo pending a determination of the action on the merits," and (2) a

mandatory injunction that "orders a responsible party to take action."  *Marlyn Nutraceuticals,*

*Inc. v. Mucos Pharma GmbH & Co.*, 571 F. 3d 873, 878–79 (9th Cir. 2009) (citation modified)

(alteration in original).  A mandatory injunction "'goes well beyond simply maintaining the

status quo pendente lite [and] is particularly disfavored.'"  *Stanley v. Univ. of S. Cal.*, 13 F.3d

1313, 1320 (9th Cir. 1994) (cleaned up).  Indeed, "[i]n general, mandatory injunctions are not

granted unless extreme or very serious damage will result and are not issued in doubtful cases."

*Marlyn Nutraceuticals*, 571 F. 3d at 879 (internal quotation omitted).  The moving party "must

establish that the law and facts *clearly favor* [his] position, not simply that [he] is likely to

succeed."  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (emphasis original).  Where

a plaintiff seeks mandatory injunctive relief, "courts should be extremely cautious."  *Stanley*,

13 F.3d at 1319 (9th Cir. 1994).

## ARGUMENT

I.     **Plaintiffs are unlikely to succeed on the merits of their claims.**

    A.     Plaintiffs have no likelihood of success on their APA claims because this Court lacks subject matter jurisdiction over them.

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983).  The federal government has sovereign immunity and may not be sued absent a clear and express waiver by statute.  *See United Aeronautical Corporation v. United States Air Force*, 80 F.4th 1017, 1022 (9th Cir. 2023).  Before addressing the merits, the Court must assess whether it has subject matter jurisdiction.  *See Naturo v. Slater*, 888 F.3d 418, 423 n.5 (9th Cir. 2018) (noting that federal courts have a "duty to examine *sua sponte* whether jurisdiction exists, regardless how the parties have framed their claims") (citing *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012)); *see also Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (recognizing that complaint must be dismissed in its entirety if subject matter jurisdiction is lacking).  Plaintiffs bear the burden of demonstrating that subject matter jurisdiction exists.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

The Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, waives federal sovereign immunity so that a plaintiff "adversely affected" by a "final agency action" may obtain "judicial review thereof."  *Id.* § 702.  However, the APA's sovereign immunity waiver has important limitations.  First, the waiver does not apply if the relief sought by the plaintiff is expressly or impliedly forbidden by another statute.  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012); *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998).  Second, the waiver does not apply if an agency action is "committed to agency discretion by law."  *Jajati v. U.S. Customs & Border*

*Prot.*, 102 F.4th 1011, 1015 (9th Cir. 2024) (quoting 5 U.S.C. § 701(a)(2)).  Third, the waiver

does not apply if there is no "final agency action."  *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,

465 F.3d 977, 982 (9th Cir. 2006).  In this case, Plaintiffs fails to establish a valid waiver of

sovereign immunity under the APA for all of the above reasons.

>    1.    This Court lacks jurisdiction over all of Plaintiff's claims because they are barred
>          by the Tucker Act.

First, this Court lacks jurisdiction over all of Plaintiffs' claims—including APA and the

constitutional claims—because the relief sought by Plaintiffs is barred by the Tucker Act.  The

Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over "any claim against

the United States founded" on "any express or implied contract with the United States" for

amounts over ten thousand dollars.  28 U.S.C. § 1491(a).  That court may hear "claim[s] against

the United States founded either upon the Constitution, or any Act of Congress or any regulation

of an executive department, or upon any express or implied contract with the United States, or

for liquidated or unliquidated damages in cases not sounding in tort."  *Id.* § 1491(a)(1).

The prohibition on district court jurisdiction over contract claims extends to claims

founded on grants, like those at issue here, that are implemented through "contracts to set the

terms of and receive commitments from recipients."  *Boaz Housing Auth. v. United States*, 994

F.3d 1359, 1368 (Fed. Cir. 2021).  In *Department of Education v. California*, the Supreme Court

stayed a district court order to make payments based on grant agreements because the

government was "likely to succeed in showing that the District Court lacked jurisdiction" to bar

termination of various education-related grants.  *Dep't of Educ. v. California*, 145 S. Ct. 966, 968

(2025).  The Court found the injunction was effectively an order "to enforce a contractual

obligation to pay money," and thus was not covered by section 702's limited waiver of sovereign

immunity.  *Id.*

This Court should follow the Supreme Court's ruling here. *See Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996) ("[T]his court considers itself bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements."); *ACLU of Ky. v. McCreary Cnty.*, 607 F.3d 439, 447 (6th Cir. 2010) (lower courts "obligated to follow Supreme Court dicta" absent "substantial reason for disregarding it").

To determine whether a particular action constitutes a "contract action" subject to the Tucker Act, a court must examine "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted); *see United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1025 (9th Cir. 2023) (*Megapulse* test applies in the Ninth Circuit). Where claims asserted are based on a contract, seek a declaration of contract rights, or do not exist independent of a contract, they are barred by the Tucker Act. *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646–47 (9th Cir.1998). Here, Plaintiffs' action is, at its essence, a contract action under the *Megapulse* test: (1) Plaintiffs challenge specific terms under their contracts with the government; and (2) as relief, Plaintiffs seek to enjoin ACF from enforcing those terms.

Plaintiffs have sought funds from ACF for PREP and SRAE programs. In return, they have agreed to use these funds in accordance with ACF's requirements, as outlined in the NOAs and Supplemental T&Cs. These exchanges of promises constitute government contracts for Tucker Act purposes. *See Massie v. United States*, 166 F.3d 1184, 1188 (Fed. Cir. 1999) ("[A]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government.") (cleaned up). Plaintiffs cannot evade the Tucker

Act's jurisdictional bar by labeling their contractual claims as APA claims. *See, e.g., Pippenger v. U.S. DOGE Serv.*, No. 25-cv-1090, 2025 WL 1148345, at *5 (D.D.C. Apr. 17, 2025) (concluding court was "deprive[d]" of "authority to consider claims sounding in contract or to enjoin further termination of contracts, even if they are styled as APA claims"); *Sols. in Hometown Connections v. Noem*, No. 25-cv-885, 2025 WL 1103253, at *11 (D. Md. Apr. 14, 2025) (denying motion for emergency relief challenging termination of grants considering Supreme Court's decision in *Department of Education* and concluding that plaintiffs' APA claims were "in essence contract claims"). Although Plaintiffs purportedly seek an injunction against grant conditions, the practical relief that would result—uninterrupted grant funding pursuant to federal grant agreements under terms Plaintiffs find more desirable—is fundamentally contractual.

Finally, the fact that Plaintiffs frame some of their arguments as constitutional claims does not confer subject matter jurisdiction upon this Court. The Tucker Act "prevents constitutional claims that are dependent on rights under a government contract from being brought in the district court." *Tucson Airport Auth.*, 136 F.3d at 648 (interpreting *N. Star Alaska v. United States III*, 14 F.3d 36, 37 (9th Cir. 1994)).

2.    APA review is unavailable because the challenged actions are committed to agency discretion by law.

While the APA establishes a waiver of sovereign immunity, 5 U.S.C. §§ 702, 706(1)–(2), the waiver of sovereign immunity is limited. It does not apply in circumstances where "agency action is committed to agency discretion by law." *Id.* § 701(a)(2). Courts have explained that agency action is "committed to agency discretion by law" when a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," rendering "meaningful judicial review . . . impossible." *Steenholdt v. FAA*, 314 F.3d

633, 638 (D.C. Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). This is true "even where Congress has not affirmatively precluded review." *Heckler*, 470 U.S. at 830. This happens when the "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," leaving the court with "no law to apply." *Id.*

"Congress may limit an agency's exercise of enforcement power if it wishes," but only when "it has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion," is there "law to apply" under § 701(a)(2). *Id.* at 833–34. Decisions are "general[ly] unsuitabl[e]" for judicial review when they require "a complicated balancing of a number of factors which are peculiarly within [agency] expertise" or involve how best to spend "agency resources," including whether the agency "is likely to succeed if it acts" and "whether the particular enforcement action requested best fits the agency's overall policies." *Id.* at 831. "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831–32. Hallmarks of a decision committed to agency discretion include a statute that puts the onus on the agency, not the courts, to apply a standard, *see Webster v. Doe*, 486 U.S. 592, 600 (1988), and general criteria that make it difficult for courts to meaningfully second-guess an agency determination, *see id*.

An agency's determination of how best to allocate and condition appropriated funds to fulfill its legal and policy mandates is discretionary agency action. *See Lincoln* v. *Vigil*, 508 U.S. 182, 193 (1993). In *Lincoln*, the Court explained that there is no waiver of sovereign immunity where agency action requires "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including whether "resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has

enough resources to fund a program at all." *Id.* (citations omitted). An "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.*

The PREP and SRAE statutes clearly commit the actions challenged here to agency discretion by law. These statutory programs encompass broadly drawn topics and guidelines that would not provide a meaningful rubric for judicial review. Congress has not provided any "law to apply" with respect to what satisfies the requirements for "medically accurate" or "culturally sensitive" programming. Consequently, determining what programs meet all of the requirements under the statute requires "complicated balancing of a number of factors" peculiarly within the agency's expertise. *Heckler*, 470 U.S. at 831. Accordingly, the challenged conditions are within the agency's discretion under *Lincoln*.

> 3.    APA review is unavailable because HHS's actions are not discrete, final agency actions.

APA review is available in most cases only for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. District court review is "inappropriate [where] 'final agency action,' a prerequisite for judicial review, had not yet occurred." *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 781 (9th Cir. 2000) (citing *O'Brien, Inc. v. Sec. & Exch. Comm'n*, 704 F.2d 1065, 1067 n.6 (9th Cir. 1983), *rev'd on other grounds* (further citation omitted)); *see also Ctr. for Food Safety v. Perdue*, 320 F. Supp. 3d 1101, 1104 (N.D. Cal. 2018) ("Final agency action is a prerequisite to judicial review under the APA."). "Section 704 reflects a congressional policy against premature judicial intervention into the administrative process, and in favor of courts resolving only disputes with concrete legal stakes." *Inst. for Fisheries Res. v. Hahn*, 424 F. Supp. 3d 740, 747 (N.D. Cal. 2019). In addition, agency action requires a specific "rule, order, license, sanction, relief, or the equivalent." 5 U.S.C. § 551(13).

It must be a "discrete" act, and a plaintiff may not bring a "broad programmatic attack." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

An agency action is considered "final" if two conditions are met: first, the action must "mark the consummation of the agency's decisionmaking process;" and second, the action must "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (citing *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). "[T]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Or. Nat. Desert Ass'n*, 465 F.3d at 982 (citing *Indus. Customers of NW Utils. v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir.2005) (internal citation omitted)). On *Bennett*'s second prong, courts follow a "pragmatic" approach and determine whether an action is final "based on the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it." *Cal. Cmtys. Against Toxics v. Envtl. Prot. Agency*, 934 F.3d 627, 637 (D.C. Cir. 2019) (interpreting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016)). The NOAs, Supplemental T&Cs, and PREP directives satisfy neither requirement.

Despite Plaintiffs' contentions to the contrary, the issuance of documents relevant to the administration of a grant does not "mark the consummation of the agency's decisionmaking process." None of the documents at issue here have the hallmarks of a discrete and final decision of the agency. The NOAs, the Supplemental T&Cs, and the PREP directives are, at most, expressions of agency policy and program administration. For instance, the PREP directive reflects ACF's policy guidance regarding compliance with statutory funding requirements and its interpretation of programmatic parameters. None of these documents terminates a grant, imposes penalties, or determines legal rights or obligations with finality.

Plaintiffs' posture here contrasts sharply with the administrative posture of the State of California, highlighting the lack of a final agency action. In August 2025, ACF notified California that it was taking enforcement action to terminate its PREP grant due to noncompliance with the purposes of the statute. Matthew Decl., ¶ 39; Ex. D. The letter instructed California that it "shall not incur new obligations after the effective date of the termination and shall take steps to cancel as many outstanding obligations as possible." *Id.* p. 1. It explained the basis for the termination and instructed California to "take the necessary steps to close out project operations." *Id.* p. 5. It also instructed California that the letter was "the final decision of [ACF]" and that it would remain the final decision unless appealed to the Departmental Appeals Board within 30 days. *Id.* pp. 5–6. In contrast, the issuance of program administration documents such as terms and conditions and guidance directives is not a final decision.

Relatedly, the doctrine of exhaustion of administrative remedies illustrates the lack of a final agency action in this case. "The doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law." *McKart v. United States*, 395 U.S. 185, 193 (1969). Under this doctrine, "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Id.* (quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51 (1938)). This requirement (1) protects administrative agency authority by allowing agencies to correct their own mistakes before being haled into federal court, and (2) promotes efficiency because administrative proceedings are quicker and more economical while producing a useful record for any needed subsequent judicial review. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006).

With these purposes in mind, courts generally require exhaustion of administrative remedies if "(1) agency expertise makes agency consideration necessary to generate a proper

record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review." *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007). These considerations cut against Plaintiffs' position that ACF made a final decision that the Court should review now.

HHS has established an administrative process through which Plaintiffs may appeal any future grant termination decisions. *See* 45 C.F.R. Part 16 (setting forth "requirements and procedures applicable to certain disputes arising under" certain HHS grant programs). Under that process, Plaintiffs may appeal a final written decision to the Departmental Appeals Board ("DAB") within 30 days after receiving it.[3] 45 C.F.R. § 16.7. At that point, Plaintiffs may submit documents supporting their claims that programs containing gender ideology satisfy the statutory requirements. This gives the agency an opportunity to review Plaintiffs' evidence, apply its own expertise, and make a decision in the first instance. The fact that these steps were not taken only serves to illustrate that the actions Plaintiffs challenge were not final agency actions. Given the complexity of the issues within the agency's expertise, Plaintiffs should be required to present their arguments to the agency first and await a final agency decision before proceeding with an action in this Court.

Further, in bringing this challenge involving many states and broadly challenging the terms and conditions writ large, Plaintiffs claims amount to a broad programmatic attack. But this type of challenge is impermissible under the APA. "Because an on-going program or policy is not, in itself, a "final agency action" under the APA, our jurisdiction does not extend to

---

[3] On September 19, 2025, California filed a DAB appeal of ACF's August 21, 2025 final agency decision to terminate California's PREP funding, and that appeal is currently pending.

reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (cleaned up).

Plaintiffs argue that two district courts have ruled that the adoption of federal funding conditions constitutes final agency action. Pls.' Mem. at 16. But this Court is not bound by those district court decisions and should decline to follow them for the reasons set forth above. Plaintiffs cite no binding Ninth Circuit or Supreme Court caselaw holding that, in this specific context, federal funding conditions constitute final agency action.

B.    Plaintiffs have no likelihood of success on the merits of their APA claim.

1.    Defendants' actions were not "contrary to law."

Even if APA review is available for Plaintiffs' claims, Plaintiffs' arguments fail on the merits. First, Plaintiff cannot establish that the agency's actions were "contrary to law." The Executive has a constitutional duty to enforce Congressional mandates and does so through its officers and agents. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010). Federal agencies must limit grant expenditures to costs that are authorized under a program statute because unauthorized expenses violate The Appropriations Clause of the Constitution, Art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"). Also, the Purpose Statute provides that appropriations are only available for the specific purposes for which they were made. *See* 31 U.S.C. § 1301.[4] The Supreme Court also recognizes the fundamental principle that "[t]he established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds

---

[4] As the Government Accountability Office has indicated: "The starting point in applying the purpose statute is that, absent a clear indication to the contrary, the common meaning of the words in the appropriation act and the program legislation it funds governs the purposes to which the appropriation may be applied." GAO, Principles of Federal Appropriations Law, Chapter 3, Fourth Ed. p. 3–11.

may be expended unless prohibited by Congress." *See United States v. MacCollom,* 426 U.S. 317, 321 (1976); *see also Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (recognizing that payments from the federal treasury are limited to those authorized by statute). To implement this principle, executive branch agencies, such as HHS and ACF, have the authority to impose terms on the grants they administer. Government-wide grant regulations issued by the Office of Management and Budget require that federal agencies incorporate statutory requirements into the terms and conditions of federal awards. 2 C.F.R. § 200.211(c)(1)(ii). That is what HHS and ACF did here.

Moreover, Congress has not only authorized HHS to impose conditions on grant programs but afforded discretion to the agency to establish the terms of federal award conditions.

ACF's conditions and directives requiring grantees under PREP and SRAE programs to remove references to "gender identity" from federally funded curricula is a lawful exercise of its interpretive and administrative authority. It ensures that grantee activities remain consistent with Congress's explicitly stated objectives: promoting abstinence and sexual risk avoidance, fostering responsibility, and reducing unintended teen pregnancies and sexually transmitted infections. *See* 42 U.S.C. §§ 710(b), 713(b).

Congress designed PREP and SRAE to address adolescent sexual behavior by emphasizing abstinence, self-discipline, and the development of healthy relationships. PREP programs are designed to replicate "evidence-based effective programs" that teach subjects such as "healthy relationships, adolescent development, financial literacy, and parent-child communication." 42 U.S.C. § 713(b)(2)(A), (B). SRAE grants similarly focus on "voluntarily refraining from non-marital sexual activity" and promoting personal responsibility. *Id.* § 710(b)(2)(A). Notably absent from either statute is any reference to "gender identity." When Congress enumerates specific programmatic topics, courts presume the omission of

others was intentional. *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001). By contrast, the inclusion of abstinence-based and culturally grounded components shows Congress's intent to anchor these programs in traditional understandings of biological sex, responsibility, and health risk—rather than in evolving theories of identity or gender expression.

Both the PREP and SRAE curricula must be "medically accurate and complete," meaning supported by substantial scientific evidence. 42 U.S.C. §§ 710(b)(2)(B), 713(b)(2)(B)(ii). ACF retains the authority to determine, within the bounds of the statutes, what constitutes "medical accuracy" for these programs. ACF has reasonably concluded that discussions of gender identity—an area encompassing psychological, social, and ethical dimensions—fall outside the core medical and biological content that is central to sexual-risk education. The PREP and SRAE programs focus on biological risk behaviors and adult preparation. HHS's decision to exclude gender-identity instruction preserves the scientific and behavioral focus that Congress explicitly mandated.

Therefore, ACF's directive requiring PREP and SRAE grantees to remove or avoid references to gender identity is not contrary to law. Rather, it faithfully implements Congress's intent to promote abstinence, self-discipline, and medically accurate sexual-risk education within culturally appropriate frameworks. By defining the limits of permissible content, ACF acts within its statutory authority, consistent with both the APA and established Supreme Court precedent.

Plaintiffs argue that the gender conditions violate the statutory provisions requiring grantees to present information that is "culturally appropriate" and "medically accurate and complete." Pls.' Mem. at 18–19. But the Court should reject that argument.

First, there is no plausible evidence to suggest that Congress intended for the term "culturally appropriate" to include gender identity when the PREP legislation was enacted in

2010.  Plaintiffs do not present any legislative history that supports their interpretation of the term "culturally appropriate."  Typically, the term "culturally appropriate" refers to respecting individuals regardless of factors such as their background or beliefs.  In a program primarily designed for minors, Congress would have explicitly used the term "gender identity," either alone or in conjunction with "culturally appropriate," if it had intended for that topic to be addressed within the programs.  And if Congress wanted the change the statute to include gender ideology as a component of these educational programs, they could have amended the statute.

Second, if the subject of gender identity was authorized by statue, ACF would need to closely examine any supporting studies to determine whether they were "conducted in compliance with accepted scientific standards" and medically accurate within the meaning of the PREP and SRAE statutes.  ACF would also need to review the scope of any medical guidelines that the agency determines to be supported by the weight of scientific research.  Such a review would require a close examination due to the high scientific research standard found in these programs and because any conclusion is consequential to all grantees, not just Plaintiffs. And medical accuracy reviewers within the agency have never been asked by any grant recipients, including by Plaintiffs, to assess the medical accuracy regarding the distinction between gender identity and biological sex.  Matthew Decl. ¶ 32.  It is reasonable that ACF, at this time, cannot conclude that it is "medically accurate" as a general proposition under the PREP and SRAE statutes to expose beneficiaries of these educational programs, most of whom are minors, to gender ideology content.

For these reasons, Defendants' actions were not contrary to law.

2.    Defendants' actions were not "arbitrary and capricious."

Plaintiffs' contentions that Defendants actions were arbitrary and capricious are unpersuasive.  Judicial review under the arbitrary and capricious standard is "deferential,"

*FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), and a court must "uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (citation omitted).

Here, ACF had significant discretion to impose appropriate terms and conditions on the receipt of federal funds and developed such terms consistent with the well-settled constitutional and statutory obligations of all Federal agencies to limit their appropriated expenditures to Congressionally authorized activities. This can hardly be considered arbitrary and capricious.

Plaintiffs contend that the gender conditions are arbitrary and capricious because the conditions are "neither reasonable nor reasonably explained." Pls. Mem. at 21. But contrary to Plaintiffs' suggestion, ACF has provided a reasonable explanation that teaching gender ideology is outside the scope of the statutory authority. This is because the statute does not explicitly mention gender ideology or identity, and it is irrelevant to teaching abstinence, contraception, or the PREP adult preparation subjects. *See generally* Matthews Decl., Ex. F (PREP directive letters).

Plaintiffs further contend that the gender conditions are arbitrary and capricious because "HHS itself recognizes that gender identity is discrimination based on sex," and summarily conclude that "[t]his is quintessentially arbitrary and capricious." Pls.' Mem. at 21 (citing 42 C.F.R. § 75.300(e)(8)). Plaintiffs' argument that the directive conflicts with HHS's broader interpretation of "sex discrimination" under the regulation misapprehends the scope of that regulation. The regulation prohibits discrimination against individuals based on gender identity in accessing federally funded programs. It does not expand the substantive content that may be funded under each statutory program. ACF's directive maintains that the PREP and SRAE programs remain equally available to all youth regardless of gender identity; it simply limits

federal funding to the statutorily defined curriculum topics. This distinction between participant eligibility (nondiscrimination) and curriculum content (statutory scope) is reasonable.

ACF's decision to require grantees under PREP and SRAE to omit references to gender identity is the result of a reasoned re-evaluation of the statutory limits imposed by Congress. The governing statutes—42 U.S.C. §§ 710, 713—direct HHS to fund programs providing medically accurate education focused on abstinence, reducing teen pregnancy, and promoting healthy relationships. These statutes do not authorize instruction in "gender ideology" or gender identity issues unrelated to pregnancy prevention or risk avoidance.

Plaintiffs next contend that HHS failed to explain the inconsistency between prior ACF actions and the gender conditions adopted for the current grant period. Pls.' Mem. at 22. But ACF acknowledged that prior guidance had, in practice, allowed program materials referencing gender identity. *See, e.g.,* Matthews Decl., Ex. F p. 3. Upon a thorough review of the statutory language, ACF determined that such content exceeded the programs' legislatively defined purposes. That reassessment was grounded in law—not politics or ideology. The agency's responsibility to ensure federal funds are expended only for authorized purposes provides a sound and legitimate rationale. Courts consistently defer to agencies that correct course to align implementation with statutory boundaries. *See National Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). ACF's explanation—that teaching "gender identity" falls outside of the statutory scope of pregnancy prevention or sexual risk avoidance— is a reasoned and lawful basis for its decision. It certainly is not arbitrary and capricious.

Plaintiffs cite *FDA v. Wages & White Lion Invs.*, LLC, 145 S. Ct. 898, 917 (2025) for the proposition that ACF's imposition of the current terms and conditions violates the "change-in-position doctrine." Pls.' Mem. at 22. But unlike *Wages*, Plaintiffs here are not "regulated entities." That case involved a regulated entity's challenge to an agency's supposed policy

change regarding premarket procedures for flavored e-cigarette liquids. But here, Plaintiffs are parties that chose to contract with ACF; they applied for and entered into grant agreements with ACF. Those grant agreements established the contractual parameters of their relationship with ACF. Therefore, it is misguided to consider any APA "reliance interests" when considering whether imposition of the agency's terms and conditions was arbitrary and capricious.

And even assuming the agency must consider significant reliance interests, such interests cannot compel the continuation of an unauthorized practice. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). PREP and SRAE grantees could not have developed a legitimate reliance interest in receiving federal funding for subject matter outside statutory authorization. ACF's directive does not retroactively penalize grantees or revoke funds already expended; it merely clarifies future program compliance consistent with the law. No entity has a protected reliance interest in continuing an activity that Congress did not appropriate federal funds to support. The APA does not require agencies to perpetuate legally erroneous or ultra vires policies merely because some stakeholders adjusted their expectations accordingly.

This Court should also reject Plaintiffs' argument that HHS failed to consider that "many States have laws preventing the types of discrimination required by the Gender Conditions." Pls.' Mem. at 23. First, Plaintiff's argument rests on a false premise. The gender ideology condition does not require discrimination of any kind; it simply clarifies the scope of the substantive content that may be funded under the PREP and SRAE programs. Second, to the extent states have laws requiring discussion of gender ideology in education programs regarding contraception, abstinence, and personal responsibility, they are free to use state resources to fund those programs.

ACF's decision is not a pretextual attempt to suppress content or target particular groups. ACF's reasoning—that Congress did not authorize gender ideology teaching—is facially

legitimate, internally consistent, and adequately documented in the PREP directives.  Courts

presume agency good faith and regularity absent clear evidence to the contrary.  *United States v.*

*Chem. Found.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official

acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that

they have properly discharged their official duties.").  Here, ACF's stated rationale is directly

connected to statutory interpretation and program purpose.  Even if the policy has collateral

effects that some disagree with, those effects do not render the agency's explanation pretextual

where it rests on a valid legal basis.

        In articulating that its authorizing statutes do not cover gender ideology teaching, ACF

acted well within its authority to ensure statutory fidelity.  The agency's explanation—that the

programs' purposes are confined to biological and risk-reduction education—constitutes a

rational, textually-grounded basis for its action.  Consequently, ACF's actions are neither

arbitrary nor capricious, and the Court should reject Plaintiffs' contentions and find that

Plaintiffs are unlikely to prevail on that claim under the APA.

        C.      Plaintiffs have no likelihood of success on their Spending Clause claim.

        The exclusion of gender ideology in the federally funded PREP and SRAE programs

does not violate the Spending Clause.  The Spending Clause does not prohibit the federal

government from ensuring that federally funded educational programs remain faithful to their

statutory objectives.  The exclusion of "gender ideology" from PREP and SRAE grants: (1)

provides clear, prospective notice; (2) falls within HHS's delegated authority; (3) relates directly

to the federal interest in promoting medically accurate sexual health education; and (4) imposes

no unconstitutional coercion.

        First, the "gender ideology" exclusion in the PREP and SRAE terms and conditions

provides adequate, prospective notice and is not retroactive.  The Spending Clause mandates that

funding conditions be explicitly stated, enabling states to "voluntarily and knowingly" decide whether to accept the funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The revised terms and conditions at issue here adhere to this standard. The "gender ideology" exclusion in the PREP and SRAE terms and conditions applies prospectively to grant expenditures that occurred after October 1, 2025. States are fully cognizant that accepting new awards or spending any grant funds after October 1, 2025, entails agreement with the clarified terms. Contrary to the Plaintiffs' assertion, the terms and conditions do not retroactively modify prior funding terms and conditions. The guidance governs solely ongoing and future participation in these federal grant programs. Courts have upheld the authority of agencies to impose prospective clarifications or modifications to ensure program compliance, provided that states retain the option to decline further participation. *Rust v. Sullivan*, 500 U.S. 173, 198–200 (1991).

Second, the "gender ideology" condition is not impermissibly vague. The term "gender ideology" is defined in the NOA terms and conditions referenced by plaintiffs. This definition provides sufficient clarity for states to determine whether their curricula comply. To avoid any potential ambiguity, ACF has meticulously outlined specific examples of gender ideology content that the agency identified in its August 26, 2025, directive letters. Those definitions provided grantees with sufficient clarity for states to determine whether their curricula comply. In this context, the term would refer to classroom content or programming that treats gender as independent of biological sex or introduces identity-based theories unrelated to human reproduction or sexual risk avoidance. The Spending Clause does not require perfect linguistic precision; rather, it requires only the condition be discernible to a reasonable recipient. *See Arlington Central School District Bd. of Ed. v. Murphy*, 548 U.S. 291, 296 (2006). The ACF directive merely clarifies that funded programs must adhere to the express purposes of the

authorizing statutes, which are to promote abstinence, reduce teen pregnancy, and provide medically accurate and evidence-based education. *See* 42 U.S.C. §§ 710(b), 713(b). The agency's restriction on "gender ideology" ensures that federal funds support curricula rooted in biological and medical science rather than in contested sociopolitical theories regarding gender identity. This clarification falls within the federal government's prerogative to define the terms of its own funding and to prevent the diversion of public funds to activities inconsistent with statutory objectives.

Plaintiffs' assertion that only Congress may impose funding conditions on the PREP and SRAE grants overlooks the authority of HHS as the implementing executive agency responsible for these grants. When Congress delegates program administration to an agency, it implicitly grants authority to interpret statutory terms and to promulgate conditions ensuring compliance with the funding stream. *Rust v. Sullivan,* 500 U.S. 173, 184 (1991). HHS has explicit statutory authority to determine what constitutes "medically accurate" and "culturally appropriate" materials under 42 U.S.C. § 710(b)(2)(B) and (E) as well as 42 U.S.C. § 713(e)(2). The exclusion of "gender ideology" falls within this authority because such determination was made after reviewing the Plaintiffs' PREP content for medical accuracy, in which ACF identified "gender ideology" content that falls outside the scope of the relevant statute and asked Plaintiffs to remove that content. ACF found that the statute does not require, support, or authorize teaching students that gender identity is distinct from biological sex or that boys can identify as girls or vice versa. ACF reasonably concluded that curricula promoting non-biological conceptions of gender was outside the scope of the authorizing statute and therefore a medical accuracy review on this content was a moot issue. ACF has not received any information, including within Plaintiffs' Complaint or Motion for Preliminary Injunction, that demonstrates that Plaintiffs' inclusion of gender ideology content meets the statutory objectives. As in *Rust*,

Page 27          Defendants' Opposition to Plaintiffs' Motion for Preliminary Injuction

where the Supreme Court upheld HHS's restriction on abortion counseling in Title X programs, HHS here may ensure that federal funds are utilized to advance—not undermine—the statutory mission.

Third, the revised terms and conditions for these grants are directly related to the federal interest in promoting medically accurate sexual risk avoidance education. Conditions imposed under the Spending Clause must be related to the "federal interest in particular national projects or programs." *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987). The restriction on "gender ideology" is integrally related to this interest. PREP and SRAE exist to provide young people with medically accurate, evidence-based education concerning sexual health, reproduction, and risk avoidance. Instruction advancing subjective theories of gender ideology unrelated to reproductive biology undermines these objectives and diverts resources away from factual, medically verifiable content. The exclusion of such material therefore ensures that program content remains consistent with the evidence-based standards Congress mandated. Far from being unrelated, the condition is a logical extension of the statutes' core purposes.

Finally, the exclusion does not cross the constitutional line into coercion. As the Supreme Court held in *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 582–85 (2012), coercion arises only when the federal government conditions unrelated funding or threatens existing entitlements. Here, the restriction of "gender ideology" applies solely to voluntary participation in PREP and SRAE, two discrete grant programs. Plaintiffs remain free to reject the funds and to design their own programs using state resources. The condition is thus a lawful inducement, not unconstitutional compulsion.

For these reasons, the challenged exclusion of "gender ideology" from PREP and SRAE grants does not violate the Spending Clause, and Plaintiffs are unlikely to succeed on the merits of this claim.

D.      Plaintiffs have no likelihood of success on their Separation of Powers claim.

The exclusion of "gender ideology" from federally funded PREP and SRAE programs does not violate the Separation of Powers principle.  The Constitution grants Congress the power to allocate funds (U.S. Const. art. I, § 8, cl. 1), while simultaneously entrusting the Executive Branch with the responsibility to faithfully execute the laws (U.S. Const. art. II, § 3).  Once Congress enacts a funding statute, the Executive's duty is to administer that statute in accordance with its text, purpose, and limitations.  Agencies naturally exercise interpretive discretion in determining whether activities fall within or outside a program's scope. *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013).  When a statute authorizes funding for programs with specific educational or health objectives, such as PREP or SRAE, the Executive may appropriately interpret those objectives to exclude activities or content that are not aligned with the statutory purpose, including topics not authorized by Congress.  The exclusion of gender ideology, which falls outside the statutory text, purpose, or legislative intent, therefore constitutes lawful program administration and does not constitute an unconstitutional usurpation of legislative authority.

By excluding non-statutory subjects from the PREP curricula and programmatic materials, ACF upholds Congressional intent rather than contradicting it.  The crux of the separation of powers doctrine lies in determining whether the Executive has acted within the bounds of statutory authority.  In *Youngstown Sheet & Tube Co. v. Sawye*r, 343 U.S. 579, 585 (1952), the Supreme Court ruled that the Executive's seizure of property without statutory authorization was unconstitutional.  In this case, unlike *Youngstown*, the agency's exclusion of gender ideology constitutes an interpretive act consistent with adhering to the statutory text.  Congress did not explicitly include gender ideology or related instruction within the authorizing language of the PREP or SRAE statutes.  These programs, respectively, focus on youth pregnancy prevention through evidence-based education and sexual risk avoidance consistent

with abstinence-centered curricula. By excluding materials unrelated to these objectives, ACF simply enforces the statute's limitations and declines to fund content that Congress never authorized. This approach respects, and does not violate, the separation of powers.

Plaintiffs erroneously cite *Washington v. Trump*, 768 F. Supp. 3d 1239, 1261–63 (W.D. Wash. 2025) and *King County v. Turner*, 2025 WL 1582368 (W.D. Wash. June 3, 2025), to support their claim that ACF has overstepped its authority by imposing conditions on federal funding. However, a closer examination of those cases and the facts of the present matter reveals a fundamental distinction: *Washington* and *King County* involve executive overreach, whereas HHS's action here is squarely within the bounds of Congressional authorization. In both *Washington* and *King County*, the courts addressed situations where the Executive Branch imposed new conditions on federal funding that were not authorized by Congress. Those actions were found to encroach on Congress's exclusive prerogative to set the terms and scope of federal grants. Unlike in the cited cases, ACF in the present matter has not imposed extra-statutory conditions on federal grant awards. Instead, ACF has acted to remove materials from funded programs that fall outside the scope of the authorizing statutes. This is a critical distinction. ACF's action is not an act of executive overreach or defiance; rather, it is a faithful execution of the statutory mandate set forth by Congress. Congress defines the permissible scope of federally funded programs through explicit statutory language. ACF is obligated to ensure that funded activities comply with these Congressional directives. By removing materials related to gender ideology—which are not authorized by the PREP or SRAE funding statutes—ACF is upholding the text, purpose, and limitations of the statute, not circumventing them.

Plaintiffs have not presented any evidence that the PREP or SRAE funding statutes authorize the instruction of "gender ideology." In the absence of such statutory authorization, ACF's decision to exclude these materials does not constitute the imposition of unauthorized

conditions. Rather, it reflects adherence to Congressional intent and statutory boundaries. The cases cited by Plaintiffs therefore are inapposite; they address executive actions that add new requirements, not the enforcement of existing statutory limitations.

As the agency responsible for administering these grants, ACF has the authority to enforce content standards that align with statutory objectives. ACF can establish programmatic guidance to ensure that grantees comply with legislative intent. In *Rust v. Sullivan*, 500 U.S. 173, 192–200 (1991), the Supreme Court upheld agency regulations prohibiting federally funded family planning programs from providing counseling on abortion. Similarly, ACF can decline to fund curricula that advance "gender ideology" if it determines that such content deviates from the statutory objectives of risk avoidance and sexual responsibility education. These content-based distinctions do not constitute novel "funding conditions"; rather, they represent programmatic enforcement decisions within the existing statutory framework.

The doctrine of the separation of powers prohibits judicial interference in the Executive's administration of these grants. Ironically, it is the plaintiffs' theory that would disrupt the constitutional balance. By requesting judicial invalidation of ACFs interpretive authority, they ask the court to micromanage the agency implementation of congressionally enacted programs. However, once Congress grants authority to administer a funding statute, the Executive retains discretion to implement those programs in accordance with statutory boundaries and policy judgments. *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). Courts have consistently recognized that not every exercise of administrative discretion implicates separation of powers concerns. So long as the agency acts in accordance with statutory authorization and not in defiance of it, the action is constitutionally valid. Excluding non-statutory subject matter such as "gender ideology" falls within ACF's permissible administrative action.

The exclusion of "gender ideology" from federally funded education programs does not violate the separation of powers.  Rather, it reflects ACF's faithful adherence to Congressional intent, enforcement of statutory limits, and lawful exercise of administrative discretion in implementing grant programs.  Since the authorizing statutes do not encompass "gender ideology," its exclusion preserves, rather than usurps, Congress's legislative prerogatives.

## II.    Plaintiffs fail to demonstrate a likelihood of irreparable harm that favors a preliminary injunction.

In addition to establishing the merits element above, to obtain a preliminary injunction, Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original).  The "possibility" of such harm is insufficient.  *Id.*  Plaintiffs must show both immediacy and likelihood that they will be irreparably harmed absent emergency relief.  *See Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

Plaintiffs request an extraordinary order to unwind what has already occurred—a so-called "mandatory" injunction.  Such an injunction is "particularly disfavored."  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (cleaned up).  In general, mandatory injunctions "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages."  *Id.* (cleaned up).

Plaintiffs have failed to make a sufficient showing of irreparable harm here because the harm to the named Plaintiffs is economic in nature.  They seek payment of the grant money on terms and conditions that they prefer pursuant to contracts with the federal government.  Because Plaintiff's financial harms are recoverable in the Court of Federal Claims, such harms do not constitute irreparable injury.  *See Dep't of Educ. v. Cal.*, 145 S. Ct. at 969 (finding that

"respondents would not suffer irreparable harm" where "they have the financial wherewithal to keep their programs running" and "can recover any wrongfully withheld funds through suit in an appropriate forum").

Plaintiffs assert that they face harm from having to choose between losing federal funding or complying with funding conditions they deem to be "unlawful." Pls.' Mem. at 28. But it is always the case that "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). If a party makes the voluntary decision to forego funds, any subsequent economic harm cannot constitute an irreparable injury attributable to the federal government. And because Plaintiffs cannot show that the applicable gender ideology terms and conditions are contrary to law, they cannot make the necessary showing of irreparable harm.

Plaintiffs' claim that they would suffer irreparable harm by complying with the terms and conditions at issue is based on a misinterpretation of those terms. Pls. Mem. at 32–34. They argue that compliance with the terms amounts to "censorship" that undermines a "central" purpose of these programs by "denying the existence of transgender, gender-diverse, and DSD individuals." Pls.' Mem. at 11–12. In truth, the ACF terms merely state that the subjects of whether gender identity is distinct from biological sex or boys can identify as girls and vice versa, or whether there is a vast spectrum of genders that are disconnected from one's sex, are outside the scope of the PREP and SRAE authorizing statutes. Carrying out projects that refrain from addressing those subjects in no way compels Plaintiffs to endorse a position with which they disagree. And, as indicated below, no ACF authority prohibits Plaintiffs from administering separate programs that address gender ideology-related subjects.

Moreover, gender ideology subjects have not been "central" to any of the PREP curricula that ACF has received from States. In fact, PREP curricula received that did include gender

ideology content generally contained marginal amounts of such content in proportion to the full text of those materials.  Matthew Decl. ¶ 45.  For example, 11 of the 16 plaintiff states informed ACF that they are incorporating into their PREP programs a curriculum entitled "Proud Choices," which only has a small amount of gender ideology content.  *Id.*

Plaintiffs also claim that they will suffer irreparable harm by refusing to comply with the terms and conditions, as this would prevent them from continuing to provide education and services to youth populations.  Pls.' Mem. at 29.  But this harm would be entirely attributable to Plaintiffs' own decisions to refrain from supporting those services.  By Plaintiffs' own account, many if not all of them have been using federal PREP and SRAE funds to administer their state-authorized programs absent any indication that Congress intended for them to use the federal funds to supplant state funds for those programs.  Plaintiffs' motion essentially conflates state authorized teen pregnancy prevention and sexual risk avoidance programs with federally authorized PREP and SRAE programs and argues that limitations in the latter programs are "censoring" the former programs.  That Plaintiffs are relying on requirements in state-authorized programs that are distinct from federal programs is apparent from statutory conflicts between the State and Federal laws, and inconsistent standards for "medical accuracy."  Yet, Plaintiffs' argument rests on the idea that they have no obligation to appropriate funding for their own educational programs, and therefore the Court should compel HHS to do so notwithstanding Plaintiffs' refusal to comply with statutory limitations on these federal funds.

Each Plaintiff with a state-authorized program has made a voluntary choice to either (1) cease funding that program and rely exclusively on PREP and SRAE funds, thereby risking the loss of available funds; or (2) fund its state-authorized program, thereby making funds available to carry out programs separate from PREP and SRAE that can address the gender ideology subjects at issue.  Considering these options, it becomes clear that Plaintiffs have either assumed

the risk of the alleged harm based on their voluntary choices or can avoid the risk of the alleged harm by using their funds to address gender ideology.

Plaintiffs here have not provided this Court with sufficient evidence to support their irreparable harm claim.  First, Plaintiffs fail to identify whether they have state funding available to support gender ideology programming.  Second, while they claim that the federal gender ideology limitations "prohibit" them from effectuating appropriate state laws and policies, this is not the case.  Although Plaintiffs cite allegedly inconsistent state laws, not all of those appear to require that gender ideology be included in their programs.  *See e.g.*, Wash. Rev. Code § 28A.300.475.

Finally, to bolster the claim of alleged harm, Plaintiffs' brief includes five references to ACF prohibiting PREP and SRAE grant recipients from including gender ideology "in any program or service."  This broad pronouncement is both vague and inaccurate.  It implies that the new ACF terms and conditions prohibit Plaintiffs from funding and administering separate programs that allow for the inclusion of state-funded gender ideology.  But this is simply not the case.  None of the ACF terms and conditions restrict any state-funded program.

For these reasons, Plaintiffs do not and cannot carry their burden to show they would be irreparably harmed by complying or choosing not to comply with PREP and SRAE gender ideology terms and conditions.

## III.    Neither the balance of the equities nor the public interest supports a preliminary injunction.

Finally, Plaintiffs fail to meet their burden of proving that both the balance of equities and public interest support their requested extraordinary remedy of a mandatory injunction.  Where the government is a party, the balance of equities and public interest elements merge.  *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  Courts "should pay

particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (cleaned up). The balance of equities and public interest factors do not favor Plaintiffs; instead, they favor Defendants.

First, the public interest is harmed when the federal government is forced to pay out funds under terms that do not comply with the statutory purpose of these funds because it may not be able to recover them. *See Dep't of Educ.*, 145 S. Ct. at 968–69 (noting that the funding recipients "have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed."); *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) (concluding that the federal government is irreparably harmed if the funds "cannot be recouped" such as when federal grant recipients "do not state that they will repay the grant money if the Government ultimately prevails"); *see Harris Cnty., Texas v. Kennedy*, 786 F. Supp. 3d 194, 223 (D.D.C. 2025) ("Should it turn out that the government is not required to pay out these grants, then the government would likely be left without any means of recovering large sums of taxpayer money."). On the flip side, grantees have the choice of whether "to keep the programs operating" under the terms of the grant; if they choose not to, "then any ensuing irreparable harm would be of their own making." *Dep't of Educ.*, 145 S. Ct. at 968–69 (noting that grantees "can recover any wrongfully withheld funds through suit in an appropriate forum" if they ultimately prevail in their claims).

Second, Plaintiffs claim that the public interest is served by maintaining the status quo, but the requested relief significantly exceeds maintaining the status quo. Essentially, Plaintiffs are asking this Court to intervene and direct HHS regarding the type of programming it must fund. Plaintiffs' requested relief constitutes extraordinary interference with HHS's lawful administration of the PREP and SRAE grant programs, as well as the agency's lawful discretion.

Accordingly, the balance of the equities and the public interest do not favor Plaintiffs, and this Court should deny Plaintiffs' motion.

**IV.    Any injunction should be narrowly tailored to the harms to the named Plaintiffs.**

If this Court were to consider entering injunctive relief here, that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Any injunction issued by the Court should be narrowly tailored to the specific harms suffered by the named plaintiffs in this action. The Court should refrain from issuing a broad injunction that extends to states not named as Plaintiffs here. The Supreme Court recently addressed the concept of "universal injunctions," which it defined as injunctions that "prohibit enforcement of a law or policy against anyone," as opposed to injunctions "prohibiting executive officials from enforcing a challenged law or policy only against the plaintiffs in the lawsuit." *Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025). The Supreme Court explained that universal injunctions "likely exceed the equitable authority that Congress has granted federal courts," as they have no historical analogue in equity practice. *Id.* The Court reiterated its prior pronouncement that "'[n]either declaratory nor injunctive relief . . . can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs.'" *Id.* at 844 (quoting *Doran v. Salem Inn, Inc*., 422 U.S. 922, 931 (1975)).

Here, Plaintiffs' request for injunctive relief is impermissibly broad because it appears to seek enforcement of an injunction that extends beyond the Plaintiffs in this particular lawsuit. Pursuant to the Supreme Court's opinion in *CASA*, if Plaintiffs demonstrate an entitlement to any injunctive or declaratory relief, that relief should be tailored to address only the alleged harms to Plaintiffs directly. *Id.* at 851 (explaining that the "equitable tradition has long embraced the rule that courts generally may administer complete relief between the parties") (quotations omitted).

**V.    If the Court issues injunctive relief, it should be stayed pending appeal and should accompany a bond.**

If this Court issues any injunctive relief, Defendants respectfully request that the Court stay such relief pending the disposition of any appeal that is authorized by the U.S. Solicitor General, or at a minimum, administratively stayed for a period of seven days to allow the government to seek an emergency, expedited stay from the U.S. Court of Appeals for the Ninth Circuit if an appeal is authorized.  At least a modest stay is warranted to allow for orderly briefing in the Court of Appeals.

Defendants also respectfully request that any injunctive relief be conditioned on a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for preliminary injunction.

Respectfully submitted this 10th day of October, 2025.

<div style="margin-left:auto">

SCOTT E. BRADFORD
United States Attorney
District of Oregon

*/s/ Sarah E. Feldman*
SARAH E. FELDMAN
Assistant United States Attorney

*/s/ Susanne Luse*
SUSANNE LUSE
Assistant United States Attorney
Counsel for Defendants

</div>

## WORD COUNT CERTIFICATE

The preceding memorandum does not comply with the applicable word-count limit under LR 7-2(b), because it contains 11,597 words, based on the word-count function of the word processing system used to prepare the memorandum.  This word count includes headings, footnotes, and quotations, but excludes the caption, table of contents, table of authorities, signature block, and certificates of counsel.  A motion to file excess pages is forthcoming.

Respectfully submitted this 10th day of October, 2025.

SCOTT E. BRADFORD
United States Attorney
District of Oregon

*/s/ Sarah E. Feldman*
SARAH E. FELDMAN
Assistant United States Attorney
Counsel for Defendants