IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF OREGON; STATE OF MINNESOTA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF WISCONSIN, | **OPINION & ORDER**<br><br>Civ. No. 6:25-cv-01748-AA |

          Plaintiffs,

    vs.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
ROBERT F. KENNEDY, JR., in his Official
Capacity as Secretary of U.S. Department of
Health and Human Services; UNITED STATES
HEALTH AND HUMAN SERVICES
ADMINISTRATION FOR CHILDREN AND
FAMILIES; and ANDREW GRADISON, in his
Official Capacity as Acting Assistant Secretary
of U.S. Health and Human Services
Administration for Children and Families,

          HHS.

_____

AIKEN, District Judge:

      Before the Court is a Motion for Preliminary Injunction filed by sixteen States

and the District of Columbia (collectively, "Plaintiff States") against United States

Department of Health and Human Services ("HHS"); Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS; Administration for Children and Families ("ACF"); and Andrew Gradison, in his official capacity as Acting Assistant Secretary of ACF (collectively, "HHS" or "Defendants"), ECF No. 2.

Plaintiff States allege that HHS seeks to impose new grant conditions on non-discretionary health education grants that Congress authorized and funded. *See* Compl., ECF No. 1. Plaintiff States allege that the new grant conditions, which require grantees to remove any reference to gender identity from their sexual health education curricula, run counter to statutory authority and directly undermine congressional purpose to reduce adolescent rates of pregnancy and sexually transmitted infections, including HIV. Plaintiff States allege that, in imposing conditions not authorized by Congress, HHS violates the U.S. Constitution's Separation of Powers doctrine; the Spending Clause, U.S. Const. art. I, § 8, cl. 1; and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A),(B)&(C). Plaintiff States seek preliminary relief. For the reasons explained below, the Plaintiff States' Motion for a Preliminary Injunction, ECF No. 2, is GRANTED.

## BACKGROUND

Plaintiff States are recipients of non-discretionary federal grants that fund "evidence-based" adolescent sexual health education programs. Matthew Decl. ¶¶ 6, 7, 11, 12, 19, 20, ECF No. 71. The grant funds are issued by HHS under the direction of two statutes: the Personal Responsibility Education Program ("PREP") grant, 42 U.S.C. § 713, and the Title V Sexual Risk Avoidance Education ("SRAE")

grant, 42 U.S.C. § 710.  Congress enacted PREP and SRAE to reduce adolescent rates of pregnancy and sexually transmitted infections ("STIs"), including HIV.[1]  The authorizing statutes require that PREP and SRAE provide sexual health education that is "evidence-based," "medically accurate and complete," "age-appropriate," and "culturally appropriate."  42 U.S.C. § 713(b)(2)(B)(i) & (ii), (v), (vi); 42 U.S.C. § 710(b)(2)(B),(C),(E) & (e)(2)).  Plaintiff States, generally, have received PREP grants since 2010 and SRAE grants since 2018.  Pl. Mot. at 5–6.  Plaintiff States allege that, this year, HHS threatened to terminate their non-discretionary grant awards if Plaintiff States fail to remove "gender ideology" from program curricula by October 27, 2025, and that HHS has already terminated California's PREP grant for that reason.  Compl. ¶¶ 123–129.

A.  *Personal Responsibility Education Program (PREP)*

In 2010, Congress authorized and funded PREP under Section 513 of the Social Security Act, 42 U.S.C. § 713.[2]  Congress allocated $75 million annually to

---

[1] The "purpose" of PREP is "to educate adolescents on both abstinence and contraception for the prevention of pregnancy and sexually transmitted infections, including HIV/AIDS" . . . and . . . adulthood preparation subjects" such as "healthy relationships," "adolescent development," and "parent-child communication."  42 U.S.C. § 713(b)(2)(A),(C).  The "purpose" of SRAE is "to implement education exclusively on sexual risk avoidance (meaning voluntarily refraining from sexual activity)," but the program may include education on contraception as long as that "education does not include demonstrations, simulations, or distribution of contraceptive devices."  42 U.S.C. § 710(b)(1),(4).  SRAE programs must address "the benefits [of] personal responsibility [and] self-regulation," "healthy relationships[,]" "risk behaviors, such as drug and alcohol usage," and "sexual coercion and dating violence," among other topics.

[2] In 2010, Congress enacted PREP as part of the Patient Protection and Affordable Care Act (ACA). 124 Stat. 347-352, Pub. L. No. 111-148 § 2953 *codified as amended at* 42 U.S.C. § 713.

fund PREP, most of which is allotted to states as non-competitive (non-discretionary) formula grants. *Id.* § 713(a)(1)&(f). Under the formula grant model, any state that applies for a PREP grant receives an allotment that is determined by a formula pegged to that state's proportion of the national youth population. *Id.* § 713(a)(1). The allotted funds are available for expenditure over a three-year period. *Id.*

To receive its PREP allotment, a state must apply for the grant and certify that its sexual health education program complies with statutory requirements. *Id.* § 713(a)(1)(C). The statute requires that PREP programs educate youth about "responsible sexual behavior" with "substantial emphasis on both abstinence and contraception for the prevention of pregnancy among youth and sexually transmitted infections." *Id.* § 713(b)(2)(B)(iii)&(iv). Curricula must be "evidence-based," "medically accurate and complete," "age-appropriate," and "provided in the cultural context that is most appropriate for individuals in the particular population group to which they are directed." *Id.* § 713(b)(2)(B)(i) & (ii), (v), (vi). In both the PREP and SRAE authorizing statutes, Congress defined "medically accurate and complete" as "verified or supported by the weight of research conducted in compliance with accepted scientific methods" and either "published in peer-reviewed journals, where applicable" or "comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete." *Id.* § 713(e)(2). Congress also intended that PREP programs target "high-risk, vulnerable, and culturally under-represented youth populations, including youth in foster care, homeless youth, youth with HIV/AIDS, victims of human

trafficking," pregnant women and mothers under 21 years old and their partners. *Id.* § 713(c)(1); § 713(a)(1)(C)(ii)(III).   Otherwise, under the formula grant, a state has some flexibility in how to use the grant funds.  Pl. Mot. at 7.

Each of the Plaintiff States applied for and received a PREP formula grant. Plaintiff States allege, and HHS does not dispute, that Plaintiff States have met PREP's compliance certification requirement.  *Id.* ¶ 45.  *See* Roberts-WA Decl. ¶¶ 7, 8, ECF No. 9; Liu-OR Decl. ¶ 7, ECF No. 15; Woodrich-MN Decl. ¶ 9, ECF No. 16; Castillo-CO Decl. ¶¶ 6–7, ECF No. 17; Vigil-CT Decl. ¶ 7, ECF No. 18;  Blessing-DE Decl. ¶ 6, ECF No. 19; Barnes-DC Decl. ¶ 6, ECF No. 77; Suzuki-HI Decl. ¶ 5, ECF No. 21; B. Johnson-IL Decl. ¶ 6, ECF No. 22; Va-ME Decl. ¶ 6, ECF No. 24; Sullivan-MD Decl. ¶ 7, ECF No. 25; Blodgett-MA Decl. ¶ 7, ECF No. 27; Lyon-Callo-MI Decl. ¶ 7, ECF No. 28; Brown-NJ Decl. ¶ 7, ECF No. 29; Davis-NY Decl. ¶ 14, ECF No. 32; Campagna-RI Decl. ¶ 6, ECF No. 33; Tran-WI Decl. ¶ 8, ECF No. 35.

### B.    *Sexual Risk Avoidance Education (SRAE)*

In 2018, Congress authorized and funded Title V SRAE under Section 510 of the Social Security Act, 42 U.S.C. § 710.[3]  Congress allocated $75 million annually to Title V SRAE funding, most of which is allotted to states as non-competitive (non-

---

[3] In 1996, in response to rising teen pregnancy rates, Congress enacted a Title V abstinence-only education grant program that preceded SRAE. Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105.  Congress restructured the abstinence-only education program to permit a more comprehensive approach to sexual health education (beyond abstinence-only) and renamed the program Sexual Risk Avoidance Education.  Title V of the Social Security Act, 42 U.S.C. § 710.

discretionary) formula grants. *Id.* § 710(a)(1)&(f). SRAE grant allotments are determined by a formula that is pegged to a state's proportion of "low-income children." *Id.* § 710(a)(1)(B)). To receive its SRAE allotment, a state must apply for the grant, collect data on "the programs and activities funded through the allotment[,]" and submit reports to the Secretary on that data. *Id.* § 710(a)(1), (b)(6). In addition to receiving a PREP formula grant, five Plaintiff States—Oregon, Minnesota, Illinois, New Jersey and New York—applied for and received an SRAE formula grant. Baney-OR Decl., Ex. 3, ECF No. 14-3; Woodrich-MN Decl., Ex. L, ECF No. 16-12; B. Johnson-IL Decl., Ex. B, ECF No. 22-2; Brown-NJ Decl., Ex. 5, ECF No. 29-5; Davis-NY Decl., Ex. D, ECF No. 32-4.

The SRAE authorizing statute requires that grantees "implement education exclusively on sexual risk avoidance (meaning voluntarily refraining from sexual activity)," but programs may also provide information about contraception. 42 U.S.C. § 710(b)(1), (4). Like the PREP curricula, SRAE curricula must be "medically accurate and complete," "age-appropriate," and "culturally appropriate, recognizing the experiences of youth from diverse communities, backgrounds, and experiences." *Id.* § 710 (b)(2)(B),(C)&(E)). The statutory definition of "medically accurate and complete" is identical to that of the PREP statute. *See id.* § 710(e)(2). Congress required that SRAE curricula teach "personal responsibility [and] self-regulation[,]"; "refraining from nonmarital sexual activity . . . to improve . . . physical and emotional health of youth[,]"; "[t]he increased likelihood of avoiding poverty when youth attain self-sufficiency . . . before engaging in sexual activity[,]"; "foundational components

of healthy relationships[,]"; "how other youth risk behaviors, such as drug and alcohol usage, increase the risk for teen sex,"; and "how to resist and avoid . . . sexual coercion and dating violence[.]"  *Id.* § 710(b)(3)(A)–(F).

### C.   *Executive Actions*

On January 20, 2025, President Trump issued Executive Order 14,168, ("E.O. 14,168" or the "E.O."), which declared that it is "the policy of the United States to recognize two sexes, male and female[,]" that "are not changeable and are grounded in fundamental and incontrovertible reality." Exec. Order No. 14,168 § 2; 90 Fed. Reg. 8615 (Jan. 20, 2025).   The E.O. gave new definitions to the terms "sex," "woman," "man," "female," "male," "gender ideology," and "gender identity" and directed that those terms "shall govern all Executive interpretation of and application of Federal law and administration policy[.]"[4]  *Id.*

On April 14, 2025, HHS's Administration of Children & Families ("ACF") sent a letter to PREP grantees, including Plaintiff States, requiring them to submit all PREP "curricula and programmatic materials currently in use and approved for

---

[4] E.O. 14,168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," provides that "'Sex' shall refer to an individual's biological classification as either male or female [and] . . . does not include the concept of 'gender identity.'"  90 FR 8615 § 2(a); "'[W]oman' . . . shall mean adult . . . human female[.]"  *Id.* § 2(b); "'[M]an' . . . . shall mean adult . . . human male[.]"  *Id.* § 2(c); "'Female' means a person belonging, at conception, to the sex that produces the large reproductive cell."  *Id.* § 2(d); "'Male' means a person belonging, at conception, to the sex that produces the small reproductive cell."  *Id.* § 2(e); "'Gender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa[.]"  *Id.* § 2(f); "'Gender identity' reflects a fully internal and subjective sense of self, disconnected from biological reality and sex[.]"  *Id.* § 2(g).

future use[]" for a "medical accuracy review."  Matthew Decl. ¶ 41, Ex. E; *see also,* *e.g.*, Roberts-WA Decl., Ex. 3, April 14, 2025 ACF Letter to Washington State Dep't Health, ECF No. 9 at 90.  HHS attests that "PREP and SRAE [medical accuracy reviews] are typically conducted every five years and may be conducted more frequently[.]"  Matthew Decl. ¶ 31.  Plaintiff States timely complied by submitting their PREP and SRAE curricula for the medical accuracy review.  Compl. ¶ 119.

On August 6, 2025, HHS issued Notices of Awards ("NOAs" or "Notices") to PREP grantees for the 2024–2027 fiscal cycle and to SRAE grantees for the 2024–2026 fiscal cycle—cycles that were already underway.  Matthew Decl. ¶ 28; *see also,* *e.g.*, Roberts-WA Decl., Ex. 4, Washington State Dep't Health PREP NOA, ECF No. 9-4; Baney-OR Decl., Ex. 3, Oregon Dep't of Human Servs. SRAE NOA, ECF No. 14-3.  The NOAs inform recipients that their awards are "subject to the requirements listed in the terms and conditions,"; refer recipients to "[t]he electronic copy of Terms and Conditions,"; and state that "[r]ecipients are prohibited from including *gender ideology* in any program or service that is funded with this award."  ECF No. 9 at 94; ECF No. 14 at 87 (emphasis added).  The NOAs also advise recipients that "the use of Federal funds from this award constitutes the grantee's acceptance of the listed terms and conditions."  *Id.*

On August 7, 2025, HHS issued "Supplemental Terms and Conditions" for both the PREP and SRAE awards ("Supplemental T&Cs"), effective August 7, 2025, that prohibit grant recipients "from including gender ideology in any program or service that is funded with this award."  Wolf-WA Decl., Ex. 15  at 1 (PREP), Ex. 16

at 2 (SRAE), ECF Nos. 7-15, 7-16.  The PREP and SRAE Supplemental T&Cs also provide that

> the [PREP or SRAE] statutory authority . . . does not authorize teaching students that gender identity is distinct from biological sex or boys can identify as girls and vice versa, or that there is a vast spectrum of genders that are disconnected from one's sex. Therefore, gender ideology is *outside of the scope of the statutory authority* for this award.

*Id.* (emphasis added).

On August 21, 2025, HHS terminated California's PREP award because California declined to comply with HHS's new conditions to remove gender identity references (the "Gender Conditions") from its PREP curricula.  Wolf-WA Decl., Ex. 17, ECF No. 7-17; Matthew Decl., Ex. D.  California had received earlier notice than Plaintiff States of the Gender Conditions including an earlier-dated NOA and a Directive ("PREP Directive") to remove "gender ideology" from its PREP curricula by August 19, 2025.  Matthew Decl. ¶¶ 33–38, Ex. A (Mar. 27, 2025 medical accuracy review letter), Ex. B (Jun. 20, 2025 PREP Directive), Ex. C (Aug. 19, 2025 letter from California declining to remove the "content in question"), ECF Nos. 71-1, 71-2, 71-3.  On September 19, 2025, California submitted an appeal of the PREP termination decision to the HHS Departmental Appeals Board.  Matthew Decl. ¶ 40.  As of the date of this decision, that appeal is pending.  *Id.*

On August 26, 2025, HHS also sent a PREP Directive to all PREP grantees, including Plaintiff States.  *See* Wolf-WA Decl., Ex. 20, ECF No. 7-20 (PREP Directives sent to all state and territory PREP grantees); Matthew Decl., Ex. F, ECF No. 71-6 (same).  The PREP Directive states

> ACF identified [gender ideology] content in the curricula and other program materials that fall outside of the scope of PREP's authorizing statute. . . . Therefore, ACF instructs [State] *to remove all content concerning gender ideology* from its curricula, program materials and any other aspect of its program delivery . . . and provide a copy of the modified materials to ACF for approval[] . . . no later than Monday, October 27, 2025[.]

*Id.* (emphasis added). The Directive also advises that "ACF may take additional enforcement action . . . to withhold, disallow, suspend, or terminate Federal awards" if the grantee fails to "make the appropriate modifications" to its curricula. *Id.*

In a footnote, ACF announced that it had decided to "chang[e] our planned course of action" and did not conduct a medical accuracy review of grantees' PREP curricula because "the content that [ACF] w[as] going to review for medical accuracy is outside of the subjects that are statutorily authorized in this program[.]" *Id.* at 1 n.1. Further, ACF described, for the first time, that its planned medical accuracy review—the one that it did not conduct—was a review "to determine if [States'] approach to biological sex . . . is medically accurate and in compliance with the program statute[.]" *Id.*

Among the curricular content that the PREP Directive "flagged" as "gender ideology" "outside the scope of the authorizing statute" is Delaware's facilitator instruction: "Demonstrate acceptance and respect for all participants, regardless of personal characteristics, including race, cultural background, religion, social class, sexual orientation or gender identity[,]" Blessing-DE Decl., Ex. D, ECF No. 19-4 at 30; Oregon's facilitator instruction: "Help the group understand sexual orientation is the term used to describe what gender(s) someone is sexually or romantically

attracted to. Gender identity is the term used to describe how someone views their gender. . . . Ask participants if they know what the term straight or heterosexual means. Ask participants if they are familiar with the term LGBTQ[,]" Liu-OR Decl., Ex. 4, ECF No. 15-4 at 26; Massachusetts' content: "Gender refers to the ideas in a culture or society about the appropriate ways for men and women to dress, behave, think and feel. Ideas about what gender behavior is appropriate change in different cultures and at different times in history. Sometimes one gender is given more power or status than another[,]" Blodgett-MA Decl., Ex. 4, ECF No. 27-4 at 59; Rhode Island's facilitator instruction: "Use inclusive language. Even if you have known all your participants a long time, do not make assumptions about their sexuality and who they are interested in dating. LGBTQ youth can quickly feel isolated if all relationship examples and language are only heterosexual. Use the term 'partner' to refer to a romantic partner[,]" Campagna-RI Decl., Ex. 3, ECF No. 33-3 at 17; Maine's glossary definition: "*Gender Nonconforming*: When a person's gender expression doesn't fit inside traditional male or female categories (sometimes called the gender binary)[,]" Va-ME Decl., Ex. C, ECF 24-3 at 18; Washington's high school content: "Everyone has a sexual orientation and a gender identity. A person knows their sexual orientation because of who they feel attracted to. A person knows their gender identity because they feel like a boy, a girl, both, neither or somewhere in between. People of all sexual orientations and gender identities need to know how to prevent pregnancy and ST[I]s, either for themselves or to help a friend[,]" Roberts-WA Decl., Ex. 5, ECF 9-5 at 99.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must show that (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the plaintiff's favor; and (4) an injunction is in the public interest. *Id.* at 20. "Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020).

In the Ninth Circuit, courts may apply an alternative, sliding-scale, approach to determine preliminary relief where a stronger showing on one element offsets a weaker showing on another. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under that approach, serious questions going to the merits and a balance of hardship that tips sharply towards a plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest. *Id.* at 1135 (internal quotation marks and citation omitted). The plaintiff must carry its burden of persuasion by a "clear showing" of the four *Winter* elements. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

**DISCUSSION**

Plaintiff States move for a preliminary injunction to enjoin Defendants from imposing the Gender Conditions on the non-discretionary PREP and SRAE grants that Congress has authorized and funded. Plaintiff States allege that, in imposing the Gender Conditions, Defendants violate the Administrative Procedure Act, 5 U.S.C. § 706(2)(A),(B)&(C), Counts I–III, the Constitution's Separation of Powers doctrine, Count V, and the Spending Clause, U.S. Const. art. I, § 8, cl. 1, Count IV.

I.    *Subject Matter Jurisdiction*

Defendants first argue that this Court lacks subject matter jurisdiction because this case presents a contract dispute under the Tucker Act, which vests exclusive jurisdiction in the Court of Federal Claims. Def. Resp. at 10, ECF No. 70. "Sovereign immunity shields the United States from suit absent a consent to be sued that is 'unequivocally expressed.'" *United States v. Bormes*, 568 U.S. 6, 9–10 (2012) (quoting *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 33–34 (1992)). "Congress has enacted several broad waivers of the United States' sovereign immunity." *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1168 (9th Cir. 2017). "[A plaintiff] may sue the United States only if Congress has waived sovereign immunity for the lawsuit[] and may bring its claim in federal district court only if Congress has provided for jurisdiction there." *N. Star Alaska v. United States*, 9 F.3d 1430, 1432 (9th Cir. 1993) (*en banc*) (*per curiam*).

The APA waives sovereign immunity for suits "seeking relief other than money damages" against a federal agency. 5 U.S.C. § 702. The APA "confers a

general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute[.]'" *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984) and 5 U.S.C. § 702. "The default rule is that agency actions are reviewable under federal question jurisdiction, pursuant to 28 U.S.C. § 1331[.]" *Perez Perez v. Wolf*, 943 F.3d 853, 860 (9th Cir. 2019). But the APA waives sovereign immunity for suits only so long as no other statute "expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702.

Defendants assert that the Tucker Act precludes judicial review under the APA. Def. Resp. at 10. The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over "any claim against the United States founded" on "any express or *implied contract* with the United States" for amounts over ten thousand dollars. 28 U.S.C. §§ 1346(a)(2), 1491(a)(1) (emphasis added). Defendants argue that "claims founded on grants, like those at issue here," are implied contracts because they "are implemented through 'contracts to set the terms of and receive commitments from recipients.'" Def. Resp. at 10 (quoting *Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021)). But the Ninth Circuit "interpret[s] the Tucker Act to 'impliedly forbid' an APA action seeking injunctive and declaratory relief only if that action is a 'disguised' breach-of-contract claim." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).

To determine whether an APA claim is a disguised breach-of-contract claim, courts examine (1) "the source of the rights upon which the plaintiff bases its claims,"

and (2) "the type of relief sought (or appropriate)." *Id.* (quoting *Megapulse*, 672 F.2d at 968). As to the first *Megapulse* prong, "[i]f rights and remedies are *statutorily* or *constitutionally* based, then districts courts have jurisdiction; if rights and remedies are *contractually* based then only the Court of Federal Claims does, even if the plaintiff formally seeks injunctive relief." *Id.* (emphasis in original).

Here, Plaintiff States allege that HHS's imposition of the Gender Conditions violates the Constitution and federal statutes, including the APA and the grants' authorizing statutes. "[T]he fact that there are underlying contractual relationships between the [Plaintiff] States and HHS does not automatically 'convert a claim asserting rights based on federal regulations into one which is, at its essence, a contract claim.'" *Colorado v. U.S. Dep't of Health & Hum. Servs.*, 788 F. Supp. 3d 277, 296 (D.R.I. 2025) (cleaned up) (quoting *Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1299 (10th Cir. 2009)). Here, the question is whether HHS has legal authority to condition non-discretionary grants that Congress authorized and funded. Plaintiff States do not assert rights that are rooted in the grants' underlying agreements; they assert rights that are rooted in statutory and constitutional authorities and that are *independent* of the grant agreements.

Defendants rely on *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646–47 (9th Cir. 1998) to support their argument that Plaintiff States' claims are disguised breach-of-contract claims. In *Tucson Airport*, the defendant, a successor in interest to the original contracting party with the government, asked the district court to determine whether the government had a duty to defend the

successor's interest. *Id.* at 647. To answer that question, the court had to examine the contract terms to determine whether the contract imposed such a duty on the government. *Id.* The court determined that because the defendant's claims "do not exist independent of the [contract]," the claims were "contractually-based, not statutorily-based, and therefore are barred by the Tucker Act." *Id.* at 646. In *Tucson Airport*, the Ninth Circuit also explained and distinguished its holding in *North Side Lumber Co. v. Block*, 753 F.2d 1482, 1485 (9th Cir.1985), in which plaintiff did *not* ask the court to determine its contract rights against the government but instead argued that "whatever the content of those rights, federal statutes preclude[d] the government from enforcing them." *Tucson Airport Auth.*, 136 F.3d at 646–47 (quoting *North Side Lumber*, 753 F.2d at 1486); *see also Cmty. Legal Servs. in E. Palo Alto*, 137 F.4th 932, 938 (9th Cir. 2025) ("[P]laintiffs seek to enforce compliance with statutes and regulations, not any government contract. . . . Seeking to ensure compliance with statutory and regulatory commands is a matter beyond the scope of the Tucker Act's exclusive jurisdiction."). As in *North Side Lumber*, Plaintiffs here assert that whatever the content of their rights as to the grants themselves, constitutional and statutory authorities preclude HHS from imposing grant conditions that were not authorized by Congress.

As to the second *Megapulse* prong, "[i]f the relief sought is 'akin to the traditional remedies available for breach of contract (damages or specific performance),' the Tucker Act applies, and Plaintiffs' claims belong in the Court of Federal Claims." *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 879

(W.D. Wash. 2025) (quoting *United Aeronautical Corp.*, 80 F.4th at 1026). "If, however, the relief sought is not for money damages, then [p]laintiffs' claims do not belong in the Court of Federal Claims." *Id.* "The Claims Court does not have the general equitable powers of a district court to grant prospective relief." *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988).

Defendants argue that "[a]lthough Plaintiffs purportedly seek an injunction against grant conditions, the practical relief that would result—uninterrupted grant funding pursuant to federal grant agreements under terms Plaintiffs find more desirable—is fundamentally contractual." Def. Resp. at 12. That is, Defendants argue that what Plaintiff States really seek is a contract remedy. The Court disagrees. Plaintiff States do not seek monetary damages as in a breach-of-contract claim to "provide relief that substitutes for that which ought to have been done[,]" a retrospective remedy to compensate or "to *substitute* for a suffered loss." *Bowen v. Massachusetts*, 487 U.S. at 910, 895 (emphasis in original) (holding that the Tucker Act does not apply where "Maryland is seeking funds to which a statute allegedly entitles it, rather than money in compensation for the losses, whatever they may be, that Maryland will suffer or has suffered by virtue of the withholding of those funds."). As in *Bowen*, Plaintiff States do not seek a retrospective remedy to substitute or compensate them for a suffered loss—they seek a prospective remedy, to enjoin Defendants from imposing new grant conditions. And "[w]hile it is true that a preliminary injunction may ultimately result in payment by the government to [p]laintiffs, the injunction, itself, will not direct such payment." *Martin Luther*

*King, Jr. Cnty.*, 785 F. Supp. 3d at 882; *see also R.I. Coal. Against Domestic Violence v. Kennedy, Jr.*, No. 25-CV-342-MRD-PAS, 2025 WL 2899764, at *5 (D.R.I. Oct. 10, 2025) (Tucker Act does not apply when plaintiffs "seek[] to set aside unlawful [grant] conditions that [federal defendants] have imposed as requirements to be eligible to receive an award, and not payment for a suffered loss.") (cleaned up). Here, what Plaintiff States seek is broader than a mere contract remedy and is "validly based on grounds other than a contractual relationship with the government." *Megapulse*, 672 F.2d at 968.

In sum, the Tucker Act does not apply because Plaintiff States' claims are not implied or disguised breach-of-contract claims. Here, the APA waives federal sovereign immunity, and this Court exercises subject matter jurisdiction under 28 U.S.C. § 1331.

## II.    *Reviewability Under the APA*

Defendants argue that APA review is unavailable because "the challenged - actions are committed to agency discretion by law[,]" and because HHS's actions are not final agency actions. Def. Resp. at 12, 14 (citing 5 U.S.C. § 701(a)(2)). The Court concludes that neither ground precludes APA review here.

### A.    *Agency Discretion does not Preclude Reviewability*

"There is a strong 'presumption in favor of judicial review of final agency action' under the APA." *Jajati v. United States Customs & Border Prot.*, 102 F.4th 1011, 1016 (9th Cir. 2024) (quoting *Perez Perez*, 943 F.3d at 860); *see also Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986) (noting the "strong

presumption that Congress intends judicial review of administrative action"). Although the presumption of judicial review can be overcome when an action is committed to agency discretion by law, "the Supreme Court has instructed [that] this exception to judicial review is read 'quite narrowly.'" *Id.* (quoting *Perez Perez*, 943 F.3d at 860). "[A]gency action is 'committed to agency discretion by law' only 'in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply,' thereby leaving the court with 'no meaningful standard against which to judge the agency's exercise of discretion.'" *Id.* (quoting *Webster v. Doe*, 486 U.S. 592, 599 (1988) and *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).

Defendants contend that this is one of those rare instances. Defendants contend that Congress committed to HHS the determination of "what satisfies the requirements for 'medically accurate' or 'culturally sensitive' programming." Def. Resp. at 14. This is so, Defendants assert, because (1) the Court lacks "meaningful rubric for judicial review" because the program topics and guidelines are so "broadly drawn" and (2) such determination "under the statute requires a 'complicated balancing of a number of factors' peculiarly within the agency's expertise." Def. Resp. at 14.

This is not one of those rare instances where the Court has no meaningful standard against which to judge HHS's actions. The authorizing statutes commit very little discretion, if any, to the agency. The statutes authorize and fund non-discretionary formula grants to which states are entitled so long as they apply and then certify that they have met the statutory requirements. *See* 42 U.S.C. §

713(a)(1)&(f) (PREP); 42 U.S.C. § 710(a)(1)&(f) (SRAE). The statutory requirements are not ambiguous nor so broadly drawn that there are no meaningful standards for review. Congress expressly required that program curricula be "medically accurate and complete," and "culturally appropriate." Congress defined "medically accurate and complete" as

> verified or supported by the weight of research conducted in compliance with accepted scientific methods and (A) published in peer-reviewed journals, where applicable; or (B) comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete.

42 U.S.C. § 713(e)(2) and § 710(e)(2). And Congress provided clear statutory standards to determine what is culturally appropriate, including the direction to provide curricula that is "culturally appropriate, recognizing the experiences of youth from diverse communities, backgrounds, and experiences[,]" *id.* § 710(b)(2)(E), and that is "provided in the cultural context that is most appropriate for individuals in the particular population group to which they are directed[,]" *id.* § 713(b)(2)(B)(vi), and the direction to target

> youth populations that are the most high-risk or vulnerable for pregnancies or otherwise have special circumstances, including youth in foster care, homeless youth, youth with HIV/AIDS, pregnant youth who are under 21 years of age, mothers who are under 21 years of age, and youth residing in areas with high birth rates for youth.

*id.* § 713(a)(1)(C)(2).

"Only where there is truly 'no law to apply' have we found an absence of meaningful standards of review." *Perez Perez*, 943 F.3d at 861–62 (collecting cases finding meaningful standards in statutory language such as "feasible and prudent alternative,"; "consistent with sound business principles,"; "if [grantee] considers it

feasible,"; "reliable,"; "currently available,"; "likely to assist in promoting the objectives,"; "affected unit of local government,"; and "in the public interest"). Here, there are standards and clear law to apply. Further, Congress expressly directed that the determination of what is "medically accurate and complete" lies not with the agency but with the weight of scientific evidence-based peer-reviewed research and leading professional organizations with relevant expertise in the field. *See* 42 U.S.C. § 713(e)(2) and § 710(e)(2).

Finally, even assuming that the authorizing statutes commit any aspect of grant implementation to agency discretion—they do not—review is not precluded. "Section 701(a)(2) does not preclude judicial review of *all* discretionary decisions because the APA itself 'command[s] that courts set aside agency action that is an abuse of discretion.'" *Jajati*, 102 F.4th at 1016 (emphasis in original) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) and 5 U.S.C. § 706(2)(A)).

For these reasons, the Court determines that the challenged actions are not committed to agency discretion by law and, as such, are not precluded from review.

B.  *HHS Actions Are Final Agency Actions*

Defendants argue that APA review is not available "because HHS's actions are not discrete, final agency actions." Def. Resp. at 14.

Judicial review under the APA is limited to "final agency action." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 867–68 (9th Cir. 2022). An agency action is final when two conditions are met. *Id.* First, "[t]he action must 'mark the consummation of the agency's decision-making process[,]" and, second, "it

must also determine 'rights or obligations' or be one 'from which legal consequences will flow.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).  To determine whether an agency action is final, courts consider "whether the action amounts to a definitive statement of the agency's position, whether it has a direct and immediate effect on the day-to-day operations of the subject party, and if immediate compliance is expected." *Prutehi Litekyan: Save Ritidian v. Dep't of Airforce*, 128 F.4th 1089, 1108 (9th Cir. 2025) (cleaned up).

Plaintiff States contend that the Notices of Awards, Supplemental T&Cs, and PREP Directive each constitute a final agency action because "each presents a definitive statement of the agency's position and interpretation of law and states that it has legal effect on grantees effective immediately." Pl. Mot. at 16.  The Court agrees.

As to the first *Bennett* prong, "the core question is whether the agency has completed its decision[-]making process, and whether the result of that process is one that will directly affect the parties." *Or. Nat. Desert Ass'n*, 465 F.3d 977, 982 (9th Cir. 2006) (quoting *Indus. Customers of Nw. Utils. v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005)).  Here, each of the three documents puts into effect HHS's decision to impose the Gender Conditions.  That decision was a final decision because it changed the terms of the grant agreements.  Unlike agency action that is of a "merely tentative or interlocutory nature[,]" *Bennett*, 520 U.S. at 178, the imposition of a new term to an agreement, by its very nature, changes the parties' legal obligations and rights.  "Where an agency establishes conditions on grant

eligibility, the agency has taken action that 'marks the 'consummation' of the agency's decision[-]making process.'" *San Francisco Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 740 (N.D. Cal. 2025) (cleaned up) (quoting *Bennett*, 520 U.S. at 177–78); *see also State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031 (N.D. Cal. 2018) (where an agency had notified grant recipients of a grant funding condition, that agency "ha[d] rendered its final word, satisfying the first prong of the *Bennett* test").

As to the second prong, courts undertake a "pragmatic" inquiry to determine whether an action is final "based on the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it." *Cal. Cmtys. Against Toxics v. Envtl. Prot. Agency*, 934 F.3d 627, 637 (D.C. Cir. 2019). Here, legal consequences flow from each of the three documents because each of them imposes legal consequences on grantees and each of them puts those consequences into effect immediately. The NOAs and Supplemental T&Cs provide: "the use of Federal funds from this award constitutes the grantee's acceptance of the listed terms and conditions." *See, e.g.*, Wolf-WA Decl. Ex. 13 at 3; Ex. 14 at 3. If grantees use their awards, they are deemed to have accepted the new legal obligation to comply with the condition, and if they decline the condition, they lose the right to their awards.

Defendants argue that the documents lack "the hallmarks of a discrete and final decision of the agency, [and are], at most, expressions of agency policy and

program administration[]" because "none of [them] terminates a grant, imposes penalties, or determines legal rights or obligations with finality." Def. Resp. at 15.

The Court disagrees. First, each of the three documents puts into effect HHS's final decision to impose the Gender Conditions on the PREP and SRAE grantees, as evidenced by HHS's public announcement of that decision in a press release.[5]

Second, this Court agrees with other courts that the imposition of federal grant funding conditions is the consummation of a final agency decision because it directly triggers legal consequences. *See, e.g.*, *R.I. Coal. Against Domestic Violence*, 2025 WL 2899764, at *5–6 (imposition of DEI and "gender ideology" grant conditions on federal grants are final agency action because "[p]laintiffs are effectively prevented from participating in the application process and from receiving funding Congress has appropriated for supporting their missions if they decline to abide by [those conditions]"); *City of Fresno v. Turner*, No. 25-cv-07070-RS, 2025 WL 2721390, at *7 (N.D. Cal. Sept. 23, 2025) (imposition of diversity, equity, and inclusion ("DEI") and "gender ideology" grant conditions are reviewable final agency action because they "take the definitive legal position  that the [conditions] are authorized and enforceable against [p]laintiffs") (cleaned up); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 866 (N.D. Ill. 2018) (imposition of immigration-related grant conditions is a final agency action because "[t]he Conditions attached to the [funds]

---

[5] *See* Wolf-WA Decl., Ex. 22, ECF No. 7 at 643.  Press Release, U.S. HHS, Trump Administration Puts 46 States and Territories on Notice to Remove Gender Ideology Content from Sex Ed Materials (Aug. 26, 2025), https://www.hhs.gov/press-room/hhs-acf-states-remove-gender-ideology-sex-ed.html.

trigger important legal and practical consequences: They force Chicago to choose between accepting the award with the Conditions or forgoing the award in favor of maintaining the City's policy preferences"); *California ex rel. Becerra*, 284 F. Supp. 3d at 1030–31 ("As to the second prong of the *Bennett* test, legal consequences clearly flow from the imposition of the certification condition. Receipt of the grants is conditioned on certifying compliance with the federal government's interpretation of [the relevant statute].").

Third, even though none of the three documents includes a termination notice, each of them presents Plaintiff States a Hobson's Choice with immediate legal consequences. The statement in the documents that "the use of Federal funds from this award constitutes the grantee's acceptance of the listed terms and conditions[]" effectively compels Plaintiff States to decline their awards, or accept them, subject to the Gender Conditions, which, they allege would cause them to violate federal and state anti-discrimination laws and policies and implement a program that harms students and undermines public health. Pl. Mot. at 8–10.

Defendants also contend that "Plaintiffs['] claims amount to a broad programmatic attack [that is] impermissible under the APA." Def. Resp. at 17. A "programmatic attack" may occur when a plaintiff brings a [5 U.S.C.] § 706(1) APA claim to "compel[] agency action unlawfully withheld or unreasonably delayed." *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (rejecting "wholesale" challenge to BLM's land withdrawal review program because the § 706(1) claim sought to compel reform of several aspects of BLM's program but failed to identify

discrete agency actions). First, Plaintiff States do not bring claims under § 706(1) of the APA. Second, in contrast to a programmatic attack, the challenge here is to a discrete agency action—the imposition of new conditions on the non-discretionary grants to which Plaintiff States are entitled.

The Court concludes that the NOAs, T&Cs, and PREP Directive are final agency actions because they put into effect HHS's decision to impose new grant conditions, which alters the terms of the grants and results in direct and immediate legal consequences to grantees.

In sum, the challenged agency actions are reviewable under the APA because they are not committed to agency discretion by law and they are final agency actions.

III.  *Preliminary Injunction*

Plaintiff States ask the Court to enjoin Defendants from imposing the Gender Conditions on the PREP and SRAE non-discretionary grants that Congress has authorized and funded. Pl. Mot. at 35. The Court concludes that Plaintiff States are entitled to injunctive relief.

To obtain preliminary relief, a plaintiff must show a "likelihood of success on the merits," *Winter*, 555 U.S. at 20, or, under the alternative sliding-scale approach, that the claim raises "serious questions going to the merits." *All. for the Wild Rockies*, 632 F.3d at 1131–32. But a court's decision on preliminary relief is not a ruling on the merits of the claim. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). In considering the likelihood of success on the merits, a court is not strictly bound by the rules of evidence, as the "preliminary

injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Because of the extraordinary nature of injunctive relief, including the potential for irreparable injury if not granted, a court may consider evidence outside the normal rules of evidence, including hearsay, exhibits, declarations, and pleadings. *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

A.    *Likelihood of Success on the Merits*

Plaintiff States allege that HHS's new requirement to remove gender identity references from their PREP and SRAE curricula as a condition of receiving their non-discretionary funding awards violates the APA, 5 U.S.C. § 706(2)(A),(B)&(C) (Counts 1, 2, and 3); the Separation of Powers doctrine (Count 5); and the Spending Clause, U.S. Const. art. I, § 8, cl. 1 (Count 4).

1.    *Agency Action Contrary to Law, Count 1*

Plaintiff States contend that HHS's imposition of the new grant conditions is unlawful because it is in excess of statutory authority under the APA. 5 U.S.C. § 706(2)(A), (C). Plaintiff States maintain that to condition the PREP and SRAE grants on removing gender identity references from PREP and SRAE program materials contradicts Congress's express purpose in enacting PREP and SRAE and contradicts the statutory requirements to provide sexual health education that is "medically accurate and complete" and "culturally appropriate." Pl. Mot. at 19.

The APA requires a court to "hold unlawful and set aside agency action . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C).

For agencies charged with administering statutes, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). An agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "[U]nder our system of separation of powers, neither good intentions nor pressing policy problems can substitute for an agency's lack of statutory authority to act." *Kaweah Delta Health Care Dist. v. Becerra*, 123 F.4th 939, 944 (9th Cir. 2024). "Administrative agencies are creatures of statute," and "accordingly possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022); *see also City of Arlington*, 569 U.S. at 297 (finding that when an executive agency administers a federal statute, the agency's power to act is "authoritatively prescribed by Congress"). "If an agency acts without statutory authority, then a court must set that action aside" under the APA. *Drs. for Am. v. Off. Of Pers. Mgmt.*, No. 25-322 (JDB), 2025 WL 1836009, at *17 (D.D.C. July 3, 2025).

a.  *Appropriations Clause*

HHS first argues that the Constitution's Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, gives it authority to "impose conditions on grant programs." Def. Resp. at 19, 18 (quoting the Appropriation Clause: "No Money shall be drawn from

the Treasury, but in Consequence of Appropriations made by Law"). HHS argues that the Appropriations Clause requires it to impose grant conditions lest expenditures exceed amounts authorized by the statutes. *Id.* at 18. Defendants thus implicitly concede that imposing the new grant conditions effectively restricts the PREP and SRAE funding that Congress already authorized. Even if this were the real reason behind Defendants' imposition of the Gender Conditions, Defendants would not prevail. "Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *Id.* at 1235.

The Appropriations Clause does not provide the Executive branch a tool that it can use to thwart Congress's will. Quite the opposite. The Appropriations Clause is intended to check, not expand, Executive power. "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) (quoting Off. of Pers. Mgmt. v. *Richmond*, 496 U.S. 414, 425 (1990)). "The [Appropriations] Clause has a 'fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents.'" *Id.* (quoting *Office of Pers. Mgmt.*, 496 U.S. at 427–28). "Without it, Justice Story

explained, 'the executive would possess an unbounded power over the public purse of the nation; and might apply all its moneyed resources at his pleasure.'" *Id.* (quoting *Office of Pers. Mgmt.*, 496 U.S. at 427) (quoting 2 Joseph Story, *Commentaries on the Constitution of the United States* § 1348 (3d ed. 1858)).

Here, the grants at issue are formula grants, not discretionary ones. Plaintiff States have a statutory right to the funding that Congress authorized and funded. 42 U.S.C. § 713(a); *id.* § 710(a)(1). The Court concludes that the Appropriations Clause provides HHS no authority to condition funds that Congress has authorized.

### b.    *Congress's Purpose*

HHS next argues that removing gender identity from PREP and SRAE curricula "ensures that grantee activities remain consistent with Congress's explicitly stated objectives." Def. Resp. at 19. HHS argues that Congress "inten[ded] to anchor these programs in traditional understandings of biological sex, responsibility, and health risk—rather than in evolving theories of identity or gender expression." *Id.* at 20.

"The purpose of statutory construction is to discern the intent of Congress in enacting a particular statute." *The United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999). Courts "first look to the language of the statute to determine whether it has a plain meaning." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009). "To determine the plain meaning of a particular statutory provision, and thus congressional intent, the court looks to the entire statutory scheme." *Daas*, 198 F.3d at 1174. And courts "presume that [the] legislature says in a statute what it

means and means in a statute what it says there." *McDonald v. Sun Oil Co.*, 548 F.3d 774, 780 (9th Cir. 2008) (quoting *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004)) (internal quotation marks omitted). "If the statutory language is unambiguous, its plain meaning controls unless Congress has clearly expressed a contrary legislative intention." *MK Hillside Partners v. Comm'r of Internal Revenue*, 826 F.3d 1200, 1204 (9th Cir. 2016) (internal quotation marks omitted). If the relevant language is plain and unambiguous, the court's task is complete. *United States v. Carter*, 421 F.3d 909, 911 (9th Cir. 2005).

The parties agree that Congress clearly stated that the purpose of the PREP and SRAE programs is to reduce adolescent rates of pregnancy and STIs, including HIV. The PREP statute provides that "the purpose of an allotment . . . is to enable the State . . . to carry out personal responsibility education programs." 42 U.S.C. § 713(b)(1). Congress defined a personal responsibility education program as "a program that is designed to educate adolescents on . . . both abstinence and contraception for the prevention of pregnancy and sexually transmitted infections, including HIV/AIDS."

The SRAE statute provides that the purpose of an allotment "is to enable the State . . . to implement education exclusively on sexual risk avoidance (meaning voluntarily refraining from sexual activity)[,]" but also provides that states may provide contraception education so long as it is "medically accurate and complete" and "does not include demonstrations, simulations, or distribution of contraceptive devices." 42 U.S.C. § 710(b)(4). SRAE grantees "shall collect information on the

programs" and "submit reports to the Secretary on [that] data[,]" and "the Secretary shall . . . conduct one or more rigorous evaluations" of the interventions using "established scientific methods" to determine the interventions' impacts on "changing . . . sexual risk behaviors" or "reducing pregnancy" among youth. *Id.* §§ (b)(6), (c), (e)(3)(A).

Congress expressly required that PREP and SRAE curricula be "medically accurate and complete." 42 U.S.C. §§ 713(b)(2)(B)(ii), 710(b)(2)(B). Both statutes define "medically accurate and complete" as that which is

> verified or supported by the weight of research conducted in compliance with accepted scientific methods and (A) published in peer-reviewed journals, where applicable; or (B) comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete.

42 U.S.C. § 713(e)(2); *id.* § 710(e)(2). And Congress expressly required that PREP and SRAE curricula include content "proven on the basis of rigorous scientific research" to change youth sexual risk behavior. The PREP statute requires that

> programs replicate[] *evidence-based effective* programs or substantially incorporate[] elements of *effective* programs *that have been proven* on the basis of rigorous scientific research to change behavior, which means delaying sexual activity, increasing condom or contraceptive use for sexually active youth, or reducing pregnancy among youth.

42 U.S.C. § 713(b)(2)(B)(i) (emphasis added).

Congress also expressly required that programs be culturally appropriate. *See* 42 U.S.C. § 713(b)(2)(B)(vi) ("The information and activities carried out under the program are provided in the cultural context that is most appropriate for individuals in the particular population group to which they are directed."); *id.* §

710(b)(2)(E) ("Education on sexual risk avoidance shall be culturally appropriate, recognizing the experiences of youth from diverse communities, backgrounds, and experiences.").

Defendants contend that, despite the express statutory language that programs be "medically accurate and complete" and "culturally appropriate," that Congress intended to "anchor the programs in traditional understandings[.]" Def. Resp. at 20. Defendants do not argue that the concept of gender identity is not "medically accurate and complete" or that it is not "culturally appropriate," only that to include gender identity references in PREP and SRAE program materials is not consistent with Congress's objective to anchor programs in "traditional understandings."

Defendants' position is the opposite of what Congress's expressly stated intention . "[Courts] must reject administrative constructions of a statute . . . that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1112 (9th Cir. 2020) (quoting *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32 (1981)). In *Planned Parenthood of Greater Washington*, the Ninth Circuit held that HHS grant criteria giving preference to abstinence-only programs was contrary to law because Congress expressly intended that programs "replicat[e] programs that have been proven effective . . . to reduce teenage pregnancy." *Id.* at 1106.

Here, to achieve its objective of reducing teen pregnancy and STI, including HIV, rates, Congress expressly required grantees to replicate programs proven to be effective at changing adolescent sexual risk behavior—programs that rely on evidence-based medical and social science, a current and evolving body of knowledge. Congress thus expressly rejected programs based on traditional understandings.

The Court concludes that the PREP and SRAE statutes provide no grounds to require that Plaintiff States remove gender identity references from their PREP and that HHS acted in excess of statutory authority to require that they do so.

### c.    *Medically Accurate and Complete*

HHS also argues that removing gender identity references from program materials meets the statutory requirement that PREP and SRAE programs be "medically accurate and complete."  Def. Resp. at 20.  Defendants contend that "ACF has reasonably concluded that discussions of gender identity—an area encompassing psychological, social, and ethical dimensions—fall outside the core medical and biological content that is central to sexual-risk education."  *Id.*  Defendants appear to argue that ACF has determined that gender identity is not a medical or biological issue and thus cannot be included in program content.  Defendants assert that "[b]y defining the limits of permissible content, ACF acts within its statutory authority[.]"  *Id.*

First, the Court does not agree that Congress intended to restrict curricula to medical and biological content.  The statutes require that curricula "substantially incorporate[] elements of effective programs that have been proven on the basis of

rigorous scientific research to change behavior." 42 U.S.C. § 713(b)(2)(B)(i). Human behavior extends to, and arguably is mainly based on, the social and psychological sciences.

Second, the Court also does not agree that the concept of gender identity "fall[s] outside the core medical and biological content that is central to sexual-risk education." Def. Resp. at 20. A curricula that denies the existence of transgender and gender diverse people is not medically accurate and complete. The Supreme Court itself acknowledged that "1.6 million Americans over the age of 13 identify as transgender, meaning that their gender identity does not align with their biological sex." *United States v. Skrmetti*, 145 S. Ct. 1816, 1824 (2025). Further, the concept of gender identity is firmly established in the medical literature. Dr. Millington attested that "[e]veryone has a gender identity."[6] Dr. Millington attested that it is the broad consensus of the medical community, including the American Academy of Pediatrics, Endocrine Society, Pediatric Endocrine Society, and American College of Obstetricians and Gynecologists, that "gender identity is distinct from biological sex[.]" Millington-WA Decl. ¶ 29. Dr. Millington further attests that "[a] program

---

[6] Dr. Millington, Board-certified Harvard-trained Pediatric Endocrinologist and Assistant Professor and Clinical Educator at Hasbro Children's Brown University Health, with specialty in "assessment and treatment of transgender adolescents," provided expert testimony that "[g]ender identity refers to one's internal sense of self. Everyone has a gender identity. Most people have a gender identity that conforms with the sex they were assigned at birth. However, some individuals have a gender identity that does not conform with their sex designated at birth. The umbrella term *transgender* is used to describe those individuals with a gender identity that is different than the sex designated at birth." Millington Decl. ¶¶ 4–9, 26, ECF No. 8. Emphasis in original.

that did not mention gender identity or did not teach that there is a diversity of human experience with regard to gender identity, or insisted that sex and gender are not binary, would not be medically accurate or complete[,]" *id.* ¶ 45., that the "PREP and SRAE Gender Conditions and Executive Order 14168 are not consistent with biological reality or the diversity of human experience[,]" *id.* ¶ 49, and that "[t]hey inaccurately represent human physiology and well-established scientific facts regarding the complex concepts of sex and gender[,]" *id.* Finally, Defendants do not identify any statutory provision that grants it authority to determine what is medically accurate or that grants it authority to "defin[e] the limits of permissible [PREP or SRAE] content."

The Court concludes that removing evidence-based gender identity references from PREP and SRAE curricula conflicts with the statutory requirement that curricula be "medically accurate and complete." The Court also concludes that HHS has no statutory authority to redefine the scope of what is "medically accurate and complete" and that HHS, in imposing the Gender Conditions, acts in excess of statutory authority.

d.  *Culturally Appropriate*

HHS also argues that removing gender identity from program materials meets the statutory requirement that PREP and SRAE programs be "culturally appropriate." Def. Resp. at 20. This is so, Defendants assert, because the statute does not include the term "gender identity" and because "there is no plausible evidence to suggest that Congress intended for the term 'culturally appropriate' to

include gender identity when the PREP legislation was enacted in 2010." Def. Resp. at 20–21.

The PREP statute requires that "[t]he information and activities carried out under the program are provided in the cultural context that is most appropriate for individuals in the particular population group to which they are directed." 42 U.S.C. § 713(b)(2)(B)(vi). The PREP statute also requires that states, in their allotment applications, describe plans to reduce adolescent rates of pregnancy and STIs, including HIV,

> among youth populations that are the most high-risk or vulnerable for pregnancies or otherwise have special circumstances, including youth in foster care, homeless youth, youth with HIV/AIDS, pregnant youth who are under 21 years of age, mothers who are under 21 years of age, and youth residing in areas with high birth rates for youth.

42 U.S.C. § 713(a)(1)(C)(ii). The SRAE statute requires that sexual risk avoidance education "be culturally appropriate, recognizing the experiences of youth from diverse communities, backgrounds, and experiences." 42 U.S.C. § 710(b)(2)(E).

First, that Congress did not explicitly mention gender identity in the authorizing statutes is irrelevant because, aside from abstinence and contraception, the statutes do not contain a list of curricular topics. There is no mention, for example, of anatomy, physiology, menstrual cycles, or sexual orientation and so the omission of gender identity from a non-existent list is irrelevant. "A statute should not be interpreted so as to produce an absurd result." *Church of Scientology of Cal. v. Dep't of Justice*, 612 F.2d 417 (9th Cir. 1979). Second, as reviewed above, the statutes expressly require that content be "medically accurate and complete" and

"proven on the basis of rigorous scientific research to change [adolescent sexual risk] behavior[.]"  The science on adolescent sexual risk behavior is an evolving body of knowledge, which is the standard that Congress expressly intended.  So, whether gender identity was part of that body of knowledge in 2010 is irrelevant.

Contrary to Defendants' assertions, the statutes' requirements to provide "culturally appropriate" education,  to "recogniz[e]" diverse youth, to target "high risk youth," and to provide information "in the [most appropriate] cultural context" show that Congress intended that the PREP and SRAE programs reach diverse youth audiences.  Plaintiff States maintain that Congress expressly intended PREP grants to target "'high-risk, vulnerable, and culturally underrepresented youth populations' and [be] used to teach subjects such as healthy relationships, adolescent development, and parent-child communication . . . to reduce high risk sexual behaviors."  Pl. Mot. at 19 (citing 42 U.S.C. §§ 713(a)(1)(C)(ii)(III), (b)).  Plaintiff States maintain that gender diverse youth are at greater risk of high-risk sexual behavior. *Id.* (citing authorities).  Dr. Milligan attests that "[g]ender minority youth are at increased risk for . . . decreased condom use, earlier initiation into sex, more sexual partners, using drugs or alcohol prior to sex, higher burdens of sexually transmitted infections, and increased risk of pregnancy in adolescence."  Milligan Decl. ¶ 44 (citing authorities).

It is evident from the statutes' purpose, from its requirement to provide a "culturally appropriate" curricula, and its attention to high-risk youth populations, that Congress sought to expand the programs' reach, not contract it by excluding

certain segments, especially high-risk segments, of a states' youth population, as HHS seeks to do. HHS does not identify any statutory provision that grants it authority to redefine the scope of what is culturally appropriate or to exclude certain segments of the youth population from the PREP and SRAE programs.

The Court concludes that HHS's exclusion of gender minority youth from the PREP and SRAE programs directly conflicts with Congress's requirement that PREP and SRAE curricula be "culturally appropriate" and target high-risk youth. The Court concludes that HHS, in imposing the Gender Conditions, acts in excess of statutory authority.

On this record, the Court concludes that Plaintiff States are likely to succeed on the merits of their APA claim that Defendants acted "contrary to law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)&(C). This factor supports injunctive relief.

2.    *Arbitrary and Capricious Agency Action, Count 2*

Plaintiff States contend that HHS's imposition of the new grant conditions is unlawful because it is arbitrary and capricious under the APA. 5 U.S.C. § 706(2)(A). Plaintiff States allege that HHS's requirement to remove gender identity from PREP and SRAE program materials is arbitrary and capricious because the action is "neither reasonable nor reasonably explained[,]" Pl. Mot. at 21; "contradict[s] HHS's own position on [gender and sex] discrimination[,]" *id.*; contradicts HHS's prior position on the PREP and SRAE program materials, *id.* at 22; and that HHS's justification for removing gender identity is an "impermissible pretext[,]"*id.* at 23.

The APA requires a court to "hold unlawful and set aside agency action . . . found to be . . . arbitrary [and] capricious[.]" 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

### a.  *Failure of Reasoned Decision-Making*

Plaintiff States first contend that HHS's imposition of the Gender Conditions is arbitrary and capricious because it is "neither reasonable nor reasonably explained." Pl. Mot. at 21.

The APA requires federal agencies to engage in "reasoned decision[-]making," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020). An agency must show that it "examine[d] the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43  (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). A court may hold unlawful and set aside agency action that is not "reasonable and reasonably explained." *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

HHS's explanation for imposing the Gender Conditions is "that teaching gender ideology is outside the scope of the statutory authority." Def. Resp. at 22. "This is because the statute does not explicitly mention gender ideology or identity,

and it is irrelevant to teaching abstinence, contraception, or the PREP adult preparation subjects." *Id.*

First, HHS provides no factual findings or a reasoned basis for its decision. "'[B]aldly asserting that' longstanding funding is being terminated to 'comply with [an agency's] statutory mandate' does not constitute a 'reasoned explanation' under the APA." *Thakur v. Trump*, 787 F. Supp. 3d 955, 982 (N.D. Cal. 2025) (quoting *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 689 (9th Cir. 2007)).

Second, as explained above, aside from abstinence and contraception, the statutes do not contain a list of sexual health education topics. The statutes do not mention other key sex health education components such as menstrual cycles, anatomy, physiology, and sexual orientation, so relying on a non-existent list is not reasonable. Further, that HHS determined that "gender identity is not relevant to teaching abstinence, contraception or the adult preparation subjects" reveals to the Court that HHS failed to consider (1) the statutory purpose and relevant statutory requirements—such as the mandate to reduce adolescent rates of STIs, including HIV, and the requirements to provide "medically accurate and complete" content and to target "high-risk youth" populations with "culturally appropriate" educational content; (2) the data on gender minority youth populations; (3) the data on youth sexual health risk behaviors; and (4) the data on interventions "proven on the basis of rigorous scientific research" to reduce sexual health risk behaviors, adolescent pregnancy, and STIs, including HIV. It is obvious that gender minority youth are at

risk of pregnancy or contracting STIs.[7]  An agency contravenes the APA when it "fails to examine the relevant data[,]" *Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015), and when the explanation offered "runs counter to the evidence[,]" *State Farm*, 463 U.S. at 43, as here.  This is precisely the type of agency failure that the arbitrary and capricious standard is intended to address.

b.    *Unreasoned Change in Position*

Plaintiff States also contend that HHS's imposition of the Gender Conditions is arbitrary and capricious because it is an "abrupt" change in policy without reasoned explanation or consideration of reliance interests.  Pl. Mot. at 22–23.

In contrast to HHS's new position, the 2024 PREP NOA required grantees to provide PREP programming to "to youth populations that are the most high-risk or vulnerable for pregnancies and sexually transmitted infections, including HIV/AIDS, or have other special circumstances including culturally underrepresented youth populations such as . . . youth who identify as lesbian, gay, bisexual, transgender, and/or questioning."  Wolf-WA Decl., Ex. 8 at 12, ECF No. 7-8.  And the 2024 SRAE Notice of Funding Opportunity stated that "States must ensure that SRAE projects are inclusive of youth who identify as lesbian, gay,

---

[7] In fact, Dr. Millington testified that "gender minority youth are at increased risk for high-risk sexual behaviors and negative sexual health outcomes compared to their cisgender peers including decreased condom use, earlier initiation into sex, more sexual partners, using drugs or alcohol prior to sex, higher burdens of sexually transmitted infections, and increased risk of pregnancy in adolescence."  Millington Decl. ¶ 44.

bisexual, transgender, and/or questioning, intersex, asexual, and two-spirit (LGBTQIA2S+)." *Id.*, Ex. 9 at 7, ECF No. 7-9.

HHS concedes that it changed its position and maintains that it had to do so because "teaching 'gender identity' falls outside of the statutory scope of pregnancy prevention or sexual risk avoidance[,]" Def. Resp. at 23, and because its "reassessment" is "grounded in law—not politics or ideology," *id.*

But HHS's conclusory assertion and lack of factual findings do not satisfy the arbitrary and capricious standard. HHS cannot determine whether teaching gender identity falls outside the statutory scope because it failed to make any factual findings on which to base that determination. "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *Thakur*, 148 F.4th at 1106 (internal citations omitted). "A reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (internal citation omitted). "Unexplained inconsistency" between agency actions is "a reason for holding an interpretation to be an arbitrary and capricious change." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

Further, HHS provides no evidence that it considered Plaintiff States' reliance interests. "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be

taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks and citation omitted).citation modified). "It would be arbitrary and capricious to ignore such matters." *Id.*

Here, HHS's Gender Conditions effectively froze, and now threaten to terminate, federal funding for grant programs that "have been in place for over fifteen years and have become an embedded part of school districts' efforts to provide sexual health education services and reduce teen pregnancy and STIs." Pl. Mot. at 22. And, worse, HHS acted after Plaintiff States had already committed resources to the PREP and SRAE programs for the current school year.

Plaintiff States allege that "schools, grantees, and sub-grantees typically develop their curricula far ahead of time, and do not have the option of changing their curricula in the middle of a school year as HHS has demanded." Pl. Mot. at 22; *see, e.g.*, Sharnbroich-WA Decl. ¶¶ 23, 24, ECF No. 10; ("If districts were to cease use of the curricula found objectionable by HHS . . . districts would be deprived of resources (including curricula that require licensing fees) for which they have already paid, and which were previously found compliant with PREP program goals." And the program's sub-recipient "has already invested in staff labor expenses it will not be able to recoup" without continued funding.); Baney-OR ¶14 (explaining that if new curriculum is required, Oregon would need to hire an external contractor to produce the updated curriculum, send curriculum through design process, match current formatting, align with ADA compliance and produce newly translated version); Davis-NY Decl. ¶¶ 19, 48 (explaining that even if NYSDOH attempted to

comply, NYSDOH could not ensure compliance by its subgrantees, "without causing severe disruption to the agency and the subgrantees which rely on those funds for their ongoing operations" and "termination of these awards and loss of staff would haphazardly interrupt student education and engagement"); Herrmann-WI Decl. ¶ 18 ("The absence of this funding leaves Wisconsin School districts without a specifically funded position to ensure Human Growth and Development statute compliance.").

Plaintiff States contend that it will be extremely difficult if not impossible for school districts to replace their own programs because, without funding to hire subject matter experts and subgrantees and to pay staff, districts do not have the expertise to write curricula or train staff or the capacity to deliver programming. Pl. Mot. at 22–23. *Id.* *See, e.g.*, Roberts-WA Decl. ¶ 28 (Washington has already had to allow its contract with its sub-recipient and "main training partner," who provides essential technical support and subject matter expertise, to lapse); Dils-WA Decl. 18, ECF No. 11 (explaining that Washington, like other states, uses copyrighted sexual health education materials, that the state does not have control over that content, and that, "[w]e cannot know if they will revise their content to comply with new federal demands. This leaves [us] in an uncertain place, just as the school year has begun."); Herrmann-WI ¶ 18, ECF No. 34 (Without funding for technical assistance, Wisconsin cannot administer programming to youth at the Wisconsin Center for the Blind and Visually Impaired and the School for the Deaf); Blessing-DE Decl. ¶ 21 ("Professional development activities and training will no longer be provided to

teachers and community-based providers responsible for delivering sexual health education to adolescents. As a result, the comprehensive education and evidence-based materials that previously reached approximately 3,000 youth annually will no longer be disseminated."); L. Johnson-ME Decl. ¶ 19, ECF No. 23 ("If Maine Family Planning loses PREP funding, [it] would be unable to meet its obligations to provide age-appropriate and medically accurate education to youth."); Brown-NJ ¶¶ 23, 26 (explaining that subawards to partner organizations that administer PREP and SRAE programs to high risk youth across New Jersey will be lost); Barnes-DC ¶ 17 (explaining that the District of Columbia relies on PREP funds to deliver "fact based sexual education" to high risk youth and that the loss of access to that education "would have severe ramification including but not limited to increases in sexually transmitted infections, unintended pregnancies, and increases in HIV transmission.").

Plaintiff States also contend that HHS failed to consider "that many States have laws preventing the types of  discrimination required by the Gender Conditions." Pl. Mot. at 23.  *See* Pl. Mot. at 8 n.6–9 (citing States' anti-discrimination laws and policies).

HHS provides no evidence that it considered any reliance interests let alone Plaintiff States' investment in human resources, service networks, curricula development, subject matter expertise, and delivery infrastructure; the waste of such resources that would result from program termination or compliance with the

conditions; or the funding gap and unmet sexual health education needs that would result from termination or compliance.

Defendants respond that they need not consider Plaintiff States' reliance interests because Plaintiff States are not "regulated entities." Def. Resp. at 30. "But the Supreme Court and the Ninth Circuit have applied this framework and considered reliance interests even where the plaintiff is not a regulated entity." *Or. Council for Hums. v. DOGE Serv.*, No. 3:25-CV-829-SI, 2025 WL 2237478, at *31 (D. Or. Aug. 6, 2025) (collecting cases).

HHS further responds that Plaintiff States could not have developed "legitimate reliance interest in receiving federal funding for subject matter outside statutory authorization[,]" that is, for "continuing an activity that Congress did not appropriate federal funds to support." Pl. Resp. at 24. Defendants also argue that even that "significant reliance interests . . . cannot compel the continuation of an unauthorized practice." *Id.* The Court finds HHS's arguments unavailing. All of HHS's responses turn on the same faulty and conclusory argument—that it removed gender identity from PREP and SRAE program material to comply with the statute. The Court has already  addressed this argument and need not do so again.

c.    *Violation of Anti-sex-discrimination Laws*

Plaintiffs also contend that HHS's imposition of the Gender Conditions is arbitrary and capricious because it violates 42 U.S.C. § 708, which prohibits discrimination on the basis of sex under any federal grant program. Pl. Mot. at 21. Congress expressly provided that 42 U.S.C. § 708 apply to PREP and SRAE. *See* 42

U.S.C. § 713(d)(2)(B)(vi) (PREP); *id.* § 710(d)(1) (SRAE).  HHS has itself interpreted 42 U.S.C. § 708 to bar discrimination on the basis of sexual orientation and gender identity.[8]  *See* 45 CFR § 75.300(e)(8).

HHS responds that the statutory and regulatory bars on sex discrimination apply only to individuals seeking to "access[] federally funded programs" but not to the "substantive content" funded under those programs.  Def. Resp. at 22.  Defendants do not dispute that the agency prohibits discrimination on the basis of gender identity.  *See id.*  Instead, they argue that the statutory and regulatory bars on sex discrimination do not apply to federally funded program content.  *Id.*  By HHS's reasoning, the federal government could readily fund programs that actually teach race, sex, or religious discrimination and could mandate that such discrimination be included as a condition of grant funding.  The Court finds Defendants' explanation absurd and concludes that the Gender Conditions violate the government's sex discrimination laws and policies.

d.    *Pretext*

Finally, Plaintiff States contend that the imposition of the Gender Conditions is arbitrary and capricious because HHS's explanation is a pretext.  Pl. Mot. at 23.  Plaintiff States assert that the real reason behind HHS's Gender Conditions is to

---

[8] "[HHS] interprets 42 U.S.C. § 708 to include a prohibition against discrimination on the basis of sexual orientation and gender identity, consistent with the Supreme Court's decision in *Bostock* v. *Clayton County*, 590 U.S. 644 (2020), and other Federal court precedent applying *Bostock's* reasoning that sex discrimination includes discrimination based on sexual orientation and gender identity."  45 CFR § 75.300(e)(8).

"erase" transgender and gender diverse people from the program materials consistent with "this administration's overtly hostile comments regarding transgender people[.]" *id.*; Pl. Reply at 17, ECF No. 76. That is, Plaintiff States contend that the real reason behind HHS's Gender Conditions is to implement the administration's policy objectives as set out in E.O. 14,168. The Court agrees.

In its April 14, 2025, letter to Plaintiff States, ACF asked Plaintiff States to submit their curricula for a "medical accuracy review." Matthew Decl. ¶ 41, Ex. E; *see also, e.g.*, Roberts-WA Decl., Ex. 3. But in its August 26, 2025, PREP Directive to Plaintiff States, ACF stated that it decided to "change course" and refrain from conducting a medical accuracy review until *after* Plaintiff States removed "gender ideology" from their materials. *See* Wolf-WA Decl., Ex. 20 (PREP Directives sent to all state and territory PREP grantees); Matthew Decl., Ex. F (same). On this record, the Court infers that, in imposing the Gender Conditions, what HHS really seeks is to implement the administration's policy preferences. The "medical accuracy review" was mere pretext. But after HHS discovered that curricula materials that reference gender identity would survive a medical accuracy review, it then invented a second pretext—that "gender ideology is outside the scope of the authorizing statute." *Id.*

In sum, HHS fails to show that the new grant conditions are reasonable, let alone offer any reasonable explanation, other than pretext, for its action. HHS provides no evidence that it made factual findings or considered the statutory objectives and express requirements, the relevant data, the applicable anti-sex-discrimination statutes and its own regulations or Plaintiff States' reliance interests.

On this record, the Court concludes that Plaintiff States are likely to succeed on the merits of their APA claim that Defendants' actions are arbitrary and capricious. This factor supports injunctive relief.

3. *Agency Action Contrary to Constitutional Right, Count 3*

Plaintiff States assert that HHS's imposition of the new grant conditions is contrary to constitutional right [or] power because it violates the Separation of Powers doctrine and the Constitution's Spending Clause. Pl. Mot. at 20. The APA requires a court to "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right [or] power[.]" 5 U.S.C. § 706(2)(B).

As explained below, on the record here, the Court concludes that Plaintiff States are likely to prevail on their APA claim that HHS acted "contrary to constitutional right [or] power." This factor supports injunctive relief.

4. *Violation of the Separation of Powers, Count 5*

Plaintiff States contend that HHS's imposition of the Gender Conditions violates the Separation of Powers doctrine because HHS seeks to "rewrite funding conditions" on PREP and SRAE programs that "conflict with the enabling statutes and [that] were not authorized by Congress." Pl. Mot. at 28.

"The United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco*, 897 F.3d 1225, 1231 (9th Cir. 2018) (citing the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, and the Spending Clause, U.S. Const. art. I, § 8, cl. 1) ("As Alexander Hamilton succinctly put it, Congress 'commands the purse.' The Federalist, No. 78. James Madison

underscored the significance of that exclusive congressional power, stating, '[t]he power over the purse may [be] the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people.' The Federalist, No. 58."). The Constitution also vests Congress, not the Executive, with the exclusive power to legislate, Art. I, Sec. 1. "Congress may attach conditions on the receipt of federal funds[] and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *Id.* at 1232 (quoting *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987)).

The Executive does not have plenary power. The Executive authority is limited to those powers specifically conferred by Article II of the Constitution and by federal statutes. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes[,]" *City & Cnty. of San Francisco*, 897 F.3d at 1232 (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)) or to "decline to follow a statutory mandate or prohibition simply because of policy objections[,]" *id.* (quoting *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013)) (internal quotation marks omitted). "And when it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon." *Id.* at 1233 (quoting *Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring)).

The same is true of the Executive's agents. *Colorado v. Dep't of Health and Human Servs.*, 788 F. Supp. 3d at 308–09. Administrative agencies have no power

to unilaterally impose conditions on federal funding without Congressional authorization. *See, e.g.*, *City & Cnty. of San Francisco*, 897 F.3d at 1231, 1234–35 (withholding federal grants from sanctuary cities and counties without congressional authorization violated separation of powers); *City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020) (imposing "extra-statutory conditions on federal grant awards as a tool to obtain compliance with [the executive's] policy objectives strikes at the heart of . . . the separation of powers.").

Courts have held that funding conditions requiring compliance with the executive definitions of "gender ideology" violate the separation of powers. *Washington v. Trump*, 768 F. Supp. 3d 1239, 1262–63 (W.D. Wash. 2025) (executive order imposing "gender ideology" funding conditions violated separation of powers); *Martin Luther King, Jr. Cnty.*, 785 F. Supp. 3d at 886 (executive order imposing "gender ideology" and anti-DEI funding conditions violated separation of powers); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 432–43 (D. Md. 2025) (executive order imposing funding conditions on medical institutions that would deny recipients gender-affirming care violated separation of powers).

HHS argues that *Washington v. Trump* and *Martin Luther King, Jr. Cnty.* are distinguishable from this case because they "involved executive overreach." Def. Resp. at 30. HHS explains that, in *Washington v. Trump* and in *Martin Luther King, Jr. Cnty.*, "the Executive Branch imposed new conditions on federal funding that were not authorized by Congress [and] were found to encroach on Congress's exclusive prerogative to set the terms and scope of federal grants." *Id.* But that is

exactly the case here. The only distinction—and it is a distinction without a difference—is that, in the former cases, the President used an executive order to affect his overreach. Here, the President uses an executive agency to affect his overreach.

HHS argues that it "has the authority to enforce content standards that align with statutory objectives." *Id.* But as explained above, HHS's new "content standards," the removal of gender identity references, contradicts the express statutory requirements and is unmoored from the statutory purpose. "[C]ourts must presume that a legislature says in a statute what it means" and must "enforce [the statute] according to its terms." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

Where, as here, an executive agency takes an action that flouts a statute, it violates the Separation of Powers doctrine. On this record, the Court concludes that Plaintiff States are likely to succeed on the merits of their Separation of Powers claim. This factor supports injunctive relief.

5.    *Violation of the Spending Clause, Count 4*

Plaintiff States contend that HHS violates the Spending Clause because (1) it seeks to impose the Gender Conditions retroactively (for fiscal years 2023, 2024, and 2025), and (2) it fails to define "gender ideology"[9] and thus fails to give Plaintiff States the requisite "clear notice" of the funding conditions. Pl. Mot. at 25.

---

[9] Plaintiff States maintain that "to the extent that the definition [of gender ideology] comes from the January 2025 Executive Order, it is hopelessly vague and relies on unscientific definitions of 'male' and 'female.'" Pl. Mot. at 25. According to

Under the Constitution's Spending Clause, "Congress shall have Power to lay and collect Taxes . . . to . . . provide for the . . . general Welfare of the United States." Art. I, Sec. 8, cl. 1, U.S. Constitution.  The Spending Clause vests Congress with "broad power . . . to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022).  Although Congress has broad power to attach conditions to the receipt of federal funds, the power is not unlimited. *South Dakota v. Dole*, 483 U.S. at 206–07.  "If Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously[]" so that "the States can knowingly decide whether or not to accept those funds." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 24 (1981).  "The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the [grant] terms." *Id.*  States "cannot knowingly accept conditions of which they are unaware or which they are unable to ascertain." *Id.*

The Spending Clause applies not only to Congress but also to agencies that implement spending legislation.  *San Francisco Unified Sch. Dist.*, 789 F. Supp. 3d at 744.  "The Ninth Circuit has held that the Spending Clause 'appl[ies] to agency-

---

the E.O., "male" is the sex that produces the small reproductive cell at conception, and "female" is the sex that produces the large reproductive cell at conception, but zygotes do not produce reproductive cells at conception.  E.O. 14,168, § 2(f); *see* Millington Decl. ¶¶ 47–48 (explaining that, at conception, "an egg and a sperm combine to form a zygote[,]" but "a zygote at conception has not yet gone through sex differentiation and cannot be easily labeled male and female. . . . It does not have gonadal sex, anatomical sex, or gender identity.  It does not have the ability to produce its own reproductive cells, large or small.").

drawn conditions on grants to states and localities just as they do to conditions Congress directly places on grants.'" *Id.* (quoting *City of Los Angeles v. Barr*, 929 F.3d 1163, 1176 n.6 (9th Cir. 2019)) ("We see no reason why the addition of an agency middleman either expands or contracts Congress's power to 'provide for the . . . general Welfare[.]'"). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986).

HHS asserts that the funding conditions are not retroactive, that the Gender Conditions "appl[y] prospectively to grant expenditures that occurred after October 1, 2025." Def. Resp. at 26. But the record does not support HHS's assertion. First, the PREP Directive subject line (for Washington) states: "RE: State Personal Responsibility Education Program grants for Fiscal Years 2023 (#2301WAPREP), 2024 (#2301WAPREP), and 2025 (#2501WAPREP)." Roberts-WA Decl. Ex. 5; *see also* Matthew Decl., Ex. F. Second, the PREP Directive states that ACF has deemed "gender ideology" "outside the scope of the authorizing statute." *Id.* Given that the authorizing statutes have remained unchanged through several funding cycles, any content deemed outside that scope now was also outside that scope in earlier cycles. Finally, Defendants identify no language in the relevant documents that inform Plaintiff States that the Gender Conditions are not retroactive. Congress's power to legislate under the spending power "does not include surprising participating states with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25. The Court concludes that even if HHS had the power to attach the Gender Conditions to

the PREP and SRAE grants—it does not—those conditions violate the Spending Clause because they are retroactive and deprive Plaintiff States of clear notice and the ability to knowingly and voluntarily accept them.

HHS argues that "the 'gender ideology' condition is not impermissibly vague." Def. Resp. at 26. HHS argues that the term "is defined in the NOA terms and conditions" and that "ACF has meticulously outlined specific examples of gender ideology content that the agency identified in its August 26, 2025, directive letters." Id. The NOA terms and conditions define "gender ideology" as teaching that

> gender identity is distinct from biological sex or boys can identify as girls and vice versa, or that there is a vast spectrum of genders that are disconnected from one's sex.

See, e.g., Roberts Decl., Ex. 4. ACF's letters show that a broad range of content is deemed to be "outside the statutory authority," and among the content that ACF "flagged" are the terms, "gender identity," "LGBTQ," "sexual orientation," homosexual," "heterosexual," and any reference to "gender." See examples supra. ACF flagged whole paragraphs instructing facilitators to create respectful environments including, for example, from the Be Proud Be Responsible! Facilitator Curriculum Manual, used by four Plaintiff States:

> Demonstrate acceptance and respect for all participants, regardless of personal characteristics, including race, cultural background, religion, social class, sexual orientation or gender identity.

See, e.g., Blessing-DE Decl., Ex. D, ECF No. 19 at 30. And ACF flagged whole paragraphs from the Making Proud Choices! Curriculum Manual, used by eleven Plaintiff States:

> Respect diversity: Let's keep in mind that there's diversity in society and in the group. Individuals come from different family backgrounds, different racial and cultural groups and different living situations. Some young people have already had romantic relationships; others aren't even thinking about it. Some have had sexual intercourse. Some have had sex because they choose to; other's may have had sex against their will. Some may identify as gay, lesbian, bisexual or straight. Some may identify as male, female or transgender.

*See, e.g.*, Woodrich-MN Decl., Ex. G. Given this broad range of material deemed by ACF to be "gender ideology," and given that because the term lacks scientific or any other discernable basis, it is likely undefinable, the Court concludes that it is too vague to give Plaintiff States notice of what ACF expects from them. Again, even if HHS had the power to attach the Gender Conditions to the PREP and SRAE grants—it does not—the Gender Conditions violate the Spending Clause because they are ambiguous.

On this record, the Court concludes that Plaintiff States are likely to succeed on the merits of their Spending Clause claim. This factor supports injunctive relief.

B.    *Irreparable Harm*

"A plaintiff seeking preliminary relief must 'demonstrate that irreparable injury is likely in the absence of an injunction.'" *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (quoting *Winter*, 555 U.S. at 22). "A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (quoting *Winter*, 555 U.S. at 22). "The analysis focuses on irreparability, 'irrespective of the

magnitude of the injury.'" *Azar*, 911 F.3d at 581 (quoting *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999)).

To demonstrate irreparable harm, a plaintiff must show a "sufficient causal connection between the alleged irreparable harm and the activity to be enjoined." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 823 (9th Cir. 2018) (internal quotation marks and citation omitted). "[B]ut, a plaintiff 'need not further show that the action sought to be enjoined is the exclusive cause of the injury.'" *Id.* at 819 (quoting *M.R. v. Dreyfus*, 697 F.3d 706, 728 (9th Cir. 2012)).

As a threshold matter, Defendants contend that "Plaintiffs request an extraordinary order to unwind what has already occurred—a so-called 'mandatory' injunction." Def. Resp. at 32. "Such an injunction is 'particularly disfavored.'" *Id.* (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)) (cleaned up). Plaintiff States reply that they "seek a prohibitory preliminary injunction, not a mandatory one." Pl. Reply at 25. They maintain that they seek to preserve the status quo by enjoining the imposition of the Gender Conditions. *Id.* The Court agrees. Plaintiff States do not ask this Court to "unwind" anything; they seek to preserve the status quo. "The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy.'" *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)); *see also Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023)

(the status quo is the "'legally relevant relationship between the parties before the controversy arose'") (quoting *Ariz. DREAM Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014)).   Here, Plaintiff States have neither used the grant funds that they were awarded in the NOAs nor accepted the Gender Conditions.  And the PREP Directive does not alter the status quo because it triggers no action until after the October 27, 2025, deadline.  The status quo is thus the same state of affairs that existed at the time Plaintiff States received their Notices of Awards.

As to allegations of irreparable harm, Plaintiff States assert that HHS's actions "have forced Plaintiff States into an untenable dilemma" of forgoing essential public health education funding or complying with unlawful funding conditions.  Pl. Mot. at 14, 28.

If Plaintiff States decline PREP and SRAE funding, Plaintiff States allege that they will suffer "an immediate loss of at least $35 million[.]"  Pl. Mot at 29.  Plaintiff States provide an extensive record of the harms that likely will flow from that loss.  *Id.* at 29–31.  On the other hand, Plaintiff States allege that "complying with the unlawful funding conditions is no less injurious."  *Id.* at 32.

Plaintiff States provide an extensive record of the harms that likely will flow from the loss of PREP and SRAE funding.  Those harms include (1) an impaired ability to provide public health services; (2) an impaired ability to sustain public health infrastructure and delivery networks; and (3) an impaired ability to protect the public health generally.

1.    *Harm to Public Health Services*

Without federal PREP and SRAE funding, Plaintiff States contend that they "will not be able to provide critical education and services to the youth populations that need them most[,]" services to high risk, inaccessible, or geographically remote youth populations. Pl. Mot. at 29. And because the school year is already underway, Plaintiff States have already committed funding to curricula, training, subrecipients, technical support, and subject matter experts. *Id.* at 22–23.

As to the inability to provide services, Minnesota attests, for example, that without SRAE funding, it will not be able to provide "medically accurate, culturally competent" sexual health education each year to hundreds of families in federally recognized tribal communities, some of which are in remote regions of Minnesota. Woodrich-MN Decl. ¶ 35(b). Minnesota uses SRAE funding to pay a subrecipient to provide culturally appropriate services in the Ojibwe language and is one of the few, if not only. subrecipients who could do so. *Id.*; *see also, e.g.*, Thomas-Jones-DE Decl. ¶¶ 19-20, ECF No. 69 (without PREP funding, Delaware cannot serve vulnerable middle and high school-aged youth, including homeless youth, youth in foster care, and youth in correctional settings); Liu-OR Decl. ¶¶ 5, 23 (without PREP funding, Oregon cannot serve almost 1,300 youth with Intellectual and Developmental Disabilities); Vigil-CT Decl. ¶ 18 (without PREP funding, Connecticut cannot serve youth aging out of foster care, homeless youth, youth with HIV/AIDS, victims of human trafficking, pregnant or parenting youth who are under age 21, and youth who live in rural areas or areas with high teen birth rates); Bell-MA Decl. ¶ 14, ECF No. 26 ("PREP has been a primary source (and one of the few sources) of grant

funding for educational programming concerning prevention of teen pregnancy and STIs in Massachusetts schools in communities with high rates of teen pregnancy and STIs. Loss of PREP grant funding for such schools will make it more difficult for them to provide this critical educational programming."); Roberts-WA Decl. ¶¶ 34, ("PREP funding is the only funding DOH has dedicated to sexual health education."); Campagna-RI Decl. ¶ 18 (same); Brown-NJ Decl. ¶ 26 (same); Davis-NY Decl. ¶ 42 (same).

### 2.    *Harm to Public Health Infrastructure*

Without federal PREP and SRAE funding, Plaintiff States contend that they will suffer harm to public health infrastructure, including the loss of "access to vital training and technical support from subject matter experts[,]" Pl. Resp. at 29, and "harm [to] state agencies' workforce, planning, and partnerships[,]" *id.* at 31.

In Washington, "[t]he PREP Directive throws into disarray [Washington Department of Health's ("DOH")] ability to incur and pay for contracted services that are not currently subject to any modified or supplemental terms and conditions." Roberts-WA Decl. ¶ 27. As a result, Washington's contract with Cardea, its main training partner, has lapsed. *Id.* at ¶ 28. Without Cardea, DOH loses its capacity to assist school districts with planning sexual health education curricula, performing needs assessments, answering questions about district-specific issues, holding parent/caregiver workshops, and providing ongoing support throughout the school year. Sharnbroich-WA Decl. ¶¶ 8–9, 14; Rossman-WA Decl. ¶¶ 7, 9, 10, ECF No. 12; Smith-WA Decl. ¶¶ 6, 7, 8, ECF No. 13; *see also* Baney-OR Decl. ¶ 12 (without SRAE

funding, loss of capacity "to provide trainings for teachers and peer educators and update . . . program materials to ensure medical accuracy"); Davis-NY Decl. ¶¶ 41, 47 (confusion for NYSDOH, its PREP and SRAE sub-grantees, and partners, loss of "critical capacity," severely impaired ability to budget and plan for the future, loss of "referrals [to] connect[] youth to vital services" such as mental health and reproductive health services, substance abuse counseling, nutrition services (food pantry, soup kitchen), employment services, medical and dental services); MN-Woodrich Decl. ¶ 28 (Loss of PREP and SRAE funding "would leave [partner] community organizations without . . . resources to support Minnesota's most vulnerable youth populations and also may threaten these organizations' ability to maintain staff positions"); Tran-WI Decl. ¶¶ 4, 22 (loss of community-based sub-awardees who provide sexual health education services for youth at ten high schools, three residential care facilities, and two community sites); Liu-OR Decl. ¶ 19 ("immense confusion" for agency, partners, community-based organizations, and local school districts, loss of ability "to implement new sites, build sustainability, and increase number of youths served per year[,]" dismantl[ing of] OHSU partnership that provides sexual health education support for teachers, school districts statewide and community-based partners to provide services to developmentally and disabled youth); Blessing-DE Decl. ¶ 21 (loss of professional development activities and training for teachers and community-based providers who deliver sexual health education to adolescents, loss of evidence-based materials that reach 3,000 youth annually, loss of workshops and parent and community outreach, loss of critical

supports that will "significantly limit the capacity of educators, families, and communities to engage adolescents in informed, healthy decision-making"); Barnes-DC Decl. ¶¶ 19–20 (loss of capacity to reach "high-risk youth populations including those in foster care, juvenile justice systems, homeless/runaway youth, and LGBTQ+ youth" via partners); B. Johnson-IL Decl. ¶ 29 (loss of capacity to provide sexual health prevention services to youth and loss of referrals and resources for other vital services within participants' communities); Lyon-Callo-MI Decl. ¶ 22 (disruption of statewide collaboration and professional development, staff reductions at both state and local levels, loss of youth development programming, including "adulthood preparation and youth advisory councils" that provide "over 3,000 youth in high-need areas" with "instruction, mentorship, and supportive relationships with trusted adults."); Va-ME Decl. ¶ 27 (Without funding, we are "forced to contemplate reducing or terminating the contract with Family Planning Association of Maine [and] would need to evaluate which services could continue without this funding, if any, exist."); Suzuki-HI Decl. ¶ 4 (loss of PREP-funded sexual health education programs at "15 school districts and 244 community-based youth organizations.").

3.    *Harm to Ability to Protect the Public Health*

Without federal PREP and SRAE funding, Plaintiff States contend that they also suffer harm to their ability to protect the public health. Pl. Resp. at 30–32. Agency actions that increase public health risks may result in irreparable harm. *See, e.g.*, *State v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1074 (N.D. Cal. 2018) (finding irreparable harm from agency rule that "will have irreparable consequences

for public health") (citation omitted); *Sierra Club v. Dep't of Agric., Rural Utils. Serv.*, 841 F. Supp. 2d 349, 358 (D.D.C. 2012) (finding irreparable harm from agency action that increases public exposure to pollutants resulting in an increased threat to public health).

Plaintiff States attest that the PREP and SRAE programs have proven to be highly effective in decreasing sexual health risk behaviors in adolescents[10] and that without such interventions, Plaintiff States will suffer increased social and economic costs due to the "inevitable increase in unplanned pregnancy, higher birth rates, and higher rates of HIV and other STIs among young people in vulnerable populations." Pl. Mot. at 30; Wolf-WA Decl., Ex. 11 at 12, HHS, ACF PREP PERFORMANCE MEASURES FINAL REPORT: 2013-2017 (2021) ("Pregnancies and STIs pose negative

---

[10] During the 2020–21 reporting period, PREP providers operated 457 programs and served 73,081 youth. Wolf-WA Decl. Ex. 10 at 3, ECF No. 7-10. HHS, PREP STUDIES OF PERFORMANCE MEASURES AND ADULTHOOD PREPARATION SUBJECTS (PMAPS) FACT SHEET (Feb. 2023). At program conclusion, just over half of high school-age and older youth planned to abstain from sex for at least three months as a result of PREP. *Id.* at 5. Among those who did not plan to abstain, 41% said PREP made them less likely to have sex in the next three months, 65% said they were more likely to use condoms if having sex, and 59% said they were more likely to use other forms of birth control. *Id.*; *see also* Sandra Anti Eyiah & Adrienne Duke-Marks, *Evaluating Associations of the Personal Responsibility and Education Program (PREP) with Adolescents' Sexual Health and Relationship Advocacy*, 20 Am. J. Sexuality Educ. 1 (2025) (finding that participation in PREP is associated with positive outcomes in adolescents' sexual health indicators, behavioral intent, and relationship advocacy). Most participants reported that PREP helped them better understand what makes a relationship healthy, made them more likely to respect others, and to resist pressure to participate in sexual acts. *Id.* Most youth reported positive perceptions of PREP, with 88% reporting that they felt "respected as people." *Id.*; *see also* Wolf-WA Decl. Ex. 11 at 34–40, ECF No. 7-11. HHS, ACF PREP PERFORMANCE MEASURES FINAL REPORT: 2013-2017 (2021) (youth participants consistently reported that PREP programs were helpful, engaging, and made them feel safe and supported).

consequences for both the teenagers who experience them and society, including billions of dollars in health care and taxpayer costs"); Wolf-WA Decl., Ex. 5, CDC, SEXUALLY TRANSMITTED INFECTIONS PREVALENCE, INCIDENCE, AND COST ESTIMATES IN THE UNITED STATES (2024) (STIs cost the American healthcare system nearly $16 billion in healthcare costs).

In Michigan, the "[l]oss of PREP funding would threaten Michigan's historic reductions in teen pregnancy, as the program is central to the state's prevention strategy." Lyon-Callo-MI Decl. ¶ 22. Minnesota reports that PREP funding is vital to its youth STI reduction approach especially since it "does not have alternative funding."

> In recent years, Minnesota, consistent with national trends has been experiencing an increase in the rate of sexually transmitted infections. Minnesota adolescents have disproportionally higher rates of STIs compared to the rest of the Minnesota population. . . . Some youth are at higher risk than others for STIs. . . . LGBQ and gender expansive youth are less likely to engage in safe sexual health behaviors. In 2022, 9th and 11th grade LGBQ students who had sex were more likely than heterosexual peers to report having used drugs or alcohol before the last time they had sex[] . . . [and] less likely . . . to report having spoken to every partner about preventing STIs and HIV.

Woodrich-MN Decl. ¶¶ 28, 33; *see also, e.g.*, Spicer-NY Decl. ¶ 15, ECF No. 30 (reporting results from a two-year study showing "increased ability to access health information, use condoms or birth control, and say 'no' to sex" among youth who participated in PREP program); Castillo-CO Decl. ¶ 17 (any reduction in the reach or efficacy of the PREP-funded sexual education health programs, which currently serve Colorado's rural and underserved communities, "will place vulnerable youth at risk of unintentionally becoming pregnant or contracting STIs, deteriorating the

public health."); L. Johnson-ME Decl. ¶ 20 (Funding loss will take away youth opportunities to learn from trusted adults trained to provide "trauma-informed, comprehensive sexual health education" in "[a]lternative education and life skills programs and other close knit learning environments" and "will put young people at further risk, leave them vulnerable to misinformation, ill-equipped to navigate intimate relationships, more prone to unsafe behaviors and situations[.]").

4.    *Harms from the Gender Conditions*

On the other hand, Plaintiff States maintain that if they accept their PREP and SRAE awards and the attached Gender Conditions, they violate state and federal anti-sex-discrimination laws and state laws and policies that require gender diverse sexual health education.  Pl. Mot. at 14, 8 n.6–9 (citing Plaintiff States' anti-sex-discrimination laws and policies).  *See, e.g.*, Castillo-CO Decl. ¶ 17; Vigil-CT Decl. ¶ 16; Blessing-DE Decl. ¶ 18; Suzuki-HI Decl. ¶ 16; Va-ME Decl. ¶ 17; Blodgett-MA Decl. ¶ 17; Liu-OR Decl. ¶ 18; Baney-OR Decl. ¶ 12; Tran-WI Decl. ¶ 18.

Plaintiff States also maintain that removing evidence-based gender identity references from PREP and SRAE curricula they will diminish the programs' efficacy and harm gender minority students.  Pl. Mot. at 32 (citing authorities); *see also* Millington Decl. ¶¶ 39, 43, 44 (including gender identity in comprehensive sexual health education is supported and recommended by numerous professional organizations; if educational programs "incorrectly insist that sex and gender are binary, they cannot adequately educate [gender minority youth] . . . [who] are at

increased risk for high[-]risk sexual behaviors and negative sexual health outcomes[.]") (citing authorities).

Maryland, which serves the DC Metro area, attests that compliance with the PREP Directive, will "modif[y] current programming to be less responsive to youth experience in Washington [D.C.] and Prince George's Counties [and] reduc[e] the desirability of participation." Sullivan-MD Decl. ¶ 20. "Modifying programs to not reflect local youth experience will reduce engagement and hamper statutorily required messaging regarding delaying sexual activity, increasing condom or contraceptive use for sexually active youth, or reducing pregnancy among youth." *Id.* "In Prince George's County in particular, this modification will decrease community discourse around healthy sexual behaviors." *Id.* This is especially important because in 2019, the federal government recognized Prince George's County as having one of "the highest HIV disease burden[s]" in the country. *Id.*; *see also* Castillo-CO ¶ 20 ("Some youth served [in Colorado's rural and underserved communities] identify as LGBTQ+ and will be directly harmed . . . by discriminatory or non-inclusive alterations to current programming. These youth often suffer from trauma, may be more prone to high-risk behaviors, and are in environments where quality sexual health education is not otherwise available. Absent quality education, these population segments will be at increased risk of endemic STIs, unintended pregnancies, and will suffer from continued marginalization as a result."); Johnson-ME Decl. ¶ 20 ("Removing any mention of gender diversity throughout the curriculum . . . erases and harms vulnerable transgender and non-binary youth[.]");

Woodrich-MN Decl. ¶ 34 (describing research articles emphasizing the importance of sex education that is culturally appropriate and that is inclusive of LGBTQ+ youth); Hermann-MI Decl. ¶ 21 ("specific harms to transgender youth as a result of erasure and rejection are documented in national, state, and local data"); Campagna-RI Decl. ¶ 19 ("Elimination of this programming and revisions to language inclusive of gender identity would contribute harm to LGBTQ+ youth."); Davis-NY Decl. ¶ 56 ("[C]ensoring the curricula by removing all references to gender identity and gender roles would drastically decrease these programs' efficacy [and] harm the very communities the programs were designed to serve.").

The Court concludes that Plaintiff States provide substantial record evidence that without PREP and SRAE funding, they will likely suffer (1) a significantly impaired ability to deliver medially accurate and complete and culturally appropriate sexual health education services to youth; (2) a significant loss of public health infrastructure and capacity to reach youth, families, and communities; and (3) a significantly impaired ability to protect the public health. Plaintiff States also provide substantial record evidence that if they accept their PREP and SRAE awards with the attached Gender Conditions, they will violate state anti-discrimination laws and policies and will likely suffer an inability to protect the public health because the sex health education they provide will be medically inaccurate and culturally inappropriate and will harm youth.

    5.  *Defendants' Response*

HHS first responds that "Plaintiffs have failed to make a sufficient showing of irreparable harm here because the harm to the named Plaintiffs is economic in nature." Def. Resp. at 32.

The general rule is that "the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). "But the general rule that '[e]conomic harm is not normally considered irreparable' does not apply where there is no adequate remedy to recover those damages, such as in APA cases." *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 408 F. Supp. 3d 1057, 1121 (N.D. Cal. 2019), aff'd sub nom. *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 981 F.3d 742 (9th Cir. 2020) (quoting *Azar*, 911 F.3d at 581). Here, if HHS's action is not enjoined, Plaintiff States will lose $35 million. Although economic harm is not normally considered irreparable, such harm is irreparable here because there are no remedies that can compensate for the loss of grant funding. Nor is there any remedy for the public health harm that will result from the loss of effective sexual health education interventions. *Planned Parenthood of Greater Washington & N. Idaho v. Dep't of Health & Hum. Servs.*, 328 F. Supp. 3d 1133, 1151 (E.D. Wash. 2018) (monetary remedies are "inadequate to compensate for the injury to the youth and communities that Plaintiffs serve.").

HHS next argues that if Plaintiff States "make[] the voluntary decision to forego funds, any subsequent economic harm cannot constitute an irreparable injury attributable to the federal government." Def. Resp. at 33. HHS also argues that any

harm from "Plaintiffs' own decisions to refrain from supporting [sexual health education and services to youth populations] . . . would be entirely attributable to Plaintiffs' own decisions." *Id.* at 34. The Court finds HHS's arguments disingenuous and unavailing. HHS intentionally presented Plaintiff States with a Hobson's Choice to ensure that Plaintiff States have no choice that avoids irreparable harm. The Hobson's Choice is of the government's making and any harm that flows from that choice is directly attributable to the government. "[H]aving to decide between two losing options constitutes irreparable injury because very real penalty attaches to [plaintiffs] regardless of how they proceed." *S.F. Unified Sch. Dist. v. Americorps*, No. 25-CV-02425-EMC, 2025 WL 1713360, at *4 (N.D. Cal. Mar. 31, 2025) (internal quotation marks and citation omitted); *see also Martin Luther King, Jr. Cnty.*, 785 F. Supp. 3d at 889–90 (where federal "[d]efendants have put [p]laintiffs in the position of having to choose between accepting conditions that they believe are unconstitutional, and risking the loss of hundreds of millions of dollars in federal grant funding, including funding that [plaintiffs] have already budgeted and are committed to spending[,]" plaintiffs show likelihood of irreparable harm).

Finally, HHS argues that Plaintiffs' "[irreparable harm] argument[s] rest[] on the idea that they have no obligation to appropriate funding for their own educational programs[,]" Def. Resp. at 34, and that nothing "prohibit[s] Plaintiffs from funding and administering separate programs that allow for the inclusion of state-funded gender ideology[,]" *id.* at 35. That is, HHS suggests that Plaintiff-States use state funds to teach a curriculum that is gender-inclusive and use federal

funds to teach a curriculum that excludes gender-identity references. In essence, HHS suggests separate-but-equal sexual health education courses.

First, HHS again fails to account for Plaintiff States' reliance interests. Plaintiff States attest that school districts, in reliance on PREP and SRAE funding, "go through a lengthy process to carefully select sexual health curricula," that they "form partnerships with community organizations to provide training and support during the school year[]" and that such process "begins months in advance—often in the spring before the next school year has even started." *Id.* at 35 (quoting Rossman-WA Decl. ¶¶ 6-7; Sharnbroich-WA Decl. ¶ 8). Second, Plaintiff States maintain that they cannot remove gender identity references from their sexual health education curricula because an inclusive teaching environment is paramount to student engagement and learning. *Id.* (citing instructor manuals explaining why an inclusive teaching environment is so important). The Court agrees. HHS's "separate but equal" approach to sexual health education not only fails to meet the statutory requirements to provide "medically accurate and complete" and "culturally appropriate" sexual health education but also stigmatizes excluded students as "other" and exacerbates suicide and mental health risks for vulnerable students. *See* Millington Decl. ¶¶ 44-45.

On this record, the Court concludes that Plaintiff States have shown that they will likely suffer irreparable harm absent injunctive relief.

      C.     *Balance of the Equities and the Public Interest*

"Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman*, F.3d at 940–41. As to the "balance of equities" analysis, a court must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation marks and citation omitted). In contrast, the "public interest" analysis "primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014).

Here, Defendants argue that the public is harmed "when the federal government is forced to pay out funds under terms that do not comply with the statutory purpose of these funds because it may not be able to recover them." Def. Resp. at 36. The Court has already addressed HHS's baseless argument that Plaintiff-States' comprehensive sexual health education curricula does not comply with the statutory purpose. In fact, the opposite is true. Plaintiff States have shown that evidence-based comprehensive sexual health education reduces adolescent sexual health risk behaviors and adolescent rates of pregnancy and STIs in furtherance of the statutory purpose. And the public is benefitted from the resulting decreased public health risks and costs.

HHS also asserts that it will be injured by preliminary relief because it interferes "with HHS's lawful administration of the PREP and SRAE grant programs, as well as the agency's lawful discretion." Again, for agencies that

administer statutes, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington*, 569 U.S. at 297. An agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n*, 476 U.S. at 374. As discussed above, the imposition of extra statutory conditions on non-discretionary grant funds is not a lawful administration of those grant programs. An executive agency "may not decline to follow a statutory mandate or prohibition simply because of policy objections." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) (quoting *In re Aiken Cnty.*, 725 F.3d at 259; *see also Colorado v. U.S. Dep't of Health & Hum. Servs.*, 788 F. Supp. 3d at 314 ("Agencies do not have unfettered power to further a President's agenda, particularly when Congress appropriated this money to the States to fund their public health systems and initiatives."). The public interest is served by observing the Separation of Powers between the branches, not by executive overreach.

In contrast, Plaintiff States have shown that without injunctive relief their ability to protect the public health, especially as to high-risk youth populations, will be impaired. "The States' interest in safeguarding its public health systems is clearly paramount." *Colorado v. U.S. Dep't of Health & Hum. Servs.*, 788 F. Supp. at 314. On this record, the Court concludes that the balance of the equities and public interest tip strongly in Plaintiff States' favor.

Plaintiff States have shown that preliminary relief is warranted. Plaintiff States are likely to succeed on at least one claim, if not all of them; they sufficiently

showed that would likely suffer irreparable harm without preliminary relief; and the balance of equities combined with the public interest tips in their favor.

Defendants argue that the Court should refrain from imposing a "universal injunction," which prohibits the "enforcement of a law or policy against anyone," as opposed to injunctions that prohibit "executive officials from enforcing a challenged law or policy only against the plaintiffs in the lawsuit." Def. Resp. at 36 (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025)). Plaintiff States reply that they "seek only a preliminary injunction that would prevent enforcement of the challenged directives against the Plaintiff States themselves." Pl. Reply at 30.

IV.    *Administrative Stay*

Defendants ask the Court to grant an administrative stay "to allow for orderly briefing in the Court of Appeals." Def. Resp. at 38. "[A] federal court can stay the enforcement of a judgment pending the outcome of an appeal[.]" *Nken v. Holder*, 556 U.S. 418, 421 (2009). The granting of a stay is an exercise of judicial discretion that depends on the circumstances of the particular case. *Id.* at 432. "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* Here, Defendants do not argue the *Nken* factors and do not meet their burden to show that a stay is warranted.

Even if Defendants had argued the *Nken* factors, they would not carry such burden. That is so because "an administrative stay is only intended to preserve the status quo until the substantive motion for a stay pending appeal can be considered on the merits." *Nat'l Urban League v. Ross*, 977 F.3d 698, 700–01 (9th Cir. 2020)

(internal quotation marks omitted) (quoting *Doe #1 v. Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019)).  Here, it is the preliminary injunction that preserves the status quo. An administrative stay would have the opposite effect by allowing the PREP Directive to go into effect with likely termination of Plaintiff States' PREP and SRAE grants—the very harm the injunction seeks to prevent.  For this reason, the Court declines to grant an administrative stay.

V.    *Bond*

Defendants request that any injunctive relief be conditioned on a bond.  Under Federal Rule of Civil Procedure 65(c), a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  "Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*."  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks omitted) (emphasis in original) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)).  "The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."  *Id.* Further, a bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases).

Here, given that Plaintiff States have for years been implementing PREP and SRAE programs that are "medically accurate and complete" and "culturally appropriate," the Court concludes that there is no realistic likelihood of harm to HHS from enjoining the imposition of the Gender Conditions. Further, where Plaintiff States allege that HHS's imposition of the conditions is unconstitutional, in excess of statutory authority, and arbitrary and capricious, it "would defy logic—and contravene the very basis of this opinion—to hold the States hostage for the resulting harm." *Colorado v. U.S. Dep't of Health & Hum. Servs.*, 788 F. Supp. 3d at 315 (internal quotation marks and citation omitted). For these reasons, the Court declines to issue a bond.

## CONCLUSION

For the above reasons:

1. Plaintiff States' Motion for Preliminary Injunction, ECF No. 2, is GRANTED;

2. HHS and its officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them (collectively "Enjoined HHS Parties") are enjoined from (1) imposing or enforcing the Gender Conditions as defined in the Plaintiff States' Motion for Preliminary Injunction or in PREP Directive, the NOAs, and the Supplemental T&Cs or any materially similar terms or conditions as to any PREP or SRAE funds awarded to Plaintiff States, including any other terms or conditions that require Plaintiff States to remove "gender ideology," as defined in PREP and SRAE NOAs, Supplemental T&Cs, and PREP Directive, from their PREP and SRAE curricula or that require Plaintiff States to remove gender identity references from that curricula; (2) as to Plaintiff States, rescinding, withholding, cancelling, or otherwise not processing any PREP or SRAE Agreements, or pausing, freezing, impeding, blocking, cancelling, terminating, delaying, withholding, or conditioning PREP or SRAE funds, based on such terms or conditions, including without limitation failing or refusing to process and otherwise implement grants signed with

changes or other objection to conditions enjoined by this preliminary injunction; (3) requiring Plaintiff States to make any "certification" or other representation related to compliance with such terms or conditions; and (4) refusing to issue, process, or sign PREP or SRAE Agreements based on Plaintiff States' participation in this lawsuit;

3. The Enjoined Parties shall immediately treat any actions taken to implement or enforce the Gender Conditions, or any materially similar terms or conditions as to Plaintiff States including any delays, withholding of funds, or funding terminations as null and void and rescinded; shall treat as null and void any such conditions included in any grant agreement executed by any Plaintiff State while this injunction is in effect; and may not retroactively apply such conditions to grant agreements during the effective period of this injunction. The Enjoined Parties must immediately take every step necessary to effectuate this order, including clearing any administrative, operational, or technical hurdles to implementation;

4. Defendants' counsel shall provide written notice of this Order to all Defendants and their employees by the end of the second day after issuance of this Order;

5. By the end of the second day after issuance of this Order, Defendants SHALL FILE on the Court's electronic docket and serve upon Plaintiff States a Status Report documenting the actions that they have taken to comply with this Order, including a copy of the notice and an explanation as to whom the notice was sent;

6. This order remains in effect pending further orders from this Court.

It is so ORDERED and DATED this ___27th___ day of October 2025.


        /s/Ann Aiken
        ANN AIKEN
        United States District Judge