BRETT A. SHUMATE
Assistant Attorney General
MICHELLE BENNETT
Assistant Branch Director
JACQUELINE LAU, D.C. Bar # 90024952
Trial Attorney
Jacqueline.C.Lau@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Telephone: (202) 598-0914

*Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| STATE OF WASHINGTON, *et al.*, | Case No. 6:25-cv-01748-AA |
| *Plaintiffs*, | |
| v. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | |
| *Defendants*. | |

# TABLE OF CONTENTS

MOTION ............................................................................................................... 1

MEMORANDUM OF LAW ................................................................................... 1

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

I.      Statutory Background ................................................................................. 2

        A.      The Personal Responsibility Education Program ("PREP") .................... 3

        B.      Sexual Risk Avoidance Education ("SRAE") ........................................ 4

        C.      The "Medically Accurate and Complete" Content Requirement ............ 5

II.     Administrative Proceedings ....................................................................... 7

III.    District Court Proceedings ......................................................................... 8

STANDARD FOR JUDICIAL REVIEW ............................................................... 9

ARGUMENT ......................................................................................................... 9

I.      Gender Ideology Content Does Not Meet PREP and SRAE's Threshold Statutory
        Objectives Requirement ............................................................................. 9

II.     Because Gender Ideology Content Does Not Meet Either Statute's Objectives
        Requirement, All Plaintiffs' APA Claims Fail ......................................... 14

        A.      HHS's Decision to Remove Gender Ideology Content Is Consistent with
                Statutory Authority ............................................................................... 14

        B.      Removal of Gender Ideology Curricula Under PREP and SRAE is
                Compelled by Statute and Cannot be Arbitrary and Capricious as a
                Threshold Matter ................................................................................... 17

                1.      In any Event, Removal of Gender Ideology Curricula Was Not
                        Arbitrary and Capricious ............................................................. 18

                        a.      Removal of Gender Ideology Curricula Was Reasoned and
                                Communicated to Plaintiff States .................................... 19

                        b.      No Issue of Discrimination Exists .................................... 21

                        c.      HHS Explained Its Change in Position, and Plaintiffs'
                                Purported Reliance Interests are Unreasonable ............... 22

         d.     HHS's Decision is Rooted in Law, Not Pretext.......................... 24

C.    HHS's Actions Do Not Violate the Constitution ................................................ 25

        1.    The Gender Idology Condition Does Not Violate the Spending Clause Because It is Consistent With the Relevant Statutes, Not Retroactive, and is Not Ambiguous .......................................................... 25

        2.    HHS Did Not Violate the Separation of Powers Doctrine ....................... 27

III.    Any Judgment Should Leave HHS the Authority to Review States' Curricula on a Case-By-Case Basis ........................................................................................... 28

IV.    HHS Did Not Reach the Issue of Medical Accuracy, So the Court Cannot Either .......... 29

CONCLUSION .......................................................................................................................... 31

## TABLE OF AUTHORITIES

**Cases**

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
   548 U.S. 291 (2006) ........................................................................................... 25

*Baltimore Gas and Elec. Co. v. Nat. Res. Def. Council, Inc.*,
   462 U.S. 87 (1983) ............................................................................................. 21

*Bennett v. Kentucky Department of Education*,
   470 U.S. 656 (1985) ...................................................................................... 25, 26

*Bostock v. Clayton Cnt.*,
   590 U.S. 644, 666 (2020) ...............................................................................17, 18

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ...................................................................................... 15, 27

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
   596 U.S. 212 (2022) ........................................................................................... 25

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
   591 U.S. 1 (2020) ............................................................................................... 30

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ...................................................................................... 18, 23

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ........................................................................................... 18

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ........................................................................................... 15

*King v. Burwell*,
   576 U.S. 473 (2015) ........................................................................................... 10

*Lee v. Miller*,
   658 F. Supp. 3d 951 (D. Or. 2023) ...................................................................... 9

*Libby Welding Co. v. United States*,
   444 F. Supp. 987 (D.D.C. 1977) ........................................................................ 23

*Little Sisters of Poor Saints Peter & Paul Home v. Pennsylvania*
   140 S. Ct. 2367 (2020) ....................................................................................... 18

*Martin Luther King, Jr. Cnty. v. Turner*,
   785 F. Supp. 3d 863 (W.D. Wash. 2025) .......................................................... 28

*Michigan v. EPA*,
   576 U.S. 743 (2015) ........................................................................................... 30

*Nat'l Fed. of Indep. Bus. v. Sebelius*
(NFIB), 567 U.S. 584 (2012) .................................................. 25, 26

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) ................................................................. 23

*OCAW v. NLRB*,
46 F.3d 82 (D.C. Cir. 1995) ..................................................... 29

*Pennhurst State School & Hospital v. Halderman*,
451 U.S. 1 (1981) ..................................................................... 25

*PFLAG, Inc. v. Trump*,
769 F. Supp. 3d 405 (D. Md. 2025) .......................................... 28

*Rust v. Sullivan*,
500 U.S. 173 (1991) ...................................................... 17, 25, 26

*Satterfield v. Simon & Schuster, Inc.*,
569 F.3d 946 (9th Cir. 2009) ................................................... 10

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) ................................................................. 30

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) ................................................................. 27

*Smiley v. Citibank*,
517 U.S. 735 (1996) ................................................................. 23

*Tennessee v. Davis*,
100 U.S. 257 (1879) ................................................................. 27

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) ................................................................... 16

*Unemployment Comp. Comm'n v. Aragon*,
329 U.S. 143 (1946) ............................................................ 30, 31

*United States v. Chem. Found.*,
272 U.S. 1 (1926) ..................................................................... 24

*United States v. Daas*,
198 F.3d 1167 (9th Cir. 1999) ................................................. 10

*US Magnesium, LLC v. EPA*,
630 F.3d 188, 193 (D.C. Cir. 2011) ......................................... 17

*Washington v. Trump*,
768 F. Supp. 3d 1239 (W.D. Wash. 2025) ................................ 28

**U.S. Constitution**

U.S. Const. art. I § 8, cl. 1 ........................................................................ 27

U.S. Const. art. II § 3 ............................................................................... 27

**Statutes**

5 U.S.C. § 706 .......................................................................................... 9

42 U.S.C. § 708 ................................................................................... 20, 21

42 U.S.C. § 710 .................................................................................. *passim*

42 U.S.C. § 713 .................................................................................. *passim*

**Regulations**

2 C.F.R. § 200.211 ................................................................................... 15

45 C.F.R. § 75.371 ..................................................................................... 8

45 C.F.R. §§ 75.403-405 ............................................................................ 8

**MOTION**

Defendants file this motion for summary judgment on Plaintiffs' claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. This Motion is supported by the following memorandum of law and Defendants' certified administrative record filed on January 16, 2026 (ECF 90-97). Pursuant to LR 7-1(a), the parties conferred but were unable to resolve the need for this motion.

**MEMORANDUM OF LAW**

## INTRODUCTION

Plaintiffs—sixteen States and the District of Columbia ("Plaintiff States")—bring this action under the Administrative Procedure Act ("APA") to challenge the United States Department of Health and Human Services' ("HHS") directive to grantees in two federally-funded education programs to remove gender ideology content that falls outside the express objectives of the programs. Plaintiffs' Complaint asserts five counts against Defendants–alleging APA violations and constitutional violations of the Spending Clause and the separation of powers doctrine.

Yet, each of Plaintiffs' claims fail because the plain language of the relevant statutes establish that gender ideology curricula falls outside of the programs' purposes. The authorizing statutes contain both overarching purpose requirements, and additional content requirements for materials that further the statutory purpose. The statutes require that federally funded content be designed to educate students on abstinence or contraception for the prevention of sexually transmitted infections, specified adulthood preparation subjects, or sexual risk avoidance (i.e., voluntarily refraining from sexual activity). And HHS correctly determined that gender ideology content does not satisfy any of these purposes. Because HHS correctly interpreted the statute, all

of Plaintiffs' claims, which are premised on the absence of statutory authority for HHS's actions, fail.

Moreover, because HHS made the threshold determination that gender ideology content does not fit within the express statutory purposes, it had no occasion to consider whether such content satisfies the additional content requirements of the statutes, like medical accuracy and cultural appropriateness. The Court cannot address those questions in the first instance in this administrative record review case.

Plaintiffs may be unhappy with the plain language of the statute, or the effects Congress' chosen purposes have on their ability to obtain federal funding for their preferred education policy goals. But that does not make for a successful APA challenge. As a legal matter, Plaintiffs' claims lack merit, and the Court should grant Defendants' motion for summary judgment and enter judgment for Defendants.

## BACKGROUND

### I.    Statutory Background

The instant suit concerns two federal grant programs authorized by Congress to support states in providing education in adolescent development and sexual health. The Administration for Children and Families ("ACF"), through the Family and Youth Services Bureau ("FYSB") at HHS, administers grants under the Personal Responsibility Education Program ("PREP") and the Title V Sexual Risk Avoidance Education program ("SRAE"). PREP and SRAE grants are "formula grants," with awards calculated based on a state's youth population percentage and proportion of low-income children, respectively. 42 U.S.C. § 713(a)(1); *id.* § 710(a)(1)(B). A state may receive its PREP allotment by submitting a formal application for HHS approval, certifying compliance with the statutory requirements and "such additional requirements as

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

[HHS] may specify." *Id.* § 713(a)(1)(C)(i). To receive an allotment under SRAE, states may submit an application under the Title V Maternal and Child Health Block Grant for each fiscal year. *Id.* § 710(a)(1).

### A. The Personal Responsibility Education Program ("PREP")

PREP was established in 2010 and is authorized under the Social Security Act at 42 U.S.C. § 713. The statute requires each state to use its allotment to satisfy the objectives of the program ("Objectives Requirement"). The statute specifies that the "purpose of an allotment under [the program]" is "to enable the State . . . to carry out personal responsibility education programs consistent with this subsection." 42 U.S.C. § 713(b)(1). "[P]ersonal responsibility education program" is further defined as "a program that is designed to educate adolescents on (i) both abstinence and contraception for the prevention of pregnancy and sexually transmitted infections, including HIV/AIDS, consistent with the requirements of subparagraph (B); and (ii) at least 3 of the adulthood preparation subjects described in subparagraph (C)." *Id*. § 713(b)(2)(A). The "adulthood preparation subjects" are:

> (1) Healthy relationships, including marriage and family interactions.
>
> (2) Adolescent development, such as the development of healthy attitudes and values about adolescent growth and development, body image, racial and ethnic diversity, and other related subjects.
>
> (3) Financial literacy.
>
> (4) Parent-child communication.
>
> (5) Educational and career success, such as developing skills for employment preparation, job seeking, independent living, financial self-sufficiency, and workplace productivity.
>
> (6) Healthy life skills, such as goal-setting, decision making, negotiation, communication and interpersonal skills, and stress management.

*Id*. § 713(b)(2)(C)(i-vi).

Separate from the Objectives Requirement, the statute delineates six requirements regarding the content of authorized programs ("Content Requirements"). In addition to satisfying the statutory purpose, all education programs funded through PREP must ensure:

> (1) The program replicates evidence-based effective programs or substantially incorporates elements of effective programs that have been proven on the basis of rigorous scientific research to change behavior, which means delaying sexual activity, increasing condom or contraceptive use for sexually active youth, or reducing pregnancy among youth.
>
> (2) The program is medically-accurate and complete.
>
> (3) The program includes activities to educate youth who are sexually active regarding responsible sexual behavior with respect to both abstinence and the use of contraception.
>
> (4) The program places substantial emphasis on both abstinence and contraception for the prevention of pregnancy among youth and sexually transmitted infections.
>
> (5) The program provides age-appropriate information and activities.
>
> (6) The information and activities carried out under the program are provided in the cultural context that is most appropriate for individuals in the particular population group to which they are directed.

*Id*. § 713(b)(2)(B)(i-vi).

## B. Sexual Risk Avoidance Education ("SRAE")

The SRAE program was created in 2018 and is authorized under the Social Security Act at 42 U.S.C. § 710. Like PREP, SRAE requires states to comply with both the statute's explicit program goals and additional requirements for program materials that further those goals. SRAE's Objectives Requirement specifies that "the purpose of an allotment under [the program]" is "to enable the State … to implement education exclusively on sexual risk avoidance

(meaning voluntarily refraining from sexual activity)." 42 U.S.C. § 710(b)(1). The statute then identifies required topics that are consistent with this purpose:

> (1) The holistic individual and societal benefits associated with personal responsibility, self-regulation, goal setting, healthy decisionmaking, and a focus on the future.
>
> (2) The advantage of refraining from nonmarital sexual activity in order to improve the future prospects and physical and emotional health of youth.
>
> (3) The increased likelihood of avoiding poverty when youth attain self-sufficiency and emotional maturity before engaging in sexual activity.
>
> (4) The foundational components of healthy relationships and their impact on the formation of healthy marriages and safe and stable families.
>
> (5) How other youth risk behaviors, such as drug and alcohol usage, increase the risk for teen sex.
>
> (6) How to resist and avoid, and receive help regarding, sexual coercion and dating violence, recognizing that even with consent teen sex remains a youth risk behavior.

*Id*. § 710(b)(3)(A-F).

Separate from the Objectives Requirement, the statute delineates five requirements regarding the content of authorized programs. These Content Requirements mandate that the programming funded through SRAE: "(A) ensure that the unambiguous and primary emphasis and context for each topic […] is a message to youth that normalizes the optimal health behavior of avoiding nonmarital sexual activity; (B) be medically accurate and complete; (C) be age-appropriate; (D) be based on adolescent learning and developmental theories for the age group receiving the education; and (E) be culturally appropriate, recognizing the experiences of youth from diverse communities, backgrounds, and experiences." *Id*. § 710(b)(2)(A-E).

### C.  The "Medically Accurate and Complete" Content Requirement

As explained above, both PREP and SRAE contain a primary Objectives Requirement and subsequent Content Requirements. Among the Content Requirements, PREP and SRAE both require that education funded under these statutes be "medically accurate and complete." Under both statutes, "medically accurate and complete" is defined as "verified or supported by the weight of research conducted in compliance with accepted scientific methods" and "published in peer-reviewed journals, where applicable" or "comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete." 42 U.S.C. § 713(e)(2), § 710(e)(2).

To ensure States remain in compliance with this "medically accurate and complete" requirement, HHS mandates recipients provide program materials to FYSB for medical accuracy reviews upon request as specified in the Supplemental Terms and Conditions of the Notices of Award ("NOAs"). Administrative Record ("AR") Part 1, ECF 90-1. Conducting a medical accuracy review is an onerous task, typically only conducted every five years or upon request by FYSB. To conduct such a review, HHS requires the support of a contractor and sub-contractor to thoroughly review all documents in comparison to current medical statements of fact and in accordance with updated scientifically sound information.

HHS only conducts medical accuracy reviews of PREP and SRAE content that aligns with the statutory purpose of each program. If content is authorized under the Objectives Requirements, HHS may proceed to analyzing the content under the Content Requirements, including conducting a medical accuracy review to determine whether the content is medically accurate and complete. If the content falls outside of the scope of the authorizing statutes' Objectives Requirement upon initial review, then the content does not warrant proceeding to a medical accuracy review as any such review of the material would be irrelevant. AR Part 1, ECF

90-2. For example, HHS would not conduct a medical accuracy review of education materials describing the anatomy of the hand or otherwise assess whether the materials satisfied the statutes' Content Requirements, because teaching hand anatomy is not designed to educate students on abstinence or contraception for the prevention of sexually transmitted infections, the specified adulthood preparation subjects, or sexual risk avoidance, i.e., it does not satisfy the statutes' initial Objectives Requirements.

## II.    Administrative Proceedings

On April 14, 2025, ACF issued a letter to state grant recipients requesting PREP grantees submit curricula and programmatic materials to FYSB in anticipation of a medical accuracy review. AR Part 1, ECF 90-1. Upon initial review of the documents, and in the early stages of preparing for a medical accuracy review, HHS identified gender ideology content that fell outside of the scope of the authorizing statutes. AR Part 1, ECF 90-2. Because the content fell outside the scope of the statute, HHS did not proceed in conducting a medical accuracy review. *Id*.

On August 6, 2025, HHS issued NOAs for outstanding fiscal year 2025 PREP and SRAE awards. AR Part 1, ECF 90-3. The NOAs included Supplemental Terms and Conditions for PREP and SRAE grants and included a new condition prohibiting recipients from including gender ideology in any program or service funded by the award. *Id.* The Supplemental Terms and Conditions for both grants contained, in relevant part, the following language:

> Recipients are prohibited from including gender ideology in any program or service that is funded with this award. The statutory authority for the [PREP or SRAE] program under which this grant has been awarded . . . does not authorize teaching students that gender identity is distinct from biological sex or boys can identify as girls and vice versa, or that there is a vast spectrum of genders that are disconnected from one's sex. Therefore, gender ideology is outside of the scope of the statutory authority for this award. In

> addition, any costs associated with gender ideology are not allowable expenditures of federal grant funds or maintenance-of effort funds for this grant because they are not necessary, reasonable, or allocable for the performance of this award. See 45 C.F.R. §§ 75.403-405.

*Id.*

On August 26, 2025, HHS sent a second letter notifying grantees of the PREP statutory purpose, explaining that the statute "includes no mention of gender ideology which is both irrelevant to teaching abstinence and contraception" and that "gender ideology is outside the scope of the authorizing statute and any expenditures associated with gender ideology are not allowable, reasonable, or allocable to the PREP grant." AR Part 1, ECF 90-2. The letter instructed grantees remove all gender ideology content from their PREP materials within 60 days to remain in compliance with the authorizing statute. *Id.* Each letter contained specific examples, tailored to each grantee State, of the impermissible gender ideology content that HHS identified for removal. The August 26, 2025 letter directed the grantee States to "remove [those examples] and all similar language throughout their curricula and program materials." *Id.* If the grantee State failed to remove the requisite material, the letter provided that HHS may take "additional enforcement action" pursuant to 45 C.F.R. § 75.371. *Id.* The letters required grantee States to submit "modified curricula and materials…within sixty (60) days, and no later than Monday, October 27, 2025, at 11:59 pm." *Id.*

## III.    District Court Proceedings

Plaintiffs, sixteen states and the District of Columbia, filed this lawsuit on September 26, 2025. ECF No. 1. Plaintiffs' Complaint alleges that Defendants' actions to ensure that federally funded programs adhere to congressionally authorized subjects violate the APA and the U.S. Constitution. Plaintiffs assert that the actions taken by Defendants (1) constitute agency action

contrary to law, (2) are arbitrary and capricious, and (3) are contrary to constitutional right because they allegedly violate the Spending Clause and the separation of powers doctrine. *See* Complaint ("Compl."), ECF No. 1. That same day, Plaintiffs moved for a preliminary injunction. ECF No. 2. On October 27, 2025, the District Court entered an Opinion and Order granting the motion, enjoining Defendants from implementing the gender ideology-related condition against Plaintiffs. *See* Opinion and Order ("Op. and Order"), ECF No. 81.

## STANDARD FOR JUDICIAL REVIEW

In an APA case, the Rule 56(a) summary judgment standard, requiring the court to determine if there is a genuine issue of material fact, does not apply. *See Lee v. Miller*, 658 F. Supp. 3d 951 (D. Or. 2023). Instead, the "function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id*. at 955 (citation omitted). Under the APA, an agency action may not be set aside unless it is "arbitrary," "capricious," or "not in accordance with law." 5 U.S.C. § 706.

## ARGUMENT

### I.   Gender Ideology Content Does Not Meet PREP and SRAE's Threshold Statutory Objectives Requirement

HHS correctly determined gender ideology content is contrary to the Objectives Requirements of PREP and SRAE based on a plain reading of the authorizing statutes. The structure of the PREP and SRAE statutes make clear the distinction between the overarching Objectives Requirement and the subsequent Content Requirements. *See* 42 U.S.C. § 713(b)(2)(A-B), § 710(b)(1-2). Relying on the plain langauge and structure of the statutes, HHS correctly determined that gender ideology content does not fit within the Objectives Requirements because such content is not designed to educate students on abstinence or

contraception for the prevention of sexually transmitted infections, the specified adulthood preparation subjects, or sexual risk avoidance. HHS thus had no occassion to consider whether gender ideology content satisfies the additional Content Requirements (including medical accuracy and cultural appropriateness), as those requirements are only relevant where program content initially satisfies the statutory purpose. Because HHS's plain reading of the statutory Objectives Requirement is lawful, all Plaintiffs' claims fail.

It is well settled in the Ninth Circuit that "[t]he purpose of statutory construction is to discern the intent of Congress in enacting a particular statute. " *United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999). Therefore, courts must "first look to the language of the statute to determine whether it has a plain meaning." *Satterfield v. Simon & Schuster, Inc*., 569 F.3d 946, 951 (9th Cir. 2009). "If the statute uses a term which it does not define, the court gives that term its ordinary meaning." *Daas*, 198 F.3d at 1174. It is "[t]he plain meaning of the statute [that] controls, and courts will look no further, unless its application leads to unreasonable or impracticable results." *Id*. A court also "must read the words 'in their context and with a view to their place in the overall statutory scheme.'" *King v. Burwell*, 576 U.S. 473, 486 (2015) (citation omitted).

Here, a plain reading of both the PREP and SRAE statutes present a specific statutory structure regarding the requirements for the federally funded programs. The statutes provide a two-step process for HHS to determine whether specific content is permissible. The first step is for HHS to assess whether the content at issue aligns with the overarching Objectives Requirement for the relevant program, for example, teaching adolescents to refrain from sexual activity. If it does, and only if it does, the second step is for HHS to determine whether the

content meets the additional Content Requirements, such as the obligation to ensure that materials are medically accurate and complete and culturally appropriate.

This process is made clear by looking at the statutes. Each statute sets out in a separate provision that allotted funds are required to be used for a specified purpose. 42 U.S.C. § 713(b)(1), § 710(b)(1). For PREP, the allotment must be used to educate adolescents on "abstinence and contraception for the prevention of pregnancy and sexually transmitted infections," and specified "adulthood preparation subjects." *Id*. § 713(b)(1)-(2)(A). For SRAE, funds must be used to educate students "exclusively on sexual risk avoidance (meaning voluntarily refraining from sexual activity)." *Id*. § 710(b)(1). For education that fits within these overarching statutory Objectives Requirements, the statutes then set out, in separate provisions, additional requirements regarding content. *Id*. § 713(b)(2)(B), § 710(b)(2). The statutes' plain language and structure thus demonstrate that materials must satisfy both the Objectives Requirement and the separate Content Requirements of each program.

Here, in evaluating the curricula submitted by Plaintiff States, HHS determined that the materials on gender ideology did not pass the first step of the analysis: they did not fit within the Objectives Requirement of either statute. Consequently, HHS did not proceed to the second step of determining whether the gender ideology content met the statutes' separate Content Requirements (for example, by conducting a medical accuracy review).

HHS correctly determined that gender ideology content does not fit within the statutes' Objectives Requirements. Gender ideology content is not designed to educate students on abstinence or contraception for the prevention of sexually transmitted infections, the specified adulthood preparation subjects, or sexual risk avoidance. To educate students consistent with these statutorily designated purposes, it is not necessary to teach them that gender identity is

distinct from biological sex or that boys can identify as girls and vice versa, or that there is a vast spectrum of genders that are disconnected from one's sex. AR Part 1, ECF 90-3. This is apparent from the fact that four states (Arkansas, Utah, Georgia, and Wyoming) do not include gender ideology in their PREP or SRAE programs.

The State-specific examples of impermissible gender ideology content that HHS identified for removal in its letters to Plaintiffs, as well as additional examples in the administrative record, demonstrate that gender ideology content is not consistent with the statutory Objectives Requirements. AR Part 1, ECF 90-1, ECF 90-2.

For example, in HHS's letter to Washington, HHS identified curriculum for kindergarten students with an entire lesson dedicated to the "Gender Jamboree," which delivers the "key message" that "[s]ome people are boys, some people are girls, some people are both, and some people are neither." *Id.*, ECF 90-2 at 72. The lesson centers around a project where each kindergartener "get[s] a piece of paper that says 'girl,' 'boy,' or 'me' to indicate whether they feel like a girl, a boy, or some other way." The teacher is then instructed to "[t]ell participants that they will use art supplies to show what they feel like is their own gender identity." AR Part 7, ECF 96-4 at 11-18

In HHS's letter to Maine, HHS included an example from the "Making Proud Choices!" teacher manual that includes the following teaching: "Gender identity is your inner sense of your gender – Do you feel like a guy? Do you feel like a girl? Do you feel like something different than a guy or a girl? Often gender identity matches a person's body – someone with a girl's body feels like a girl on the inside or someone with a boy's body feels like a boy on the inside – but not always." *Id.*, ECF 90-2 at 28.

In HHS's letter to Delaware, HHS identified that a nine slide PowerPoint lesson for

middle school students dedicated to gender identity included slides that read: "Sometimes, a person's inner feelings about their gender doesn't match their body parts. For example, they have a penis, and know, 'I'm female.'" *Id*., ECF 90-2 at 17.

In addition to the examples presented by HHS in the August 26, 2025 letters to Plaintiff States, the Administrative Record reflects additional lesson plans on the topic of gender ideology submitted by Plaintiffs that do not meet the statutory Objectives Requirements:

- Washington D.C. PREP materials include a PowerPoint presentation specifically designed to teach students how to be an ally to those with differing gender identities. This presentation includes slides entitled "How can you be an ally?" and "Ally + Allyship." One slide showcases a single cartoon entitled "How to be an Ally" to those with nontraditional gender identities with a section that reads "Mistakes happen. Sometimes you fuck up. Apologize when you do, and make it a learning experience for next time." AR Part 1, ECF 90-18 at 20 (WA – 0000354).

- Massachusetts submitted separate curriculum, dedicated solely to gender ideology, complete with a page dedicated to "The Gender Unicorn," with definitions of "Gender Identity," "Gender Expression" and more. AR Part 3, ECF 92-16 at 2 (WA-0004067).

- Massachusetts' "Right. Respect. Responsibility" curriculum included a PowerPoint presentation for a "5th Grade Supplemental Lesson." One of the PowerPoint slides is entitled "Puberty Blockers" and provides bullets that state "Stop estrogen and testosterone;" "stop body changes of puberty – but can't undo changes that have already happened;" "start taking hormones of the sex that matches their gender identity;" and "young person needs to talk with parent/caregiver/guardian and medical professional before starting." AR Part 4, ECF 93-1 at 105 (WA-0004802).

- Washington State's "Puberty: the Wonder Years" curriculum for 4th graders provides a lesson on the gender non-binary spectrum and defines gender identity being "inside feelings and thoughts," defines "sex assigned at birth" being the "outside body," and

defines "gender expression with various hair, nails, [and] clothing appearances" being "outside changeable." AR Part 7, ECF 96-3 at 39-46 (WA-0014547-0014554).

None of these examples even relate to, let alone further PREP's Objectives Requirement of educating adolescents on "abstinence and contraception for the prevention of pregnancy and sexually transmitted infections," or six statutorily enumerated "adulthood preparation subjects." 42 U.S.C. § 713(b)(2)(A). Nor do they further SRAE Objectives Requirement of teaching adolescents to refrain from sexual activity. 42 U.S.C. § 710(b)(1). HHS thus lawfully adhered to the plain meaning of the statute by concluding that gender ideology teachings fall outside the scope of the Objectives Requirements and therefore require removal.

## II.     Because Gender Ideology Content Does Not Meet Either Statute's Objectives Requirement, All Plaintiffs' APA Claims Fail

Plaintiffs' APA claims (Counts I-III) fail on the merits. First, HHS did not act contrary to law (Count I) because its actions adhered to the statutory purpose requirements proscribed by Congress in 42 U.S.C. § 713 and 42 U.S.C. § 710. Second, HHS did not act arbitrarily and capriciously (Count II) because its decision to requirement removal of gender ideology content was carefully considered and intended to ensure PREP and SRAE funds are awarded in accordance with the statutory requirements. Finally, HHS did not violate the Spending Clause or separation of powers doctrine (Count III) because its actions were consistent with the requirements of the PREP and SRAE statutes.

### A.  HHS's Decision to Remove Gender Ideology Content Is Consistent with Statutory Authority

Plaintiffs' challenge to the removal of gender ideology content from PREP and SRAE curricula as contrary to law (Count I) fails, as it rests on the false premise that Congress

authorized such content under the programs' statutory Objectives Requirements. It did not. As explained in Part I above, a plain reading of the statutes confirms that gender ideology content does not meet the overarching Objectives Requirements. HHS's decision to remove gender ideology content is consistent with the plain meaning of the statute outlined by Congress. Because HHS administers these programs as "authoritatively prescribed by Congress," its obligation is not to expand statutory purposes, but to enforce them as written. *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *Id*. at 296. Here, Congress chose precision. Therefore, the Executive has a constitutional duty to enforce congressional mandates to ensure that federal funds are spent only for congressionally authorized purposes. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010). Consistent with government-wide grant regulations issued by the Office of Management and Budget, HHS incorporated these statutory requirements into the terms and conditions of PREP and SRAE. 2 C.F.R. § 200.211(c)(1)(ii). In doing so, HHS and ACF did not add new conditions or rewire the statutes—but instead enforced the statutes' plain meaning. Plaintiffs' contrary claim fails as a matter of law.

Plaintiffs previously argued, and the Court accepted at the preliminary injunction stage— that excluding gender ideology content conflicts with the PREP program's requirement that grantees target "high-risk, vulnerable, and culturally under-represented youth populations[.]" 42 U.S.C. § 713(a)(1)(C)(ii)(III), Pl. Reply at 10, Op. and Order at 39. This argument conflates *who* may be served with *what* may be taught.

At the outset, this requirement that PREP grantees target "high-risk, vulnerable [] youth populations" is mentioned twice in the statute and both mentions are wholly separate from the

Objectives Requirement, which imposes distinct limitations. *See* 42 U.S.C. §

713(a)(1)(C)(ii)(III), § 713(c)(1). Both references also include a list, enumerated by Congress, of

these types of populations. Notably, gender ideology-related populations are not among them.

First, the goal of targeting "high-risk, vulnerable [] youth populations" is mentioned under the

"Allotments to States" section which addresses requirements for grantee applications. 42 U.S.C.

§ 713(a)(1)(C)(ii)(III)). The statute provides that applications to access allotments under PREP

must include:

> "A description of the State's plan for using the State allotments
> provided under this section to achieve such goals, especially
> among youth populations that are the most high-risk or vulnerable
> for pregnancies or otherwise have special circumstances, including
> youth in foster care, homeless youth, youth with HIV/AIDS,
> pregnant youth who are under 21 years of age, mothers who are
> under 21 years of age, and youth residing in areas with high birth
> rates for youth."

*Id*.

Second, the "Reservation of Funds" section provides that:

> "the Secretary shall reserve $10,000,000 of such amount for
> purposes of awarding grants to entities to implement
> innovative youth pregnancy prevention strategies and target
> services to high-risk, vulnerable, and culturally under-
> represented youth populations, including youth in foster care,
> homeless youth, youth with HIV/AIDS, victims of human
> trafficking, pregnant women who are under 21 years of age and
> their partners, mothers who are under 21 years of age and their
> partners, and youth residing in areas with high birth rates
> for youth."

42 U.S.C. § 713(c)(1).

When Congress enumerates specific lists, examples, or exceptions, courts presume

omission of others was intentional. *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001). Congress

could have easily included gender ideology when drafting this list if Congress was concerned

that gender minority youth were at "high-risk or vulnerable for pregnancies," or Congress could

have modified the statute's Objective Requirement if it wanted states to include gender ideology

as a component of these educational programs. Regardless of the populations educated through

PREP, funding can only be used for education on abstinence or contraception for the prevention

of sexually transmitted infections and the specified adulthood preparation subjects. And, as

explained above, gender ideology content does not fit within those purposes.

HHS's determination that gender ideology content does not satisfy the Objectives

Requirement of PREP does not interfere with any intent by Congress to target populations

particularly at risk for pregnancy. The agency thus did not act contrary to law.

## B. Removal of Gender Ideology Curricula Under PREP and SRAE is Compelled by Statute and Cannot be Arbitrary and Capricious as a Threshold Matter

At the outset, HHS's determination that gender ideology teachings are contrary to the

PREP and SRAE Objectives Requirements represents a reasoned decision aligned with

Congress's statutory objectives. By definition, it cannot be arbitrary and capricious to adhere to

the PREP and SRAE authorizing statutes and follow Congress's instructions; therefore, HHS's

actions here should not be subject to arbitrary and capricious review. *See US Magnesium, LLC v.*

*EPA*, 630 F.3d 188, 193 (D.C. Cir. 2011) (rejecting "arbitrary and capricious" challenge where

agency had "no discretion" to take desired action under applicable regulations). Indeed, it is not

arbitrary and capricious for an agency to decline to adopt an incorrect reading of a statute merely

because the correct reading of the text comes with practical costs. *See Rust v. Sullivan*, 500 U.S.

173, 187 (1991) (holding that agency action was not arbitrary or capricious because the agency

"determined that the new regulations are more in keeping with the original intent of the statute").

*See also Bostock v. Clayton Cnt.*, 590 U.S. 644, 666 (2020) (employers "warn, too, about

consequences that might follow a ruling for the employees. But none of these contentions about what the employers think the law was meant to do, or should do, allow us to ignore the law as it is."). Therefore, because HHS adhered to the governing statutory text and purpose, its determination cannot, as a matter of law, be arbitrary and capricious and should not be subjected to such review.

### 1. In any Event, Removal of Gender Ideology Curricula Was Not Arbitrary and Capricious

Even if an agency could act arbitrarily and capriciously by following the statute, HHS did not do so here.  HHS's actions and explanation reflect reasoned decision making that survives arbitrary and capricious review. Consequently, all Plaintiffs' arbitrary and capricious arguments are without merit.

Agency action must be upheld in the face of an arbitrary-and-capricious challenge so long as the agency "articulate[s] a satisfactory explanation for the action including a rational connection between the facts found and the choice made." *Little Sisters of Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020) (cleaned up and citation omitted). Under this "deferential" standard, a court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A court must "uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (citation omitted). And "a court may not substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423.

At the preliminary injunction stage, Plaintiffs argued (and the Court held) that HHS's decision to remove gender ideology content from PREP and SRAE funded curricula was

arbitrary and capricious (Count II) because (1) the action was "neither reasonable nor reasonably explained[,]" (2) the action violates sex discrimination laws and policies, (3) the action represented an unexplained change in prior position, and (4) HHS's justification for removal of the content constitutes "impermissible pretext[.]" Plaintiffs' Motion for Preliminary Injunction ("Pl. Mot.") at 21-23, Op. and Order at 39. Yet, Plaintiffs' arbitrary and capricious claim fails in all respects. First, HHS's decision to remove gender ideology content was reasonable and reasonably explained to Plaintiff States in multiple letters. Second, HHS did not violate any sex discrimination laws or policies because any and all youth remain able to participate in and benefit from PREP and SRAE funded programming. Third, HHS adequately explained that its change in position was based on a plain reading of the statutes and their Objectives Requirements. Finally, HHS's decision to remove gender ideology content was a lawful action designed to align program materials with statutory objectives – it is not a pretextual attempt to implement policy objectives.

   **a. Removal of Gender Ideology Curricula Was Reasoned and Communicated to Plaintiff States**

   HHS provided a reasonable explanation to Plaintiff States that teaching gender ideology is contrary to the Objectives Requirements set forth in the PREP and SRAE statutes. Specifically, HHS explained that the statutes do not explicitly mention gender ideology and gender ideology content is not designed to educate students on abstinence or contraception for the prevention of sexually transmitted infections, the specified adulthood preparation subjects, or sexual risk avoidance. AR Part 1, ECF 90-2.

   Plaintiffs argue that HHS "does not and cannot explain how its new conditions comply with the statutory criteria discussed above or further the programs' statutory purpose as defined

by Congress." Pl. Mot. at 21. However, explanations provided in the August 26, 2025 letter to

PREP grantees and the August 6, 2025 NOAs easily defeat that claim. First, the August 26, 2025

letter notifies recipients that "[w]hile preparing [Plaintiff State]'s PREP content for the medical

accuracy review, ACF identified content in the curricula and other program materials that fall

outside of the scope of PREP's authorizing statute at 42 U.S.C. § 713." AR Part 1, ECF 90-2.

Moreover, the letter further delineated HHS's decision regarding gender ideology and to no

longer undertake a medical accuracy review:

> ACF initiated a medical accuracy review to determine if [Plaintiff
> State]'s approach to biological sex in its PREP curricula is
> medically accurate and in compliance with the program statute and
> the terms and conditions of the award. In preparing the materials
> that we received, we saw that the curricula include gender ideology
> which is not authorized by the statute. As per this letter, [Plaintiff
> State] will need to remove this content from its PREP curricula and
> program materials. In light of this, we are changing our planned
> course of action and are no longer conducting a review for medical
> accuracy because the content that we were going to review for
> medical accuracy is outside of the subjects that are statutorily
> authorized in this program.

*Id*.

Second, the Supplemental Terms and Conditions included in the August 6, 2025 NOAs

also explain why gender ideology is outside the scope of the Objectives Requirement. AR Part 1,

ECF 90-3. The Supplemental Terms and Conditions provide, in relevant part, that "[t]he

statutory authority for the [PREP or SRAE] program under which this grant has been awarded . .

. does not authorize teaching students that gender identity is distinct from biological sex or boys

can identify as girls and vice versa, or that there is a vast spectrum of genders that are

disconnected from one's sex. Therefore, gender ideology is outside of the scope of the statutory

authority for this award." *Id*.

Page 20     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Both the letter to Plaintiff States and the Supplemental Terms and Conditions

demonstrate reasoned decision-making, easily satisfying the deferential arbitrary and capricious

standard. By concretely communicating HHS's reasoning to Plaintiff States after reviewing

Plaintiff States' federally funded materials, HHS "considered the relevant factors and articulated

a rational connection between the facts found and the choice made." *Baltimore Gas and Elec.*

*Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).

### b. No Issue of Discrimination Exists

Plaintiffs' argument that HHS's decision is arbitrary and capricious because it violates 42 U.S.C.

§ 708 is misguided. 42 U.S.C. § 708 prohibits discrimination on the basis of sex or religion under

any federal grant program.[1] There is no question that the PREP and SRAE programs remain

equally available to all youth and young adults. All youth and young adults can equally

participate in and benefit from PREP and SRAE funded programming regardless of gender

identity; HHS's decision simply limits the content of federally funded programming to align it

with the Objectives Requirements delineated by Congress.

In its preliminary injunction decision, the Court misstated Defendants'

nondiscrimination argument by claiming that Defendants "argue that the statutory and regulatory

bars on sex discrimination do not apply to federally funded program content." Op. and Order at

48. The Court thought that, "[b]y HHS's reasoning, the federal government could readily fund

programs that actually teach race, sex, or religious discrimination and could mandate that such

discrimination be included as a condition of grant funding." *Id*. But the Court and Plaintiffs

---

[1] Specifically, 42 U.S.C. § 708(a)(2) provides that "[n]o person shall on the ground of sex or religion be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity funded in whole or in part with funds made available under this subchapter."

conflate the distinction between participant eligibility (nondiscrimination) and curriculum content (statutory scope). This is apparent from the longstanding interpretation of the Department's regulations implementing Title IX of the Higher Education Amendments of 1972, which prohibits discrimination on the basis of sex in education programs or activities. 45 CFR Part 86.31(a). Since 2008, the HHS Responsible Fatherhood program, authorized at 42 U.S.C. § 603(a)(2)(C), has publicly adopted an interpretation of Title IX in which mothers may also participate in programs funded under the grant, but "programming and services provided under this legislation must be father-focused." *See* Notice of Funding Opportunity HHS-2025-ACF-OFA-ZJ-0014 at 9 (Jul. 15. 2025), https://grants.gov/search-results-detail/355696.The same applies here for gender ideology and renders Plaintiffs' claim of discrimination invalid.

### c. HHS Explained Its Change in Position, and Plaintiffs' Purported Reliance Interests are Unreasonable

HHS adequately explained that its change in position was based on a plain reading of the statutes and their Objectives Requirements. HHS acknowledged that prior guidance permitted inclusion of gender ideology materials. In ACF's August 26, 2025 letters to the Plaintiff States, the agency stated that HHS is "aware that these curricula and other program materials were previously approved by ACF. However, the prior administration erred in allowing PREP grants to be used to teach students gender ideology because that approval exceeded the agency's authority to administer the program consistent with the authorizing legislation as enacted by Congress." AR Part 1, ECF 90-2.

HHS's reassessment, moreover, was grounded in law – not ideology. HHS has a responsibility to ensure that federal funds are expended only for authorized purposes. Thus, HHS's determination that gender ideology content does not fit within the statutes' Objectives

Page 22     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Requirements provided a sound and legitimate rationale for HHS's action that survives arbitrary and capricious review. Courts routinely defer to agencies that correct course to align implementation of federal statutes with statutory boundaries. Agencies are free to change their existing policies as long as they "show that there are good reasons for the new policy." *Fox Television Stations, Inc*., 556 U.S. at 515. Agencies "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* Indeed, by acknowledging and communicating to Plaintiff States in the August 26, 2025 letter, HHS was able to "show that there are good reasons for the new policy." *Id*. *See also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). HHS's decision to remove gender ideology content was carefully considered and implemented to comply with the Objectives Requirements of the PREP and SRAE statutes.

    Plaintiffs also argue that HHS "ignored the impact of its decision on reliance interests of grantees." Pl. Mot. at 22. Yet, an agency need only consider and weigh a party's valid, reasonable reliance interests—not "unreasonable" ones. *See Libby Welding Co. v. United States*, 444 F. Supp. 987, 992 (D.D.C. 1977), *aff'd*, 595 F.2d 887 (D.C. Cir. 1979). Here, Plaintiffs point to alleged difficulties in removing gender ideology content from PREP and SRAE funded programming. However, Plaintiffs could not reasonably have developed a legitimate reliance interest in receiving federal funding for subject matter outside statutory authorization. *See Smiley v. Citibank*, 517 U.S. 735, 742 (1996) (requiring agencies to consider "legitimate reliance"). HHS's directive does not retroactively penalize grantees or revoke funds already expended, but merely clarifies future program compliance consistent with the law. No Plaintiff State has a

legitimate reliance interest in promoting curricula that Congress did not appropriate federal funding to support. And given HHS's discretion to amend terms and conditions consistent with the PREP and SRAE statutes, expectations by Plaintiffs of identical Supplemental Terms and Conditions from year to year are unreasonable.

### d. HHS's Decision is Rooted in Law, Not Pretext

Plaintiffs allege that HHS's "purported explanation for the Gender Conditions is an impermissible pretext for the preordained goal of erasing transgender, gender diverse, and DSD individuals." Pl. Reply at 17. This argument fails because HHS's decision and explanation constitute a rational basis for the agency action that is grounded in the plain text of the statute, as explained above.

Courts presume agency good faith and regularity absent clear evidence to the contrary. *See United States v. Chem. Found.*, 272 U.S. 1, 14-15 (1926). In *Chem. Found.*, the Court held that "[t]he presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Id*.

In the Court's ruling on Plaintiffs' Motion for Preliminary Injunction, the Court "infer[red]" that HHS's purported medical accuracy review was "mere pretext." Op. and Order at 49. The Court speculated that "after HHS discovered that curricula materials that reference gender identity would survive a medical accuracy review, it then invented a second pretext – that 'gender ideology is outside the scope of the authorizing statute.'" *Id*. The Court's speculation is refuted by the administrative record, which HHS has now produced. The record shows that HHS has not yet conducted a medical accuracy review of the Plaintiffs materials because, upon initial review of the documents and in the early stages of preparing for a medical accuracy review, HHS

identified gender ideology content that fell outside of the scope of the authorizing statutes. AR

Part 1, ECF 90-2. Because the content fell outside the scope of the statute, HHS did not proceed

in conducting a medical accuracy review. Thus, HHS's actions were rooted in its interpretation

of the statutes governing these programs—not pretext.

### C. HHS's Actions Do Not Violate the Constitution

Removing gender ideology content consistent with a plain reading of the statutes does not

violate the Constitution. Thus, Plaintiffs' constitutional claims (Count IV and V) both fail.

### 1. The Gender Idology Condition Does Not Violate the Spending Clause Because It is Consistent With the Relevant Statutes, Not Retroactive, and is Not Ambiguous

"Congress has broad power under the Spending Clause of the Constitution to set the

terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596

U.S. 212, 216 (2022); *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291,

296 (2006). The Supreme Court has long established that once Congress makes clear that a

condition on the use of federal funds is mandatory and enforceable, it may leave the particulars

of implementing the condition to the agency charged with administering the spending program.

*See Bennett v. Kentucky Department of Education*, 470 U.S. 656 (1985). The court, in *Pennhurst*

*State School & Hospital v. Halderman*, 451 U.S. 1 (1981), held that "legislation enacted pursuant

to the spending power is much in the nature of a contract: in return for federal funds, the States

agree to comply with federally imposed conditions." *Id*. at 17. A state must "voluntarily and

knowingly accept[] the terms" attached to federal funding for those terms to be enforceable. *Id.*

For that reason, "if Congress intends to impose a condition on the grant of federal moneys, it

must do so unambiguously." *Id.* Congress cannot "surpris[e] participating States with post

acceptance or 'retroactive' conditions." *Id.* at 25; *see also Nat'l Fed. of Indep. Bus. v. Sebelius*

(*NFIB*), 567 U.S. 584 (2012). Courts have upheld the authority of agencies to impose prospective clarifications or modifications to ensure program compliance, provided that states retain the option to decline further participation. *See Rust*, 500 U.S. at 198-200.

At the preliminary injunction stage, the Court found that Defendants violated the Spending Clause because Defendants (1) sought to impose the gender ideology condition retroactively for fiscal years 2023, 2024, and 2025, and (2) that the gender condition itself is ambiguous and failed to give Plaintiffs the requisite clear notice of the funding conditions. Op. and Order at 53. However, there is no question that the condition excluding gender ideology content applies only to prospective grant funding and that the condition itself is not ambiguous.

First, the condition is not retroactive. Defendants have been clear in their position that the condition excluding gender ideology content in the PREP and SRAE Supplemental Terms and Conditions would only apply prospectively to grant expenditures that occurred after October 1, 2025. Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("PI Opp.") at 33. The gender ideology-related condition was first included in the Supplemental Terms and Conditions for the NOAs transmitted to Plaintiffs on August 7, 2025. The NOAs clearly provide a "Federal Award Date" of August 6, 2025. *Id*., 90-3. While Defendants disagree there is any requirement in the first place to include "language in the relevant documents that inform Plaintiff States that the Gender Conditions are not retroactive," the Court erred in overlooking the "Federal Award Date" provided in the NOAs. Op. and Order at 55, AR Part 1, ECF 90-3.

Second, the condition is not ambiguous. As the Supreme Court has articulated, when operating a grant program, "the Federal Government simply [cannot] prospectively resolve every possible ambiguity concerning particular applications of the requirements of" the underlying statute. *Bennett*, 470 U.S. at 669. This is particularly true where, as here, "grant recipients had an

opportunity to seek clarification of the program requirements" from the agency. *Id*. To avoid any potential ambiguity, Defendants meticulously reviewed curricula submissions and outlined state-specific examples of impermissible teachings on gender ideology for removal. For example, in the August 26, 2025 letter to Colorado alone, ACF identified at least seven instances of impermissible gender ideology content. AR Part 1, ECF 90-2. Further, in line with *Bennett*, the August 26, 2025 letters from ACF to Plaintiff States provides that the recipient State should contact its FYSB Federal Project Officer if clarification is needed. Consequently, Plaintiffs' claim that Defendants violated the Spending Clause fails because the gender condition at issue is both prospective and unambiguous.

### 2. HHS Did Not Violate the Separation of Powers Doctrine

The Constitution vests Congress with the power to allocate funds (U.S. Const. art. I § 8, cl. 1), while simultaneously authorizing the Executive Branch to "take Care that the Laws be faithfully executed." U.S. Const. art. II § 3. "Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203–04 (2020). In executing the laws, the Federal Government "can act only through [those] officers and agents," who must in turn "act within the States." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). Once Congress enacts a funding statute, the Executive Branch is vested with the duty to execute and administer that statute in accordance with its text, purpose, and limitations. Agencies naturally exercise interpretive discretion in determining whether activities fall within or outside of the statutory scope. *See City of Arlington*, 569 U.S. at 296. When a statute authorizes funding for programs with specific educational or health related objectives, such as the statutes at issue here, the Executive Branch may appropriately interpret those objectives to restrict materials that are

misaligned with the statutory purpose. HHS's decision to exclude teaching on gender ideology, which is contrary to the Objectives Requirement of the relevant statutes, therefore constitutes lawful program administration and does not violate the separation of powers doctrine.

At the preliminary injunction stage, Plaintiffs and the Court relied on three distinguishable cases to support their contention that Defendants violated the separation of powers doctrine by implementing the gender ideology condition: *Washington v. Trump*, 768 F. Supp. 3d 1239, 1262–63 (W.D. Wash. 2025), *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 886 (W.D. Wash. 2025), and *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 432–43 (D. Md. 2025). Yet, all three of these cases are inapplicable because the gender conditions at issue were imposed by Executive Order. The Court found that distinction is a "distinction without a difference" because the President is "us[ing] an executive agency," instead of an executive order, to "affect his overreach." Op. and Order at 53. But here, as explained above, HHS has express authorization from Congress to exclude gender identity content. HHS did not violate the separation of powers by complying with statutory requirements.

HHS's determination to exclude extraneous subject matter from PREP and SRAE programming does not violate the separation of powers, but represents adherence to the plain meaning of the statutes. Accordingly, the Court should reject Plaintiffs' separation of powers claim.

## III.   Any Judgment Should Leave HHS the Authority to Review States' Curricula on a Case-By-Case Basis

Even if the Court does not adopt HHS's position that gender ideology is categorically outside the scope of the statutes' Objectives Requirements, any judgment should preserve the agency's longstanding authority to evaluate compliance with those requirements on a case-by-

case basis. Rejection of HHS's statutory interpretation would not entail that every discussion of gender ideology or lesson on gender identity necessarily satisfies the Objectives Requirements. Rather, it would simply foreclose a *per se* rule, leaving intact the agency's ability—and obligation—to assess whether particular content advances, contradicts, or is otherwise inconsistent with the purposes Congress prescribed as a condition of federal funding. Accordingly, HHS must retain the authority to evaluate individual program content submissions, including Massachusetts' separately submitted gender ideology curricula, to determine whether they are impermissible. AR Part 3, ECF 92-16 at 2. Preserving this case-by-case review authority is essential to faithfully administer the PREP and SRAE programs. HHS therefore must remain able to make content-specific determinations about whether curricular components, including those addressing gender ideology, are consistent with the objectives of the PREP and SRAE statutes, just as it does with respect to all other instructional content.

## IV.     HHS Did Not Reach the Issue of Medical Accuracy, So the Court Cannot Either

HHS's decision that gender ideology content is contrary to the Objectives Requirements of the statutes obviated the need for it to assess if gender ideology satisfies the Content Requirements. HHS reasonably concluded that discussions of gender identity – an area encompassing psychological, social, and ethical dimensions – fall outside the scope of the medical and biological content central to pregnancy prevention and sexual risk education. AR Part 1, ECF 90-2. HHS thus had no occasion to conduct a medical accuracy review of such content. Indeed, the administrative record makes clear that HHS did not conduct a medical accuracy review of Plaintiffs' curricula or otherwise take a position on whether the curricula was medically accurate. For that reason, the Court should not address the question in the first instance.

Page 29     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

A Court's review of the propriety of agency action is generally limited to "the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 4, 13 (2020) (*quoting Michigan v. EPA*, 576 U.S. 743, 758 (2015)). *See also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *OCAW v. NLRB*, 46 F.3d 82, 92-92 (D.C. Cir. 1995). Courts decline to consider issues not raised before an agency so as not to "deprive[] the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action" in the first instance. *Unemployment Comp. Comm'n v. Aragon*, 329 U.S. 143, 155 (1946).

At the preliminary injunction stage, the Court inappropriately assessed the medical accuracy of gender ideology content when the agency had not yet conducted any medical accuracy review or made any medical accuracy determination. The Court determined that "a curricula that denies the existence of transgender and gender diverse people is not medically accurate and complete." Op. and Order. at 35. In doing so, the Court inaccurately suggested that (1) the issue of medical accuracy was before the Court, and (2) if gender ideology conforms to the Content Requirements, then it furthers the programs' purposes as set forth in the Objectives Requirement. But that determination conflates the overarching goals of the PREP and SRAE Objectives Requirements with the specified Content Requirements.

As explained in Section I of the instant motion, the decision for HHS to conduct a medical accuracy review is a two-step process. Upon collecting and reviewing Plaintiff States' PREP materials in anticipation of conducting a medical accuracy review, ACF identified the gender ideology content to be outside the Objectives Requirement of the relevant statute and thus declined to move on to the second step to conduct a medical accuracy review. *See* AR Part 1, ECF 90-2. Because HHS did not conduct a medical accuracy review, the Court may not address

that issue in the first instance, thus "depriv[ing] the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Unemployment Comp. Comm'n v. Aragon*, 329 at 155.

Likewise, the Court cannot make any determination as to whether gender ideology content satisfies any other Content Requirement, such as the "culturally appropriate" requirement in 42 U.S.C. § 713(b)(2)(B)(vi) and 42 U.S.C. § 710(b)(2)(E), because HHS did not make any such determination in the first instance. For the same reason HHS did not reach the medical accuracy review, HHS did not evaluate whether teaching on gender ideology would be "culturally appropriate" under the Content Requirements because it made the threshold determination that inclusion of gender ideology content does not satisfy the Objectives Requirement. Thus, the Court cannot address that issue either.

To the extent the Court determines that HHS erred in concluding that gender ideology content does not fit within the statutes' Objectives Requirements, the appropriate remedy would be to remand the matter back to the agency so that HHS has the opportunity to consider the issue of medical accuracy and cultural appropriateness in the first instance.

## CONCLUSION

For all the reasons discussed herein, the Court should grant Defendants' Motion and enter summary judgment in Defendants' favor. In the alternative, if the Court determines that HHS erred in concluding that gender ideology content does not fit within the statutes' Objectives Requirements, Defendants respectfully request the Court remand the matter to the agency to address the issue of medical accuracy and any other Content Requirements in the first instance.

Dated: January 30, 2026                    Respectfully submitted,

                                           BRETT A. SHUMATE
                                           Assistant Attorney General
                                           Civil Division

                                           MICHELLE BENNETT
                                           Assistant Branch Director
                                           Federal Programs Branch

                                           /s/ *Jacqueline C. Lau*
                                           JACQUELINE C. LAU
                                           (DC Bar # 90024952)
                                           Trial Attorney
                                           U.S. Department of Justice
                                           Civil Division, Federal Programs Branch
                                           1100 L Street, N.W.
                                           Washington, DC 20005
                                           Telephone: (202) 598-0914
                                           Email: Jacqueline.C.Lau@usdoj.gov

                                           *Counsel for Defendants*